JUDGE SULLIVAN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

13 CV 4657

| | |
|---|---|
| MARIAH RE LTD. (IN LIQUIDATION), acting by and through GEOFFREY VARGA and JESS SHAKESPEARE, in their capacities as Liquidators thereof, <br><br> Plaintiff, <br><br> v. <br><br> AMERICAN FAMILY MUTUAL INSURANCE COMPANY, ISO SERVICES, INC., and AIR WORLDWIDE CORPORATION. <br><br> Defendants. | ECF Case <br><br> Case No. <br><br> **COMPLAINT** |



RECEIVED
JUL 0 3 2013
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff Mariah Re Ltd. ("Mariah"), by and through Geoffrey Varga and Jess Shakespeare (together, the "Liquidators"), in their capacity as Liquidators of the voluntary liquidation of Mariah, by and through Plaintiff's attorneys, Kobre & Kim LLP, as and for its Complaint against Defendants American Family Mutual Insurance Company ("American Family"), ISO Services, Inc. (d/b/a Property Claim Service, hereafter referred to as "PCS"), and AIR Worldwide Corporation ("AIR"), (collectively, "Defendants"), alleges as follows:

## INTRODUCTION

1.      Defendant American Family is an insurance company that offers a variety of insurance products to its customers, including, for example, home and auto insurance.  Among other things, American Family provides insurance coverage for policyholders who suffer losses resulting from severe weather events.

2.      Plaintiff Mariah is a special purpose vehicle established for the particular purpose of providing reinsurance (*i.e.*, insurance on insurance) to American Family for certain losses it might be required to pay its insureds as a result of severe weather events.

3.      Unlike certain types of traditional reinsurance arrangements, however, Mariah did not simply agree to pay American Family for a share of the claims it incurred.  In other words, the triggering event for payment of money by Mariah to American Family was not tied to the fact that American Family had claims it needed to pay to its customers.  Rather, Mariah's reinsurance obligations to American Family were contingent and triggered upon (1) the occurrence of certain severe weather events; *and* (2) significantly, how those weather events were reported and analyzed by Defendant PCS (also referred to hereafter as the "Reporting Agency") and Defendant AIR (also referred to hereafter as the "Calculation Agent") — entities that contracted with Mariah to provide it services, pursuant to certain underlying agreements (the "Basic Documents").

2

4.      This lawsuit stems from Defendants' misconduct and flagrant breaches of the Basic Documents with respect to a particular storm that occurred in April 2011 (hereafter referred to as "Catastrophe 42" or "CAT 42"). As described in detail below, after CAT 42 occurred, PCS and AIR analyzed and reported on CAT 42 as they were contractually obligated to do. On November 2, 2011, PCS issued its final report with respect to CAT 42. Under the terms of the Basic Documents, AIR was to calculate how much was drawn from Mariah by using the information contained in this final report and earlier reports. In other words, under the contracts, AIR was supposed to use the information contained in this November 2 report (and earlier reports) to calculate how much money, if any, Mariah owed American Family.

5.      Unfortunately, it did no such thing. To the contrary, on November 3, 2011 (*i.e.,* the very next day after PCS issued what was supposed to be its final report), PCS surreptitiously and improperly "swapped out" a report that it had previously issued regarding CAT 42 (the "Original Bulletin", Ex. 1) and replaced it with a new report containing additional information (the "Falsified Inception Bulletin"). The Falsified Inception Bulletin is a remarkable document. Among other things:

i.      Instead of being dated as of the date it was issued, November 3, 2011, PCS "backdated" it to April 5, 2011, the date of the Original Bulletin.

ii.     Likewise, the Falsified Inception Bulletin was given the same identifying number as the first report, 42-1, apparently to make it appear to onlookers that the Falsified Inception Bulletin had actually been issued months earlier in April, rather than after the "final report" had already been issued.

iii.    In fact, PCS did not indicate anywhere on the Falsified Inception Bulletin that it was *not* the same as the Original Bulletin.

