UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



---

MARIAH RE LTD. (IN LIQUIDATION), acting by
and through GEOFFREY VARGA and JESS
SHAKESPEARE, in their capacities as Liquidators
thereof.

Plaintiff,

v.

AMERICAN FAMILY MUTUAL INSURANCE
COMPANY, ISO SERVICES, INC., and AIR
WORLDWIDE CORPORATION.

Defendants.

ECF Case

Case No. 13-CV-4657 (RJS)

**AMENDED COMPLAINT**

Plaintiff Mariah Re Ltd. ("Mariah"), by and through Geoffrey Varga and Jess Shakespeare (together, the "Liquidators"), in their capacity as Liquidators of the voluntary liquidation of Mariah, by and through Plaintiff's attorneys, Kobre & Kim LLP, as and for its Complaint against Defendants American Family Mutual Insurance Company ("American Family"), ISO Services, Inc. (d/b/a Property Claim Service, hereafter referred to as "PCS"), and AIR Worldwide Corporation ("AIR"), (collectively, "Defendants"), alleges as follows:

## INTRODUCTION

1.      Defendant American Family is an insurance company that offers a variety of insurance products to its customers, including, for example, home and auto insurance. Among other things, American Family provides insurance coverage for policyholders who suffer losses resulting from severe weather events.

2.      Plaintiff Mariah is a special purpose vehicle established for the particular purpose of providing reinsurance (*i.e.*, insurance on insurance) to American Family for certain losses it might be required to pay its insureds as a result of severe weather events.

3.      Unlike certain types of traditional reinsurance arrangements, however, Mariah did not simply agree to pay American Family for a share of the claims it incurred. In other words, the triggering event for payment of money by Mariah to American Family was not tied to the fact that American Family had claims it needed to pay to its customers. Rather, Mariah's reinsurance obligations to American Family were contingent and triggered upon (1) the occurrence of certain severe weather events; *and* (2) significantly, how those weather events were reported and analyzed by Defendant PCS (also referred to hereafter as the "Reporting Agency") and Defendant AIR (also referred to hereafter as the "Calculation Agent") — entities that contracted with Mariah to provide it services, pursuant to certain underlying agreements (the "Basic Documents").

2

4. This lawsuit stems from Defendants' misconduct and flagrant breaches of the Basic Documents with respect to a particular storm that occurred in April 2011 (hereafter referred to as "Catastrophe 42" or "CAT 42"). As described in detail below, after CAT 42 occurred, PCS and AIR analyzed and reported on CAT 42 as they were contractually obligated to do. On November 2, 2011, PCS issued its final report with respect to CAT 42. Under the terms of the Basic Documents, AIR was to calculate how much was drawn from Mariah by using the information contained in this final report and earlier reports. In other words, under the contracts, AIR was supposed to use the information contained in this November 2 report (and earlier reports) to calculate how much money, if any, Mariah owed American Family.

5. Unfortunately, it did no such thing. To the contrary, on November 3, 2011 (*i.e.,* the very next day after PCS issued what was supposed to be its final report), PCS surreptitiously and improperly "swapped out" a report that it had previously issued regarding CAT 42 (the "Original Bulletin", Ex. 1) and replaced it with a new report containing additional information (the "Falsified Inception Bulletin"). The Falsified Inception Bulletin is a remarkable document. Among other things:

   i. Instead of being dated as of the date it was issued, November 3, 2011, PCS "backdated" it to April 5, 2011, the date of the Original Bulletin.

   ii. Likewise, the Falsified Inception Bulletin was given the same identifying number as the first report, 42-1, apparently to make it appear to onlookers that the Falsified Inception Bulletin had actually been issued months earlier in April, rather than after the "final report" had already been issued.

   iii. In fact, PCS did not indicate anywhere on the Falsified Inception Bulletin that it was *not* the same as the Original Bulletin.

   iv. This Falsified Inception Bulletin is identical in all respects to the Original Bulletin that it replaced ***except for one critical difference***: PCS deceptively inserted two pages of new material—adding, to the list of impacted areas, metropolitan areas in Kansas affected by CAT 42. The addition of this new material was no accident; it provided just enough information to allow AIR to determine that Mariah owed

3

American Family an amount sufficiently large to completely wipe out all of the principal that Mariah possessed.

    v.     PCS removed any trace of the Original Bulletin from its website (*i.e.,* PCS replaced the Original Bulletin with the Falsified Inception Bulletin on its website without giving users of that website any reason to think the Original Bulletin ever existed).

6.     Using this Falsified Inception Bulletin as a supposed justification, Defendants, upon information and belief, conspired effectively to cause all of Mariah's money to be paid to American Family.

7.     As a result of the misconduct outlined above and described in more detail below, American Family was paid tens of millions of dollars more than it was contractually entitled to receive and would have received if the amount had been tabulated using the Original Bulletin. Despite Mariah's demand for the return of these funds improperly obtained by American Family, American Family has declined to surrender possession of the monies and to restore them to Mariah. Relief therefore is sought by Plaintiff under legal theories including breach of contract (including but not limited to breach of the implied covenant of good faith and fair dealing), tortious interference, conversion, and unjust enrichment, and by way of a declaration of this Court directing the specific performance of obligations undertaken by Defendants under the Basic Documents and a disgorgement of funds improperly remitted to and possessed by American Family. Plaintiff additionally seeks compensatory and consequential damages consonant with the wrongful conduct engaged in by Defendants and the harm sustained by Plaintiff.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2). Plaintiff Mariah is a Cayman Islands exempted company with its principal place of business in the Cayman Islands. Defendant American Family is incorporated in Wisconsin and has its

principal place of business in Madison, Wisconsin.  Defendant ISO Services, Inc. is incorporated in Delaware and has its principal place of business in Jersey City, New Jersey.  Defendant AIR is incorporated in Delaware and has its principal place of business in Boston, Massachusetts.  The amount in controversy exceeds $75,000, exclusive of costs and interest.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(3) because Defendants have contractually submitted to the jurisdiction of this Court.

## THE PARTIES

10.     Plaintiff Mariah is an exempted company incorporated under the laws of the Cayman Islands with limited liability and was licensed as a Class B insurer in the Cayman Islands.  Mariah, a special purpose vehicle, has its principal place of business located c/o Kinetic Partners (Cayman) Limited ("Kinetic"), 42 North Church Street, 1st Floor, The Harbour Centre, PO Box 10387, Grand Cayman KY1-1004, Cayman Islands.

11.     Geoffrey Varga and Jess Shakespeare of Kinetic were appointed as Liquidators of Mariah on May 1, 2013.

12.     Defendant American Family is a mutual insurance company domiciled in the State of Wisconsin with its principal place of business located at 6000 American Parkway, Madison, Wisconsin.

13.     Defendant ISO Services, Inc., operating as PCS, is a Delaware stock corporation with its principal place of business located at 545 Washington Boulevard, Jersey City, New Jersey.