iv.     This Falsified Inception Bulletin is identical in all respects to the Original Bulletin that it replaced *except for one critical difference:* PCS deceptively inserted two pages of new material—adding to the list of impacted areas, metropolitan areas in Kansas affected by CAT 42. The addition of this new material was no accident; it provided just enough information to allow AIR to determine that Mariah owed

3

American Family an amount sufficiently large to completely wipe out all of the principal that Mariah possessed.

v.  PCS removed any trace of the Original Bulletin from its website (*i.e.,* PCS replaced the Original Bulletin with the Falsified Inception Bulletin on its website without giving users of that website any reason to think the Original Bulletin ever existed).

6.  Using this Falsified Inception Bulletin as a supposed justification, Defendants, upon information and belief, conspired effectively to cause all of Mariah's money to be paid to American Family.

7.  As a result of the misconduct outlined above and described in more detail below, American Family was paid tens of millions of dollars more than it was contractually entitled to receive and would have received if the amount had been tabulated using the Original Bulletin. Despite Mariah's demand for the return of these funds improperly obtained by American Family, American Family has declined to surrender possession of the monies and to restore them to Mariah. Relief therefore is sought by Plaintiff under legal theories including breach of contract, tortious interference, conversion, and unjust enrichment, and by way of a declaration of this Court directing the specific performance of obligations undertaken by Defendants under the Basic Documents and a disgorgement of funds improperly remitted to and possessed by American Family. Plaintiff additionally seeks compensatory and consequential damages consonant with the wrongful conduct engaged in by Defendants and the harm sustained by Plaintiff.

## JURISDICTION AND VENUE

8.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2). Plaintiff Mariah is a Cayman Islands exempted company with its principal place of business in the Cayman Islands. Defendant American Family is incorporated in Wisconsin and has its principal place of business in Madison, Wisconsin. Defendant ISO Services, Inc. is incorporated

in Delaware and has its principal place of business in Jersey City, New Jersey. Defendant AIR is incorporated in Delaware and has its principal place of business in Boston, Massachusetts. The amount in controversy exceeds $75,000, exclusive of costs and interest.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(3) because Defendants have contractually submitted to the jurisdiction of this Court.

## THE PARTIES

10.     Plaintiff Mariah is an exempted company incorporated under the laws of the Cayman Islands with limited liability and was licensed as a Class B insurer in the Cayman Islands. Mariah, a special purpose vehicle, has its principal place of business located c/o Kinetic Partners (Cayman) Limited ("Kinetic"), 42 North Church Street, 1st Floor, The Harbour Centre, PO Box 10387, Grand Cayman KY1-1004, Cayman Islands.

11.     Geoffrey Varga and Jess Shakespeare of Kinetic were appointed as Liquidators of Mariah on May 1, 2013.

12.     Defendant American Family is a mutual insurance company domiciled in the State of Wisconsin with its principal place of business located at 6000 American Parkway, Madison, Wisconsin.

13.     Defendant ISO Services, Inc., operating as PCS, is a Delaware stock corporation with its principal place of business located at 545 Washington Boulevard, Jersey City, New Jersey.

14.     Defendant AIR is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 131 Dartmouth Street, Boston, Massachusetts.

## ALLEGATIONS OF FACT

### I.      MARIAH ISSUANCE

15.      On or about November 10, 2010, Mariah issued an offering circular as well as Supplement No. 1 to the Offering Circular ("Offering Supplement"), in which investors were offered the opportunity to purchase notes issued by Mariah (together, the "Offering Circular"). Under this offering ("Mariah 1"), the money raised from noteholders had contingent responsibility for Mariah's reinsurance of covered losses between $825 million and $925 million, *i.e.*, Mariah's payment obligations were triggered at $825 million, and the money raised from noteholders would be exhausted at $925 million.  (Under a second, simultaneous offering in connection with a second reinsurance agreement not implicated here, the proceeds of the sale of the *junior* "Mariah 2" notes had contingent responsibility for Mariah's reinsurance of covered losses between $725 million and $825 million.)