14.     Defendant AIR is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 131 Dartmouth Street, Boston, Massachusetts.

## ALLEGATIONS OF FACT

I.      **MARIAH ISSUANCE**

15.     On or about November 10, 2010, Mariah issued an offering circular as well as Supplement No. 1 to the Offering Circular ("Offering Supplement"), in which investors were offered the opportunity to purchase notes issued by Mariah (together, the "Offering Circular"). Under this offering ("Mariah 1"), the money raised from noteholders had contingent responsibility for Mariah's reinsurance of covered losses between $825 million and $925 million, *i.e.*, Mariah's payment obligations were triggered at $825 million, and the money raised from noteholders would be exhausted at $925 million.  (Under a second, simultaneous offering in connection with a second reinsurance agreement not implicated here, the proceeds of the sale of the *junior* "Mariah 2" notes had contingent responsibility for Mariah's reinsurance of covered losses between $725 million and $825 million.)

16.     On information and belief, on or before November 15, 2010, American Family issued one or more policies of insurance under which American Family promised to indemnify the insureds under such policies against losses sustained by reason of, among other catastrophic weather-related events, severe thunderstorms occurring within certain of the 48 contiguous states[1] of the United States (the "American Family Catastrophe Policies" and the "Covered Region," respectively).

II.     **MARIAH'S CONTRACTS WITH DEFENDANTS AND DEFENDANTS' OBLIGATIONS THEREUNDER**

17.     On or about November 15, 2010, Mariah entered into an indenture agreement (the "Indenture") and series supplement agreements (the "Series Supplement") with Deutsche Bank

---

[1] These states include Arizona, Colorado, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Minnesota, Missouri, Nebraska, Nevada, North Dakota, Ohio, Oregon, South Dakota, Utah, Washington, and Wisconsin.

Trust Company Americas ("DB Americas"), Deutsche Bank AG, London Branch ("DB AG"). On or about November 15, 2010, American Family and Mariah entered into a reinsurance agreement (the "Reinsurance Agreement") under which Mariah promised to make reinsurance payments to American Family in the event that severe storm losses were incurred in the Covered Region, during the relevant period of time, that gave rise to computed losses (as determined in accordance with a contractually-specified process and formula) between $825 million and $925 million.  (*See infra.*)

18.     On or about November 15, 2010, Mariah and PCS entered into the PCS License Agreement (the "Reporting Agency Agreement"), pursuant to which PCS was to act as the "Reporting Agency".  As the Reporting Agency, PCS was obligated to provide (i) a "Bulletin" in which the first notice of its assignment of a catastrophe serial number to a severe storm event was reported, and (ii) "Estimates," that is, reports providing "Preliminary," "Resurvey," and "Final" Estimates of property damage attributable to the relevant catastrophe on a state-by-state basis.  The catastrophe number assigning Bulletin and the "Estimates" are defined in the Reinsurance Agreement as "Catastrophe Bulletins."[2]

19.     The initial Catastrophe Bulletin is analogous to a birth certificate in that it is typically issued within 24-48 hours of a storm, and it not only assigns the serial number, but also provides basic information about the storm—*e.g.,* where and when the storm hit, how long it lasted, how severe it was, and which locations were impacted.

20.     The basic information is largely based on Severe Weather Summaries, which are reports describing severe weather, as well as current weather information, including conditions, forecasts, affected locations and maps, that PCS publishes daily on its website.

---

[2] See Exs. 2 and 3: Reporting Agency Agreement and Reinsurance Agreement for defined term definitions.

21.     Following the initial Catastrophe Bulletin, PCS could issue "Extension" Bulletins to extend the duration of the storm and the affected geographic area—*e.g.,* one additional day, three additional states, etc.

22.     Typically, within 30 days of the initial Catastrophe Bulletin, PCS issues a "Preliminary Estimate" of insured property damage, providing an initial estimate of losses on the ground on a state-by-state basis.   For catastrophes in which estimated losses exceed $250 million, PCS issues subsequent reports known as "Resurvey Estimates" of insured property damage to report the revised loss amount estimate.

23.     For severe weather events, it was typical for PCS to issue up to three or four "Estimates" (*i.e.,* a "Preliminary," one or two "Resurvey" and a "Final"), which reports were published over the course of six to nine months and in which the initial loss estimate in the Catastrophe Bulletin could be revised up or down.

24.     The last PCS-issued Estimate for a particular catastrophe is the "Final Estimate" of insured property damage, in which PCS pledges that the estimate is fully developed, that no further surveys will be conducted, and that the estimate constitutes PCS's final estimate.

25.     Because of the central importance of PCS's reporting on catastrophes to the financial interests of Mariah, the Offering Circular and the PCS Reporting Agency Agreement both detailed PCS's practice of posting each of the contractually-required reports on a specified, limited-access website, known as "ISOnet PCS" (also referred to hereafter as "ISOnet"), to which interested parties could subscribe for a fee of $15,000 to gain access to PCS's reports.

26.     On or about November 15, 2010, Mariah and Defendant AIR entered into the "Calculation Agent Agreement" (Ex. 4).   Pursuant to the Calculation Agent Agreement, Defendant AIR was obligated to review and analyze the data compiled in the reports prepared by

PCS, and to translate that data into estimated losses that would trigger Mariah's obligation to make reinsurance payments.

27.     Specifically, AIR was to calculate the Loss Payment Amount, defined in the Basic Documents as the amount owed by Mariah to American Family.  The Loss Payment Amount was calculated using the Aggregate Loss Amounts, *i.e.,* the sum of the Event Loss Amounts of all Covered Events for a given period.

     i.     The Event Loss Amount, in turn, is defined in the Basic Documents as the lesser of the Event Index Value and $300 million.

     ii.     The formula used by AIR to calculate the Event Index Value is:

$$\text{Event Index Value} = \Sigma_s(M_s * I^M_s + N_s * I^N_s)$$

     iii.     The components of this formula are defined in the Basic Documents as follows:

- $M_s$ = the Metro Payout Factor for each state (S) with a Metro occurrence in the Covered Area

- $I^M_s$ = the Metro Insured Industry Loss Amount for each state (S) with a Metro Occurrence in the Covered Area

- $N_s$ = the Non-Metro Payout Factor for each state (S) without a Metro Occurrence in the Covered Area

- $I^N_s$ = the Non-Metro Insured Industry Loss Amount for each state (S) with a Metro Occurrence in the Covered Area.

28.     The Event Index Value—and in particular, the difference between the "Metro" and "Non-Metro" components in the formula above—is key to understanding the relationship between PCS and AIR, and how their respective duties under the Basic Documents determined the amount owed by Mariah to American Family, or the Event Loss Amount, as defined above.

9

Specifically, the Calculation Agent Agreement obligated AIR to determine whether a catastrophe occurred, in whole or in part, in a "Metro County" of any impacted State (as that term is defined, and relevant counties are identified, in the Offering Circular and the Series Supplement).  Using information readily and publicly available on government websites, AIR was to determine whether any location *identified by PCS in a Catastrophe Bulletin* was in a Metro County.