16.      On information and belief, on or before November 15, 2010, American Family issued one or more policies of insurance under which American Family promised to indemnify the insureds under such policies against losses sustained by reason of, among other catastrophic weather-related events, severe thunderstorms occurring within certain of the 48 contiguous states[1] of the United States (the "American Family Catastrophe Policies" and the "Covered Region," respectively).

### II.     MARIAH'S CONTRACTS WITH DEFENDANTS AND DEFENDANTS' OBLIGATIONS THEREUNDER

17.      On or about November 15, 2010, Mariah entered into an indenture agreement (the "Indenture") and series supplement agreements (the "Series Supplement") with Deutsche Bank

---

[1] These states include Arizona, Colorado, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Minnesota, Missouri, Nebraska, Nevada, North Dakota, Ohio, Oregon, South Dakota, Utah, Washington, and Wisconsin.

Trust Company Americas ("DB Americas"), Deutsche Bank AG, London Branch ("DB AG"). On or about November 15, 2010, American Family and Mariah entered into a reinsurance agreement (the "Reinsurance Agreement") under which Mariah promised to make reinsurance payments to American Family in the event that severe storm losses were incurred in the Covered Region, during the relevant period of time, that gave rise to computed losses (as determined in accordance with a contractually-specified process and formula) between $825 million and $925 million. (*See infra.*)

18.     On or about November 15, 2010, Mariah and PCS entered into the PCS License Agreement (the "Reporting Agency Agreement"), pursuant to which PCS was to act as the "Reporting Agency". As the Reporting Agency, PCS was obligated to provide (i) a "Bulletin" in which the first notice of its assignment of a catastrophe serial number to a severe storm event was reported, and (ii) "Estimates," that is, reports providing "Preliminary," "Resurvey," and "Final" Estimates of property damage attributable to the relevant catastrophe on a state-by-state basis. The catastrophe number assigning Bulletin and the "Estimates" are defined in the Reinsurance Agreement as "Catastrophe Bulletins."[2]

19.     The initial Catastrophe Bulletin is analogous to a birth certificate in that it is typically issued within 24-48 hours of a storm, and it not only assigns the serial number, but also provides basic information about the storm—*e.g.,* where and when the storm hit, how long it lasted, how severe it was, and which locations were impacted.

20.     The basic information is largely based on Severe Weather Summaries, which are reports describing severe weather, as well as current weather information, including conditions, forecasts, affected locations and maps, that PCS publishes daily on its website.

---

[2] See Exs. 2 and 3: Reporting Agency Agreement and Reinsurance Agreement for defined term definitions.

21.     Following the initial Catastrophe Bulletin, PCS could issue "Extension" Bulletins to extend the duration of the storm and the affected geographic area—*e.g.,* one additional day, three additional states, etc.

22.     Typically, within 30 days of the initial Catastrophe Bulletin, PCS issues a "Preliminary Estimate" of insured property damage, providing an initial estimate of losses on the ground on a state-by-state basis.   For catastrophes in which estimated losses exceed $250 million, PCS issues subsequent reports known as "Resurvey Estimates" of insured property damage to report the revised loss amount estimate.

23.     For severe weather events, it was typical for PCS to issue up to three or four "Estimates" (*i.e.,* a "Preliminary," one or two "Resurvey" and a "Final"), which reports were published over the course of six to nine months and in which the initial loss estimate in the Catastrophe Bulletin could be revised up or down.

24.     The last PCS-issued Estimate for a particular catastrophe is the "Final Estimate" of insured property damage, in which PCS pledges that the estimate is fully developed, that no further surveys will be conducted, and that the estimate constitutes PCS's final estimate.