29.     Estimates of insurable losses for these impacted areas, as reported by PCS, were then to be multiplied by a contractually-prescribed percentage (the "Payout Factor") to derive the amount (if any) payable to American Family by Mariah.

30.     Each State covered under the Reinsurance Agreement was assigned a "*Metro* Payout Factor" and a "*Non-Metro* Payout Factor" (*see supra*, Event Index Value formula)—the Non-Metro Payout Factor being in most instances materially lower than the Metro Payout Factor (presumably to account for the higher level of damage and loss that would be sustained if storms impacted more heavily-developed and populated areas).  The respective Metro and Non-Metro Payout Factors for each state were set forth in the Offering Circular as well as in the Series Supplement.

     i.     For example, with respect to Kansas, the Metro Payout Factor was 25.36%, in contrast to the Non-Metro Payout Factor of 8.82%.

31.     As per the Event Index Value formula, the Metro and Non-Metro Payout Factors were then to be applied, respectively, to the Metro and Non-Metro Insured Industry Loss Amounts, defined in the Basic Documents as follows:

     i.     "Metro Insured Industry Loss Amount" referred to the amount of insured industry personal and automobile property losses incurred in a location determined to be a Metro area, as verified by AIR, in a state covered by the Reinsurance Agreement.

        ii.      "Non-Metro Insured Industry Loss Amount" referred to the same losses in a covered state that AIR verified not to contain affected locations that are Metro areas.

32.     Importantly, under Section 3 of the Calculation Agent Agreement, if no specific or precise geographical information that AIR could use to implicate a Metro County appeared in the initial Catastrophe Bulletin, "Extension" or "Estimate" reports prepared by PCS, AIR was obligated to treat the estimated losses in such State as Non-Metro and apply the Non-Metro Payout Factor in performing its calculations.

33.     Likewise, under the Calculation Agent Agreement, AIR was to rely exclusively on PCS's Catastrophe Bulletins to perform the requisite calculations and make the requisite determinations.

34.     Another significant limitation on AIR's calculations was the Final Development Date, defined in the Reinsurance Agreement as the date *after* which any change in the Insured Industry Loss Amount (*i.e.*, the Non-Metro Insured Industry Loss Amount together with the Metro Insured Industry Loss Amount) could not be taken into account in calculating the various loss amounts associated with the event. (*See infra.*)

## III.   CATASTROPHE 42

35.     In April and May 2011, a series of severe storms and tornadoes struck in the United States. One of those storms began on April 3, 2011, and continued through April 5, 2011. It was denominated "Catastrophe Serial No. 42" by PCS for purposes of tracking and developing expected losses.

36.     Among the areas impacted by CAT 42 was Kansas, one of the states covered under the Mariah Reinsurance Agreement.

### A.    PCS's Reports Regarding Catastrophe 42

37.    On or about April 5, 2011, PCS issued a Catastrophe Bulletin identified as "42-1"—a designation that identified this bulletin as PCS's initial bulletin in respect of CAT 42.

38.    The Original Bulletin was four pages long and contained no information about the geographical locations of loss in Kansas or the other affected states.[3]  As a result, under the terms of the Calculation Agent Agreement, the Original Bulletin required AIR to apply the relevant Non-Metro Payout Factor in calculating estimated losses in Kansas, as well as for other states (unless, of course, PCS added such information to a future Catastrophe Bulletin).  PCS posted the Original Bulletin on the ISOnet PCS website on or about April 5, 2011.

39.    On April 25, 2011, PCS published a "Preliminary Estimate of Insured Property Damage" associated with CAT 42 (the "Preliminary Estimate").  The CAT 42 Preliminary Estimate stated that it was issued "[w]ith further reference to our [Original Bulletin] dated April 5, 2011."  In this document, PCS estimated losses from insured property damage in Kansas in the amount of $360 million.  Still, PCS provided no geographical information for Kansas in the Preliminary Estimate, and in accordance with the terms of the Calculation Agent Agreement, AIR would have been required to apply the Non-Metro Payout Factor.  PCS posted the Preliminary Estimate on the ISOnet PCS website on or about April 25, 2011.

40.    On June 27, 2011, PCS published a "Re-Survey Estimate of Insured Property Damage" in respect of CAT 42 ("First Resurvey Estimate").  The First Resurvey Estimate stated that it was issued "[w]ith further reference to our [CAT 42 Preliminary Estimate] dated April 25, 2011."  PCS's First Resurvey Estimate provided a re-survey estimate of insured property damage

---

[3] Other affected states include Georgia, Iowa, Illinois, Kentucky, Missouri, North Carolina, South Carolina, Tennessee, and Wisconsin.

for Kansas in the amount of $513 million in insured loss.[4]  The First Resurvey Estimate stated that "[t]his estimate is not fully developed", and provided no information specifying the geographical impact of CAT 42 within Kansas.  Thus, consistent with the terms of the Calculation Agent Agreement, the First Resurvey Estimate continued to call for AIR's application of the Non-Metro Payout Factor.  PCS posted the First Resurvey Estimate on the ISOnet PCS website on or about June 27, 2011.

41.     On August 31, 2011, PCS published a second "Re-Survey Estimate of Insured Property Damage" in respect of CAT 42 ("Second Resurvey Estimate").  The Second Resurvey Estimate stated that it was issued "[w]ith further reference to our [First Resurvey Estimate] dated June 27, 2011."  The Second Resurvey Estimate provided a second "re-survey estimate of insured property damage" for Kansas in the amount of $710 million in insured loss.  Again, this Resurvey Estimate provided no information specifying the geographical impact of CAT 42 within Kansas.  As such, consistent with the terms of the Calculation Agent Agreement, the Second Resurvey Estimate continued to call for AIR's application of the Non-Metro Payout Factor.  PCS posted the Second Resurvey Estimate on the ISOnet PCS website on or about August 31, 2011.

42.     On November 2, 2011, PCS issued a "Final Estimate of Insured Property Damage" with respect to CAT 42 ("Final Estimate").  The Final Estimate stated that it was issued "[w]ith further reference to our [Second Resurvey Estimate] dated August 31, 2011."  PCS's Final Estimate provided no information indicating the geographical impact of CAT 42 to Metro areas within Kansas.  Thus, the terms of the Reinsurance Agreement, the Series Supplement, and

---

[4] The "insured loss" amount refers only to losses re-insured by Mariah under the Basic Documents, and therefore does not take into account commercial losses reported by PCS, which were not re-insured.

the Calculation Agent Agreement, required that AIR apply the Non-Metro Payout Factor in calculating insured losses.

43.     In the Final Estimate, PCS provided exactly that—a "*final* estimate of insured property damage" (emphasis added)—for Kansas in the amount of $710 million in insured losses, the same loss figure that had been included in the August 31, 2011 Second Resurvey Estimate.   PCS stated in the Final Estimate that "[t]his estimate is…fully developed"; and accordingly, "[n]o further surveys will be conducted."