25.     Because of the central importance of PCS's reporting on catastrophes to the financial interests of Mariah, the Offering Circular and the PCS Reporting Agency Agreement both detailed PCS's practice of posting each of the contractually-required reports on a specified, limited-access website, known as "ISOnet PCS" (also referred to hereafter as "ISOnet"), to which interested parties could subscribe for a fee of $15,000 to gain access to PCS's reports.

26.     On or about November 15, 2010, Mariah and Defendant AIR entered into the "Calculation Agent Agreement" (Ex. 4).   Pursuant to the Calculation Agent Agreement, Defendant AIR was obligated to review and analyze the data compiled in the reports prepared by

PCS, and to translate that data into estimated losses that would trigger Mariah's obligation to make reinsurance payments.

27.       Specifically, AIR was to calculate the Loss Payment Amount, defined in the Basic Documents as the amount owed by Mariah to American Family.  The Loss Payment Amount was calculated using the Aggregate Loss Amounts, *i.e.*, the sum of the Event Loss Amounts of all Covered Events for a given period.

    i.       The Event Loss Amount, in turn, is defined in the Basic Documents as the lesser of the Event Index Value and $300 million.

    ii.       The formula used by AIR to calculate the Event Index Value is:

$$\text{Event Index Value} = \Sigma_s(M_s \cdot I^M_s + N_s \cdot I^N_s)$$

    iii.       The components of this formula are defined in the Basic Documents as follows:

- $M_s$ = the Metro Payout Factor for each state (S) with a Metro occurrence in the Covered Area

- $I^M_s$ = the Metro Insured Industry Loss Amount for each state (S) with a Metro Occurrence in the Covered Area

- $N_s$ = the Non-Metro Payout Factor for each state (S) without a Metro Occurrence in the Covered Area

- $I^N_s$ = the Non-Metro Insured Industry Loss Amount for each state (S) with a Metro Occurrence in the Covered Area.

28.       The Event Index Value—and in particular, the difference between the "Metro" and "Non-Metro" components in the formula above—is key to understanding the relationship between PCS and AIR, and how their respective duties under the Basic Documents determined the amount owed by Mariah to American Family, or the Event Loss Amount, as defined above.

Specifically, the Calculation Agent Agreement obligated AIR to determine whether a catastrophe occurred, in whole or in part, in a "Metro County" of any impacted State (as that term is defined, and relevant counties are identified, in the Offering Circular and the Series Supplement). Using information readily and publicly available on government websites, AIR was to determine whether any location *identified by PCS in a Catastrophe Bulletin* was in a Metro County.

29.     Estimates of insurable losses for these impacted areas, as reported by PCS, were then to be multiplied by a contractually-prescribed percentage (the "Payout Factor") to derive the amount (if any) payable to American Family by Mariah.

30.     Each State covered under the Reinsurance Agreement was assigned a "*Metro* Payout Factor" and a "*Non-Metro* Payout Factor" (*see supra*, Event Index Value formula)—the Non-Metro Payout Factor being in most instances materially lower than the Metro Payout Factor (presumably to account for the higher level of damage and loss that would be sustained if storms impacted more heavily-developed and populated areas). The respective Metro and Non-Metro Payout Factors for each state were set forth in the Offering Circular as well as in the Series Supplement.

  i.     For example, with respect to Kansas, the Metro Payout Factor was 25.36%, in contrast to the Non-Metro Payout Factor of 8.82%.

31.     As per the Event Index Value formula, the Metro and Non-Metro Payout Factors were then to be applied, respectively, to the Metro and Non-Metro Insured Industry Loss Amounts, defined in the Basic Documents as follows:

  i.     "Metro Insured Industry Loss Amount" referred to the amount of insured industry personal and automobile property losses incurred in a location determined to be a Metro area, as verified by AIR, in a state covered by the Reinsurance Agreement.

      ii.     "Non-Metro Insured Industry Loss Amount" referred to the same losses in a covered state that AIR verified not to contain affected locations that are Metro areas.