44.     In accordance with its practices under the PCS Reporting Agency Agreement, PCS posted each of its reports regarding CAT 42 on its ISOnet website on or about the respective issuance date of each such report.   In that regard, PCS posted the Final Estimate on the ISOnet PCS website on or about November 2, 2011.

45.     Once PCS issued its Final Estimate on November 2, 2011, AIR had everything it needed from PCS in order to calculate the cost of CAT 42 to American Family (*see infra*, the Event Loss Amount), and thereby the amount of money that Mariah owed to American Family as a result of CAT 42 (*see infra*, the Loss Payment Amount).

46.     Moreover, once that Final Estimate was issued, PCS could not issue any additional Catastrophe Bulletins—by definition a Catastrophe Bulletin is either a "birth certificate" for the storm, or a Resurvey Estimate, the last of which is the Final Resurvey Estimate.

47.     Under the Calculation Agent Agreement, AIR was only permitted to consider valid Catastrophe Bulletins issued by PCS in calculating losses related to a covered event.   AIR therefore could not, by definition, consider any invalid report PCS might try to issue after a Final Estimate.

48.     Moreover, the Calculation Agent Agreement, in defining the Final Development Date, is clear that, once a Final Resurvey Estimate is issued, any change to the Insured Industry Loss Amount (*i.e.*, Non-Metro Insured Industry Loss Amount or Metro Insured Industry Loss Amount) cannot be taken into account in calculating the various loss amounts associated with the event, such as the Event Index Value. (*See infra.*)

49.     Final Development Date is defined as follows:

"<u>Final Development Date</u>" shall mean the date after which any change in the Insured Industry Loss Amount for a Covered Event will not be taken into account for purposes of calculating the Event Index Value and any corresponding Event Loss Amount, which date shall be the earliest of (a) eighteen (18) months from the Date of Loss for such Covered Event, (b) the date that the Reporting Agency releases a Catastrophe Bulletin with its final resurvey estimate for such Covered Event and (c) ten (10) Business Days prior to the Final Extended Redemption Date.

50.     For CAT 42, the Final Development Date is November 2, 2011—the date that PCS, as Reporting Agency, released its Final (Resurvey) Estimate for CAT 42.  Therefore, after November 2, 2011, AIR could not take into account any changes to the Metro and Non-Metro Insured Industry Loss Amounts, which, taken together, represent the Insured Industry Loss Amount.

**B.     *AIR's Reports Regarding Catastrophe 42***

51.     On September 23, 2011, AIR transmitted a letter to, among others, Mariah, American Family, DB AG, and DB Americas, advising that AIR had "performed the procedures required to be performed" pursuant to its Calculation Agent Agreement with respect to CAT 42 (the "Event Report").

52.     Attached to AIR's September 23, 2011 Event Report were copies, sequenced in chronological order (as per AIR's business practice), of the previously-issued Original Bulletin, Preliminary Estimate, First Resurvey Estimate, and Second Resurvey Estimate for CAT 42 (and

15

all other known Catastrophes at the time), none of which identified any Metro areas impacted by CAT 42. According to the Event Report, AIR "determined" that CAT 42 was a "Covered Event."

53.     On or about November 1, 2011, AIR submitted a second Event Report pursuant to Section 3 of the Calculation Agent Agreement.[5]  As with the previous Event Report related to CAT 42, this report annexed the CAT 42 Bulletins previously issued by PCS, including the Original Bulletin dated April 5, 2011, which did not include any Metro locations.

### C.     PCS's Falsified Inception Bulletin

*PCS Improperly Issues a Resurvey Bulletin after the Final Estimate*

54.     On or about November 3, 2011, based on information and belief, PCS improperly removed the Original Bulletin from the record of the development of estimated CAT 42 losses such that it was no longer available on ISOnet, and surreptitiously substituted it with the Falsified Inception Bulletin.

55.     The Falsified Inception Bulletin added two new pages that were *not* part of the Original Bulletin.  These two new pages provided detailed information regarding the purported impact of CAT 42 within Kansas.  Even though PCS had learned of this information months earlier, the detail of these two new pages was not included in any prior Catastrophe Bulletin issued by PCS, including the Final Estimate that had been issued just one day earlier.

*The Deceptive Nature of the Falsified Inception Bulletin and PCS's Attempts to Cover It Up*

56.     Notwithstanding its claims to the contrary (described below), it is plain that PCS issued the Falsified Inception Bulletin in order to allow AIR to perform its calculations in such a way as to cause Mariah to have to pay significantly more money to American Family.

---

[5] This report was issued for Mariah 2.

57.     In order to orchestrate the scheme, PCS needed to act in contravention of the Basic Documents—PCS could neither issue another initial estimate, or birth certificate, for CAT 42, nor could it issue another Resurvey Estimate because the Final Estimate had already been published.  PCS therefore attempted to circumvent these rules in a way so as to avoid calling attention to what it had done.

58.     By publishing the Falsified Inception Bulletin, PCS issued a separate and impermissible estimate of damages in breach of the Offering Circular, which assured investors that PCS would not prepare any "separate estimates . . . for purposes of the Notes or the respective Reinsurance Agreements."

59.     Though the Original Bulletin was actually falsified on or about November 3, 2011, PCS backdated the document to April 5, 2011, the date of the Original Bulletin.

60.     PCS did not say either on the document itself or anywhere else on its website that it had backdated the document.  To the contrary, on information and belief, in order to make it appear to onlookers that the Falsified Inception Bulletin had existed all along, PCS (a) gave the Falsified Inception Bulletin the same name as the Original Bulletin (*i.e.,* it was designated "42-1"); (b) replaced the Original Bulletin with the Falsified Inception Bulletin on its website; and (c) deleted the Original Bulletin from the website altogether.

61.     Unlike other bulletins issued by PCS, upon information and belief, the Falsified Inception Bulletin was not posted in sequential order according to the date it was actually created, *i.e. after* the five existing Catastrophe Bulletins for CAT 42.

62.     Upon information and belief, PCS caused subscribers ***not*** to receive notice that the Falsified Inception Bulletin had been issued. Specifically, PCS's ISOnet website permitted subscribers to enroll to receive automatic e-mail notifications when new catastrophe bulletins

were issued by PCS.  Consistent with that service, on November 2, 2011, ISOnet subscribers who paid to receive such e-mail notifications received e-mail notice of Catastrophe Bulletin 42-5's publication, the Final Resurvey Estimate.  Notably, however, those same subscribers did <u>not</u> receive notice the very next day, when PCS issued the Falsified Inception Bulletin.

63.     Upon information and belief, PCS, desiring not to draw attention to the Falsified Inception Bulletin, caused ISOnet to deviate from its standard practice of providing such automatic e-mail notifications in this instance.  Indeed, this was the first—and only—time that PCS issued and posted a so-called Catastrophe Bulletin without informing its ISOnet subscribers.