32.     Importantly, under Section 3 of the Calculation Agent Agreement, if no specific or precise geographical information that AIR could use to implicate a Metro County appeared in the initial Catastrophe Bulletin, "Extension" or "Estimate" reports prepared by PCS, AIR was obligated to treat the estimated losses in such State as Non-Metro and apply the Non-Metro Payout Factor in performing its calculations.

33.     Likewise, under the Calculation Agent Agreement, AIR was to rely exclusively on PCS's Catastrophe Bulletins to perform the requisite calculations and make the requisite determinations.

34.     Another significant limitation on AIR's calculations was the Final Development Date, defined in the Reinsurance Agreement as the date *after* which any change in the Insured Industry Loss Amount (*i.e.*, the Non-Metro Insured Industry Loss Amount together with the Metro Insured Industry Loss Amount) could not be taken into account in calculating the various loss amounts associated with the event. (*See infra.*)

## III.   CATASTROPHE 42

35.     In April and May 2011, a series of severe storms and tornadoes struck in the United States. One of those storms began on April 3, 2011, and continued through April 5, 2011. It was denominated "Catastrophe Serial No. 42" by PCS for purposes of tracking and developing expected losses.

36.     Among the areas impacted by CAT 42 was Kansas, one of the states covered under the Mariah Reinsurance Agreement.

###### A.    PCS's Reports Regarding Catastrophe 42

37.    On or about April 5, 2011, PCS issued a Catastrophe Bulletin identified as "42-1"—a designation that identified this bulletin as PCS's initial bulletin in respect of CAT 42.

38.    The Original Bulletin was four pages long and contained no information about the geographical locations of loss in Kansas or the other affected states.[3]  As a result, under the terms of the Calculation Agent Agreement, the Original Bulletin required AIR to apply the relevant Non-Metro Payout Factor in calculating estimated losses in Kansas, as well as for other states (unless, of course, PCS added such information to a future Catastrophe Bulletin).  PCS posted the Original Bulletin on the ISOnet PCS website on or about April 5, 2011.

39.    On April 25, 2011, PCS published a "Preliminary Estimate of Insured Property Damage" associated with CAT 42 (the "Preliminary Estimate").  The CAT 42 Preliminary Estimate stated that it was issued "[w]ith further reference to our [Original Bulletin] dated April 5, 2011."  In this document, PCS estimated losses from insured property damage in Kansas in the amount of $360 million.  Still, PCS provided no geographical information for Kansas in the Preliminary Estimate, and in accordance with the terms of the Calculation Agent Agreement, AIR would have been required to apply the Non-Metro Payout Factor.  PCS posted the Preliminary Estimate on the ISOnet PCS website on or about April 25, 2011.

40.    On June 27, 2011, PCS published a "Re-Survey Estimate of Insured Property Damage" in respect of CAT 42 ("First Resurvey Estimate").  The First Resurvey Estimate stated that it was issued "[w]ith further reference to our [CAT 42 Preliminary Estimate] dated April 25, 2011."  PCS's First Resurvey Estimate provided a re-survey estimate of insured property damage

---

[3] Other affected states include Georgia, Iowa, Illinois, Kentucky, Missouri, North Carolina, South Carolina, Tennessee, and Wisconsin.

for Kansas in the amount of $513 million in insured loss.[4]  The First Resurvey Estimate stated that "[t]his estimate is not fully developed", and provided no information specifying the geographical impact of CAT 42 within Kansas.   Thus, consistent with the terms of the Calculation Agent Agreement, the First Resurvey Estimate continued to call for AIR's application of the Non-Metro Payout Factor.  PCS posted the First Resurvey Estimate on the ISOnet PCS website on or about June 27, 2011.