64.     PCS's deceptive conduct and cover up did not stop there.  Rather, when interested parties started asking questions and its scheme began to unravel, the lies continued. For example, on or about December 9, 2011, in response to the grievances voiced by various noteholders regarding the November 23, 2011 Improper Event Report (*see infra*, para. 75) based on the Falsified Inception Bulletin, PCS issued an undated statement (the "PCS Apology").

65.     The PCS Apology states, in relevant part:

> To assist its customers in understanding the magnitude of the final damage estimate, PCS revised the original report [the Original Bulletin] on November 3, 2011 to include information published by the National Weather Service for April 3, 2011 detailing geographic areas impacted by the catastrophe.  The National Weather Service information published in revised bulletin 42-1 [the Falsified Inception Bulletin] is consistent with the type of publicly available information PCS has published in connection with other events.  The publication of this additional information was undertaken by PCS on its own initiative, and not at the request of any third party.

> In future catastrophe bulletins, where PCS believes the publication of additional information will assist its customers in understanding the event, PCS expects to publish such information in an update bulletin, rather than by way of revision to a previously published bulletin.

66.     Moreover, the PCS Apology acknowledges that the Final Estimate, which was issued on November 2, 2011, was its "final damage estimate . . . which included $820 million of losses for the state of Kansas."[6]

67.     PCS further indicates in its Apology that this was the first and only time that PCS ever issued a report for a designated catastrophe *after* the "Final Estimate" was issued.  Upon information and belief, it was also the first and only time PCS failed to notify subscribers to ISOnet that a report was issued for a designated catastrophe.

68.     PCS vowed to never again revise "a previously published bulletin."

69.     The PCS Apology contains multiple lies that, upon information and belief, were designed to obscure the real purpose of the Falsified Inception Bulletin.  For example, though PCS stated that the Falsified Inception Bulletin was intended to provide customers with information regarding the "magnitude" of the storm and the damage it caused, even a cursory review of the Falsified Inception Bulletin indicates that it was not issued for that purpose.  For instance, CAT 42 impacted nine states in addition to Kansas, as noted in the storm's Severe Weather Summaries published by PCS itself.  Yet, PCS did not include information for any of these other states in the Falsified Inception Bulletin.  Obviously, if its purpose was to provide customers with information about the magnitude of the storm, it would have done so.

70.     Upon information and belief, having failed to properly include information regarding CAT 42 in any of its timely-issued bulletins, PCS falsified documentation by adding just enough information on the storm's impact to result in a complete exhaustion of Mariah's funds.

---

[6] This $820 million in losses for Kansas includes commercial losses, not covered under the Reinsurance Agreement.

71.     Upon information and belief, knowing that the damage in Kansas was severe enough to wipe out Mariah, PCS only added additional information regarding CAT 42's impact in Kansas to the Falsified Inception Bulletin.

72.     PCS's selective publication of additional information for CAT 42 is highly suspicious, and its ulterior motives are further exposed upon comparison of its treatment of additional information for other catastrophes where PCS also had knowledge of Metro area impact from Severe Weather Summaries it issued.  For example:

   i.    PCS's publications caused Catastrophe 43 ("CAT 43") to be classified as purely Non-Metro in its Final Estimate given the absence of Metro locations in the Catastrophe Bulletins even though the Severe Weather Summaries for CAT 43 detailed information of the storm's impact on cities located in Metro counties.  PCS remained consistent in this approach (despite its professed desire to provide more information to its customers about CAT 42 in the PCS Apology), and did not publish this omitted information after issuing its Final Estimate for CAT 43.

   ii.   Catastrophe 47 ("CAT 47") was also classified as purely Non-Metro based on the lack of Metro locations in the Catastrophe Bulletins issued by PCS despite the fact that the Severe Weather Summaries for CAT 47 specified that the storm impacted cities in Metro counties.  Again, despite PCS's alleged desire to provide more information to its customers following CAT 42, PCS did not publish this omitted information after issuing its Final Estimate for CAT 47.

   iii.  PCS also had detailed geographic information showing that cities located in Metro areas were impacted, based on Severe Weather Summaries, for Catastrophe 53 ("CAT 53"). Still, PCS caused CAT 53 to be classified as a purely Non-Metro event throughout its cycle of reports (from the Initial Estimate through the Final Estimate).  And as with CAT 47, PCS did not issue any additional reports after the Final Estimate for CAT 53 (which was published on April 5, 2012, five months after PCS published the Falsified Inception Bulletin for CAT 42), despite its knowledge of affected Metro areas.

73.     PCS's treatment of these other catastrophes therefore further reveals that, notwithstanding what it claimed in the PCS Apology, the true purpose of the Falsified Inception Bulletin was to provide a basis to wipe Mariah out.

74.     Notably, in more recent versions of the Reporting Agency Agreement it has signed with other special purpose vehicles created for reinsurance purposes, PCS has added language explicitly authorizing it to do what it was unable to do under the Basic Documents governing Mariah—namely, "to restate or reopen an estimate of insured property losses resulting from a Catastrophe that has at one time been labeled as 'final'."

### D.     AIR's Improper Event Report

75.     On November 23, 2011, under the pretense of using PCS's Falsified Inception Bulletin, AIR issued a revised Event Report to, among others, Mariah, American Family, DB AG, and DB Americas, advising that it had revised its calculations under the Calculation Agent Agreement for CAT 42 (the "Improper Event Report", Ex. 5).

76.     Upon information and belief, AIR knew that the Falsified Inception Bulletin was issued on November 3, 2011 and that PCS intentionally backdated the document to April 5, 2011. The inference that PCS, AIR and American Family all conspired to wipe out Mariah is bolstered by, among other things, the relationship between the entities.

77.     Upon information and belief, though PCS and AIR approved the statement made in the Final Offering Circular that "PCS . . . is not associated or affiliated with [AIR] in any way," AIR and PCS were both, in fact, subsidiaries of Verisk Analytics ("Verisk"), a company that provides risk assessment services and decision analytics to insurance companies. ISO acquired AIR in 2002 and Verisk itself was created in 2008 as a subsidiary of ISO.  In 2009, Verisk became a public company and ISO and AIR then became *its* subsidiaries.  Indeed, just a few weeks prior to the release of the Final Offering Circular, Verisk introduced the Verisk Insurance Solutions brand under which its property and casualty subsidiaries, including PCS and AIR, would operate.

78.     Moreover, upon information and belief, Verisk had a business relationship with American Family.

79.     Attached to AIR's November 23, 2011 Improper Event Report were the Falsified Inception Bulletin, the Preliminary Estimate, the First Resurvey Estimate, the Second Resurvey Estimate, and the Final Estimate.  (*See* Ex. 5.)  The Original Bulletin was notably missing.

80.     AIR also disregarded its usual practice of attaching the Catastrophe Bulletins it referenced to the Event Report in chronological order because the Falsified Inception Bulletin, which AIR knew had been issued last, appeared first and in place of the Original Catastrophe Bulletin as if the Original Catastrophe Bulletin had never existed.