41.     On August 31, 2011, PCS published a second "Re-Survey Estimate of Insured Property Damage" in respect of CAT 42 ("Second Resurvey Estimate").  The Second Resurvey Estimate stated that it was issued "[w]ith further reference to our [First Resurvey Estimate] dated June 27, 2011."   The Second Resurvey Estimate provided a second "re-survey estimate of insured property damage" for Kansas in the amount of $710 million in insured loss.  Again, this Resurvey Estimate provided no information specifying the geographical impact of CAT 42 within Kansas.  As such, consistent with the terms of the Calculation Agent Agreement, the Second Resurvey Estimate continued to call for AIR's application of the Non-Metro Payout Factor.  PCS posted the Second Resurvey Estimate on the ISOnet PCS website on or about August 31, 2011.

42.     On November 2, 2011, PCS issued a "Final Estimate of Insured Property Damage" with respect to CAT 42 ("Final Estimate").  The Final Estimate stated that it was issued "[w]ith further reference to our [Second Resurvey Estimate] dated August 31, 2011."  PCS's Final Estimate provided no information indicating the geographical impact of CAT 42 to Metro areas within Kansas.  Thus, the terms of the Reinsurance Agreement, the Series Supplement, and

---

[4] The "insured loss" amount refers only to losses re-insured by Mariah under the Basic Documents, and therefore does not take into account commercial losses reported by PCS, which were not re-insured.

the Calculation Agent Agreement, required that AIR apply the Non-Metro Payout Factor in calculating insured losses.

43.     In the Final Estimate, PCS provided exactly that—a "*final* estimate of insured property damage" (emphasis added)—for Kansas in the amount of $710 million in insured losses, the same loss figure that had been included in the August 31, 2011 Second Resurvey Estimate.   PCS stated in the Final Estimate that "[t]his estimate is…fully developed"; and accordingly, "[n]o further surveys will be conducted."

44.     In accordance with its practices under the PCS Reporting Agency Agreement, PCS posted each of its reports regarding CAT 42 on its ISOnet website on or about the respective issuance date of each such report.  In that regard, PCS posted the Final Estimate on the ISOnet PCS website on or about November 2, 2011.

45.     Once PCS issued its Final Estimate on November 2, 2011, AIR had everything it needed from PCS in order to calculate the cost of CAT 42 to American Family (*see infra*, the Event Loss Amount), and thereby the amount of money that Mariah owed to American Family as a result of CAT 42 (*see infra*, the Loss Payment Amount).

46.     Moreover, once that Final Estimate was issued, PCS could not issue any additional Catastrophe Bulletins—by definition a Catastrophe Bulletin is either a "birth certificate" for the storm, or a Resurvey Estimate, the last of which is the Final Resurvey Estimate.

47.     Under the Calculation Agent Agreement, AIR was only permitted to consider valid Catastrophe Bulletins issued by PCS in calculating losses related to a covered event.  AIR therefore could not, by definition, consider any invalid report PCS might try to issue after a Final Estimate.

48.     Moreover, the Calculation Agent Agreement, in defining the Final Development Date, is clear that, once a Final Resurvey Estimate is issued, any change to the Insured Industry Loss Amount (*i.e.*, Non-Metro Insured Industry Loss Amount or Metro Insured Industry Loss Amount) cannot be taken into account in calculating the various loss amounts associated with the event, such as the Event Index Value. (*See infra.*)

49.     Final Development Date is defined as follows:

> "Final Development Date" shall mean the date after which any change in the Insured Industry Loss Amount for a Covered Event will not be taken into account for purposes of calculating the Event Index Value and any corresponding Event Loss Amount, which date shall be the earliest of (a) eighteen (18) months from the Date of Loss for such Covered Event, (b) the date that the Reporting Agency releases a Catastrophe Bulletin with its final resurvey estimate for such Covered Event and (c) ten (10) Business Days prior to the Final Extended Redemption Date.

50.     For CAT 42, the Final Development Date is November 2, 2011—the date that PCS, as Reporting Agency, released its Final (Resurvey) Estimate for CAT 42. Therefore, after November 2, 2011, AIR could not take into account any changes to the Metro and Non-Metro Insured Industry Loss Amounts, which, taken together, represent the Insured Industry Loss Amount.