81.     In its November 23, 2011 Improper Event Report, AIR "determined" that CAT 42 was a "Covered Event" and listed substantially revised calculations of losses attributable to CAT 42 based on the Falsified Inception Bulletin.

82.     In pertinent part, the Improper Event Report's purported *Metro* losses attributable to CAT 42 went from $0 to $710 million.

83.     This leap in the Event Loss Amount was a direct result of AIR's use of the Falsified Inception Bulletin, which (improperly) provided justification for AIR to apply the *Metro* Payout Factor of 25.36% to losses in Kansas, as opposed to the Non-Metro Payout Factor of 8.82%.

84.     Indeed, at no time prior to November 23, 2011 did AIR apply a Metro Payout Factor to the calculation of estimated losses attributable to CAT 42 because, under the terms of the Calculation Agent Agreement, AIR had to base its calculations off of PCS's Catastrophe Bulletins and no Catastrophe Bulletins issued by PCS up to and through the November 2, 2011 issuance of the Final Estimate indicated that any Metro area was affected by CAT 42.

85.     Because PCS provided no geographical information for Kansas losses in *any* Bulletin, AIR was contractually obligated to apply the relevant Non-Metro Payout Factor.  Only having taken into account the Falsified Inception Bulletin issued by PCS did AIR have any basis—albeit an illegitimate one—for applying the Metro Payout Factor to determine CAT 42's losses.

### E.    *Mariah's Losses Due to the Falsified Inception Bulletin and Improper Event Report*

86.     As of the November 2, 2011 Final Estimate, based on the Original Bulletin, the Preliminary Estimate, the First Resurvey Estimate, and the Second Resurvey Estimate, AIR was obligated to apply the Non-Metro adjustment to the Kansas losses of $710 million for CAT 42, which yielded losses chargeable to Mariah of approximately $62.6 million.

87.     However, based entirely on the information contained in the Falsified Inception Bulletin, AIR's calculation of the CAT 42 losses purportedly chargeable to Mariah for Kansas alone nearly *tripled*, from approximately $62.6 million to approximately $180.1 million.

88.     The revised loss amount based on PCS's Falsified Inception Bulletin and AIR's Improper Event Report, resulted in a 100% loss of the principal of Mariah.

## IV.    PCS BREACHED ITS CONTRACTUAL OBLIGATIONS

89.     On or around November 3, 2011, PCS breached the Reporting Agency Agreement in multiple respects.

90.     For example, Section 6(b) of the Reporting Agency Agreement obligates PCS to disseminate its bulletins "through ISOnet PCS and/or the PCS Catastrophe History Database in accordance with its *current business practices*." (Emphasis added.)

91.     From April 3, 2011, when CAT 42 occurred, through its November 2, 2011 Final Estimate, PCS did not mention in any of its Catastrophe Bulletins any geographical information

concerning the estimated insured losses for Kansas or any of the other nine States that PCS knew were, in fact, affected by CAT 42.

92.    The sudden and deliberate inclusion of county-specific geographical information in the Falsified Inception Bulletin constitutes a stark deviation from PCS's "current business practices" for estimating insured losses related to Catastrophe 42, as PCS even admitted in its Apology.

93.    Moreover, as evidenced by its own April 4, 2011 "Severe Weather Summary," PCS knew of the geographical impact of CAT 42 on Kansas, and nine other states, on April 5, 2011 (the date of its Original Bulletin), on April 25, 2011 (the date of its Preliminary Estimate), on June 27, 2011 (the date of its First Resurvey Estimate), on August 31, 2011 (the date of its Second Resurvey Estimate in which the estimated insured losses for Kansas were $710 million), and on November 2, 2011 (the date of its Final Estimate in which the estimated insured losses for Kansas remained at $710 million).  The fact that PCS waited until after issuing its Final Estimate to include information it had all along further attests to its grossly negligent or intentional misconduct.

94.    By issuing the Falsified Inception Bulletin on November 3, 2011, PCS committed a flagrant breach of Section 6(b) of the Reporting Agency Agreement, which obligates PCS to disseminate its bulletins "through ISOnet PCS and/or the PCS Catastrophe History Database in accordance with its *current business practices*" (emphasis added), in several ways. For example:

> i.    The issuance of the Falsified Inception Bulletin *after* the Final Estimate, which by definition is to be the last PCS-issued Catastrophe Bulletin, obviates the finality of the Final Estimate and moreover, cannot be construed in any way as following "current business practice." Indeed, PCS itself admits this constitutes a deviation from its current business practices in its Apology.

ii.     Rather than following its current business practices, and issuing the Falsified Inception Bulletin with the date of its creation and next number in the sequence for CAT 42 (*i.e.* November 3rd and 42-6), PCS deliberately backdated the bulletin to April 5, 2011, and gave it the *same* designation as the Original Bulletin—42-1.

iii.    ISOnet permits subscribers to sign up to receive e-mail notifications when new catastrophe bulletins are issued by PCS for a substantial fee. Consistent with that service, on November 2, 2011, ISOnet subscribers who elected to receive such e-mail notifications received e-mail notice of Catastrophe Bulletin 42-5, the Final Resurvey Estimate. Notably, however, those same subscribers did <u>not</u> receive notice the very next day, when PCS issued the "revised" Catastrophe Bulletin 42-1. Upon information and belief, PCS, desiring not to draw attention to the revised Catastrophe Bulletin 42-1, caused ISOnet to deviate from its standard practice of providing such automatic e-mail notification in this instance.

95.    In addition, Section 6(g) of the Reporting Agency Agreement requires that PCS "keep a record of each Designation, Preliminary Estimate and Resurvey Estimate disseminated through ISOnet PCS."

96.    As discussed above, in glaring contravention of this provision, PCS intentionally deleted any trace of the Original Bulletin from ISOnet, as evidenced by the following:

i.      The hyperlink for the Original Bulletin (labeled on the website as "42-1") reveals not the Original Bulletin, but the Falsified Inception Bulletin.

ii.     The column on the ISOnet webpage listing the "release date" of all the Catastrophe Bulletins misleadingly shows April 5, 2011 as the "release date" of the Falsified Inception Bulletin, even though its actual release date was November 3, 2011.

97.    In addition, pursuant to Section 1(e) of the Reporting Agency Agreement, PCS was obligated to notify Mariah of any plans to "alter, amend or change in any way its general methodology for estimating insured property losses attributable to Catastrophes, including preparing Estimates and . . . to vary from such methodology in preparing Estimates for individual Catastrophes . . ." *prior* to the implementation of such plans.

98.     PCS's violation of Section 1(e) of the Reporting Agency Agreement is evidenced by the following:

i.      From April 3, 3011, when CAT 42 occurred, through its November 2, 2011 Final Estimate, PCS did not mention in any of its Catastrophe Bulletins any geographical information concerning the estimated insured losses for Kansas or any of the other nine States that PCS knew were, in fact, affected by CAT 42.

ii.     The sudden and deliberate inclusion of county-specific geographical information in the Falsified Inception Bulletin constitutes a deviation from PCS's "general methodology" for estimating insured losses related to Catastrophe 42, as PCS even admitted in its Apology.

iii.    Upon information and belief, PCS did not at any time notify Mariah of its plans to alter its general methodology by issuing a report after the Final Development Date, much less prior to the change.