**B.     AIR's Reports Regarding Catastrophe 42**

51.     On September 23, 2011, AIR transmitted a letter to, among others, Mariah, American Family, DB AG, and DB Americas, advising that AIR had "performed the procedures required to be performed" pursuant to its Calculation Agent Agreement with respect to CAT 42 (the "Event Report").

52.     Attached to AIR's September 23, 2011 Event Report were copies, sequenced in chronological order (as per AIR's business practice), of the previously-issued Original Bulletin, Preliminary Estimate, First Resurvey Estimate, and Second Resurvey Estimate for CAT 42 (and

all other known Catastrophes at the time), none of which identified any Metro areas impacted by CAT 42. According to the Event Report, AIR "determined" that CAT 42 was a "Covered Event."

53.     On or about November 1, 2011, AIR submitted a second Event Report pursuant to Section 3 of the Calculation Agent Agreement.[5] As with the previous Event Report related to CAT 42, this report annexed the CAT 42 Bulletins previously issued by PCS, including the Original Bulletin dated April 5, 2011, which did not include any Metro locations.

C.     *PCS's Falsified Inception Bulletin*

*PCS Improperly Issues a Resurvey Bulletin after the Final Estimate*

54.     On or about November 3, 2011, based on information and belief, PCS improperly removed the Original Bulletin from the record of the development of estimated CAT 42 losses such that it was no longer available on ISOnet, and surreptitiously substituted it with the Falsified Inception Bulletin.

55.     The Falsified Inception Bulletin added two new pages that were *not* part of the Original Bulletin. These two new pages provided detailed information regarding the purported impact of CAT 42 within Kansas. The detail of these two new pages was not included in any prior Catastrophe Bulletin issued by PCS, including the Final Estimate that had been issued just one day earlier.

*The Deceptive Nature of the Falsified Inception Bulletin and PCS's Attempts to Cover It Up*

56.     Notwithstanding its claims to the contrary (described below), it is plain that PCS issued the Falsified Inception Bulletin in order to allow AIR to perform its calculations in such a way as to cause Mariah to have to pay significantly more money to American Family.

---

[5] This report was issued for Mariah 2.

57.    In order to orchestrate the scheme, PCS needed to act in contravention of the Basic Documents—PCS could neither issue another initial estimate, or birth certificate, for CAT 42, nor could it issue another Resurvey Estimate because the Final Estimate had already been published.  PCS therefore attempted to circumvent these rules in a way so as to avoid calling attention to what it had done.

58.    By publishing the Falsified Inception Bulletin, PCS issued a separate and impermissible estimate of damages in breach of the Offering Circular, which assured investors that PCS would not prepare any "separate estimates . . . for purposes of the Notes or the respective Reinsurance Agreements."

59.    Though the Original Bulletin was actually falsified on or about November 3, 2011, PCS backdated the document to April 5, 2011, the date of the Original Bulletin.

60.    PCS did not say either on the document itself or anywhere else on its website that it had backdated the document.  To the contrary, on information and belief, in order to make it appear to onlookers that the Falsified Inception Bulletin had existed all along, PCS (a) gave the Falsified Inception Bulletin the same name as the Original Bulletin (*i.e.,* it was designated "42-1"); (b) replaced the Original Bulletin with the Falsified Inception Bulletin on its website; and (c) deleted the Original Bulletin from the website altogether.

61.    Unlike other bulletins issued by PCS, upon information and belief, the Falsified Inception Bulletin was not posted in sequential order according to the date it was actually created, *i.e. after* the five existing Catastrophe Bulletins for CAT 42.

62.    Upon information and belief, PCS caused subscribers *not* to receive notice that the Falsified Inception Bulletin had been issued. Specifically, the ISOnet PCS website permitted subscribers to enroll to receive automatic e-mail notifications when new catastrophe bulletins