## V.      AIR BREACHED ITS CONTRACTUAL OBLIGATIONS

99.     On or about November 23, 2011, AIR acted in breach of its contractual duties specified in Section 3 ("Services") of the Calculation Agent Agreement between Mariah and AIR.

*AIR's Improper Use of PCS's Falsified Inception Bulletin*

100.    Section 3(a)(i) of the Calculation Agent Agreement obligates AIR to use the "information readily and publicly available online from government entities or agencies" to determine whether locations identified in the "latest Catastrophe Bulletins available as of five (5) Business Days prior to the Event Reporting Date" published by PCS were in a Metro County.

101.    The Reinsurance Agreement defines "Catastrophe Bulletins" as a "bulletin originated and disseminated by the Reporting Agency (including through ISOnet PCS) that

identifies and assigns a catastrophe number to a Peril and/or gives *preliminary, or subsequently, resurvey estimates* of insured property losses arising from a Peril."[7] (Emphasis added).

102.    AIR's calculation in the November 23, 2011 Improper Event Report was predicated on the November 3, 2011 Falsified Inception Bulletin. AIR's use of the Falsified Inception Bulletin for the calculation was in breach of the Calculation Agent Agreement because the Falsified Inception Bulletin is not a true "Catastrophe Bulletin," as defined under the contracts, as it is neither the report that identified and assigned a catastrophe number to CAT 42 (*i.e.* the birth certificate), nor a Preliminary Estimate, nor a Resurvey Estimate.

103.    Further, the Falsified Inception Bulletin is not a true "Catastrophe Bulletin" for the following reasons, among others:

  i.   Notwithstanding the fraudulent date PCS affixed to it, the Falsified Inception Bulletin was, in fact, issued after the Final Estimate.   By definition, however, the Final Estimate is the last Catastrophe Bulletin that PCS is permitted to issue.

  ii.   The Falsified Inception Bulletin was not properly disseminated by PCS.

  iii.   It is wrongly dated and does not state that it is an amended or revised bulletin.

  iv.   By PCS's own admission, it has never issued a Falsified Inception Bulletin as it did on November 3, 2011.

  v.   The PCS Reporting Agency Agreement requires that PCS perform its obligations consistent with normal business practices, which the backdating—as admitted by PCS—is not.

  vi.   The Falsified Inception Bulletin does not provide a "Preliminary", "Resurvey" or "Final" Estimate because, among other things, it contains no insured loss data.

  vii.   The Falsified Inception Bulletin is not a birth certificate for CAT 42 because it did not identify and assign a catastrophe number, whereas the Original Bulletin did.

---

[7] The Calculation Agent Agreement, to which AIR is a party, uses numerous terms defined in the Reinsurance Agreement, including "Catastrophe Bulletin".  (*See* Ex. 4.)

viii.    As evidenced by other documents posted on ISOnet (titled "PCS Severe Weather Summaries"), PCS had the additional geographical information for Kansas and all the other covered States as early as April 4, 2011. Thus, either partial, selective and therefore misleading information was released by PCS throughout the period of its reporting on the development of CAT 42 until the Falsified Inception Bulletin was surreptitiously added into the reporting record by PCS, or alternatively, PCS had made the determination that these locations were not of interest or relevant.

104.    Accordingly, the Falsified Inception Bulletin is not a "Catastrophe Bulletin" on which a proper AIR calculation and "Event Report" may be based under the explicit terms of the Calculation Agent Agreement.

*AIR's Miscalculation of Metro and Non-Metro Insured Industry Loss Amounts, as well as the Event Index Value*

105.    The Metro and Non-Metro Insured Industry Loss Amounts are key components of the Event Index Value formula AIR uses to determine the amount payable by Mariah to American Family to reinsure American Family's losses.  (*See supra.*)

106.    For purposes of calculating the Event Index Value—which is then used to calculate the Loss Payment Amount—the Final Development Date prohibits AIR from taking into account any change to the Insured Industry Loss Amount (*i.e.* the Metro Insured Industry Loss Amount, together with the Non-Metro Insured Industry Loss Amount) after PCS's issuance of a Final Estimate.

107.    This, however, was precisely what AIR did when it used the Falsified Inception Bulletin to compute the amount of money Mariah owed to American Family in the Improper Event Report.

108.    Therefore, AIR's computation of the Event Index Value through use of the Improper Event Report constitutes a breach of contract.

## VI.    AMERICAN FAMILY'S CONDUCT

109.    By letter dated January 3, 2012, American Family directed DB Americas "to wire transfer $100,000,000 from the Reinsurance Trust Account to American Family's account at US Bank."  American Family contended that there was "no basis for withholding, delaying or otherwise impeding the release of funds from the Reinsurance Trust Account to American Family."  At the time it sent this letter, American Family, upon information and belief, knew that this statement was incorrect.  Notably, this letter contained only a demand for payment.

110.    Article IX, Section 9.5 of the Indenture requires that any transfer of funds to American Family be preceded by written notice from American Family setting forth the calculations supporting a transfer of funds from DB Americas to American Family.  American Family demanded payment in its January 3, 2012 letter without providing any such notice.

111.    In response to American Family's January 3, 2012 letter, and without notice required under Article IX, Section 9.5 of the Indenture, DB Americas' transferred funds out of Mariah and to American Family in violation of the Indenture.  On January 26, 2012, American Family issued a Notice of Early Redemption on January 26, 2012 improperly terminating the Reinsurance Agreement because "the Coverage Limit of the Notes [was] equal to or less than 10% of the Original Principal Amount."  This reduction in the Original Principal Amount was a direct result of AIR's miscalculation of the Loss Payment Amount based on the Falsified Inception Bulletin issued by PCS.

112.    American Family was enriched to the detriment of Mariah, and continues to refuse to restore the funds improperly drawn from Mariah.

## FIRST CAUSE OF ACTION
### Breach of Contract
### *(By Mariah Against All Defendants)*

113.   Plaintiff repeats, reiterates and realleges each allegation as set forth in paragraphs 1 through 112 with the same force and effect as if set forth herein at length.

114.   The Reinsurance Agreement, Reporting Agency Agreement, and Calculation Agent Agreement are valid and enforceable contracts, containing implied covenants of good faith and fair dealing.

115.   Mariah fully performed under the Reinsurance Agreement, Reporting Agency Agreement and Calculation Agent Agreement.

116.   Defendants American Family, PCS and AIR have breached their contractual agreements, including the implied covenant of good faith and fair dealing, with Mariah, respectively, as detailed in paragraphs 1 through 112.

117.   As a direct and proximate cause of Defendants' conduct, Mariah has been damaged.

## SECOND CAUSE OF ACTION
### Unjust Enrichment
### *(By Mariah Against Defendant American Family)*

118.   Plaintiff repeats, reiterates and realleges each allegation as set forth in paragraphs 1 through 112 with the same force and effect as if set forth herein at length.

119.   As a result of the conduct described above, Defendant American Family will be and has been unjustly enriched at the expense of Plaintiff.

120.   All the payments provided to American Family based upon or related to Defendants' actions in light of the Falsified Inception Bulletin were unjustly awarded and at the expense of Plaintiff, resulting in substantially unearned benefits.

121.     Under principles of equity and good conscience, American Family should be ordered to disgorge the gains which it has unjustly obtained.

### THIRD CAUSE OF ACTION
**Conversion**
***(By Mariah Against American Family)***

122.     Plaintiff repeats, reiterates and realleges each allegation as set forth in paragraphs 1 through 112 with the same force and effect as if set forth herein at length.

123.     $100,000,000 was transferred to Defendant American Family out of the Reinsurance Trust Account on or around February 10, 2012.

124.     Plaintiff has an immediate right to all or a substantial portion of this $100,000,000 disbursed to Defendant American Family.

125.     Despite the demand of Plaintiff for the return of the $100,000,000, Defendant American Family continues to withhold the funds.

126.     By doing so, Defendant American Family has exercised dominion and control over the $100,000,000 without the authority to do so.

127.     As a direct and proximate result of Defendant American Family's actions, Plaintiff has been damaged in an exact amount to be determined at trial in this matter.

### FOURTH CAUSE OF ACTION
**Tortious Interference With Contract**
***(By Mariah Against American Family)***

128.     Plaintiff repeats, reiterates and realleges each allegation as set forth in paragraphs 1 through 112 with the same force and effect as if set forth herein at length.

129.     Defendant American Family, as Ceding Insurer under the Reinsurance Agreement, was aware of the valid and enforceable contract between Mariah and DB Americas and DB AG, *i.e.* the Indenture Agreement.

31

130.    American Family, intentionally and unjustifiably induced DB Americas and DB AG to breach the Indenture Agreement by transferring funds to American Family in violation of Article IX, Section 9.5.

131.    American Family's conduct therefore constituted tortious interference with the contractual relationship between Plaintiff and DB Americas and DB AG.

132.    As a result of Defendant American Family's conduct, Plaintiff suffered harm.

**FIFTH CAUSE OF ACTION**
**Declaratory Judgment**
***(By Mariah Against All Defendants)***

133.    Plaintiff repeats, reiterates and realleges each allegation as set forth in paragraphs 1 through 112 with the same force and effect as if set forth herein at length.

134.    There exists an actual controversy of justiciable issues between Mariah and Defendants within the jurisdiction of this Court involving the rights and liabilities of the parties under the Basic Documents—in particular, whether the Falsified Inception Bulletin on which the Improper Event Report containing the corrupt calculation was based, resulting in the pay out of all of Mariah's funds, should be reversed—which controversy may be determined by a declaratory judgment of this Court.

135.    Accordingly, Mariah is entitled to a declaration that (a) the Falsified Inception Bulletin was improperly issued in violation of the Basic Documents, (b) the Improper Event Report containing the corrupt calculation based on the Falsified Inception Bulletin is invalid, null and void, and (c) the payout of all of Mariah's funds, which was based on the improper Falsified Inception Bulletin and corrupt calculation in the Improper Event Report, was in violation of the Basic Documents.

## SIXTH CAUSE OF ACTION
### Specific Performance
### *(All Defendants)*

136.    Plaintiff repeats, reiterates and realleges each allegation as set forth in paragraphs 1 through 112 with the same force and effect as if set forth herein at length.

137.    Mariah substantially performed its contractual obligations and was willing and able to perform its remaining obligations, except to the extent Defendants prevented it from doing so.

138.    Defendants have breached their obligations by (a) intentionally issuing the Falsified Inception Bulletin and surreptitiously substituting it for the Original Bulletin, (b) based on the improper Falsified Inception Bulletin, issuing the Improper Event Report containing the corrupt calculation, thereby grossly inflating the Loss Payment Amount, *i.e.* the amount due from Mariah to American Family, and (c) based on the Improper Event Report's corrupt calculation, obtaining all of Mariah's funds.

139.    Because of Defendants' improper conduct, Mariah has been wrongfully deprived of the contractual protections to which it is entitled, resulting in the wrongful exhaustion of the outstanding principal of Mariah.

140.    Plaintiff has no adequate remedy at law for Defendants' misconduct.

141.    Plaintiff is entitled to a decree of specific performance compelling Defendants to fulfill their obligations by taking the following actions:

     i.     causing PCS to reinstate the Original Bulletin in the place of the Falsified Inception Bulletin;

     ii.     causing AIR to calculate the Event Loss Amount based upon the reinstated Original Bulletin and not the Falsified Inception Bulletin;

iii.     causing American Family to make restitution of all monies that it was
improperly paid, except the amount (if any) determined by the Paying
Agent as set forth in (iii) above.

### Prayer for Relief

WHEREFORE, Plaintiff prays:

1.  That PCS withdraw its Falsified Inception Bulletin;

2.  That AIR issue an Event Report based solely on the Original Bulletin, and 4 subsequent Catastrophe Bulletins, up to and including the Final Estimate issued November 2, 2011, only;

3.  That American Family return to Mariah the amount of principal deposited in its name by DB Americas and DB AG under the Reinsurance Agreement;

4.  That Plaintiff be awarded monetary damages for Defendants' egregious breaches of contract and tortious conduct in an amount to be determined at trial;

5.  That Plaintiff be awarded its attorneys' fees incurred in connection with this litigation; and

6.  That Plaintiff be awarded such other and further relief as this Court deems just and proper.

Dated: New York, New York
       October 18, 2013

KOBRE & KIM LLP

Jonathan D. Cogan
jonathan.cogan@kobrekim.com
800 Third Avenue
New York, New York 10022
Tel: + 1 212 488 1200
Fax: + 1 212 488 1220
*Attorney for Mariah Re Ltd.*

## CERTIFICATE OF SERVICE

I hereby certify that on October 18, 2013, I caused the foregoing Amended Complaint to be served upon the parties below via electronic mail and Federal Express.

Robert A. Kole Esq.
Jean-Paul Jaillet Esq.
Jessica Foster Pizzutelli Esq.
Choate Hall & Stewart LLP
Two International Place
Boston, Massachusetts 02110

David S. Douglas Esq.
Gallet Dreyer & Berkey, LLP
845 Third Avenue, 8th Floor
New York, New York 10022-6601

*Attorneys for Defendant American Family Mutual Insurance Company*

Joel M. Cohen Esq.
Matthew B. Rowland Esq.
Richard R. Barker Esq.
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017

*Attorneys for Defendant ISO Services, Inc. and AIR Worldwide Corporation*

_____
Megha Charalambides