UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

───────────────────────────────────

MARIAH RE LTD. (IN LIQUIDATION),
ACTING BY AND THROUGH GEOFFREY
VARGA AND JESS SHAKESPEARE, IN
THEIR CAPACITIES AS LIQUIDATORS
THEREOF,

                Plaintiff,

v.

AMERICAN FAMILY MUTUAL
INSURANCE COMPANY, ISO SERVICES,
INC., AND AIR WORLDWIDE
CORPORATION,

                Defendants.

───────────────────────────────────

13 Civ. 4657 (RJS) (SN)

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS OF
DEFENDANT AMERICAN FAMILY MUTUAL INSURANCE COMPANY**

**GALLET DREYER & BERKEY, LLP**
**845 Third Avenue**
**New York, New York 10022**
**(212) 935-3131**

**Attorneys for Defendant**
**American Family Mutual Insurance Company**

**Of Counsel:**
**Robert A. Kole, Esq.,** *pro hac vice*
**J.P. Jaillet, Esq.,** *pro hac vice*
**Choate, Hall & Stewart LLP**
**Two International Place**
**Boston, Massachusetts 02110**
**(617) 248-5000**

# TABLE OF CONTENTS

Preliminary Statement ........................................................................................................ 1

Statement of Facts ............................................................................................................ 3

    I.      The Mariah Catastrophe Bond ....................................................................... 3

          A.     The Structure of a CAT Bond .................................................... 3

          B.     The Process for Paying Claims Under the CAT Bond .............. 4

          C.     CAT 42 ....................................................................................... 7

    II.     Mariah's Claims Against American Family ..................................................... 8

Argument ........................................................................................................................... 8

    I.      Standards Applicable to a Motion to Dismiss .............................................. 8

    II.     Breach of Contract ........................................................................................ 9

    III.    Unjust Enrichment ...................................................................................... 11

          A.     Mariah's Unjust Enrichment Claim Falls Within the Subject
                   Matter of, and Therefore Is Precluded by, the Reinsurance
                   Agreement ................................................................................ 11

          B.     Equity and Good Conscience Preclude Restitution ................. 15

               1.      CAT 42 Was, In Fact, a Metro Occurrence ................. 15

               2.      PCS Had Discretion to Issue the Revised Original
                       Bulletin, and AIR Was Contractually Obligated to Rely
                       on It ............................................................................... 17

    IV.    Conversion ................................................................................................... 19

    V.     Tortious Interference ................................................................................... 20

          A.     Mariah Cannot Allege That American Family Intentionally
                   Procured a Breach of the Indenture Agreement Without
                   Justification ............................................................................. 21

          B.     Mariah's Allegations Are Insufficient to Establish an Actual
                   Breach of Contract ................................................................. 21

VI.     Declaratory Judgment ............................................................................................ 23

VII.    Specific Performance ............................................................................................. 24

Conclusion ...................................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

**CASES**

Alvord & Swift v. Stewart M. Muller Constr. Co.,
46 N.Y.2d 276 (1978) ........................................................................................21

Ashcroft v. Iqbal,
556 U.S. 662 (2009) ............................................................................................8

Bates Adver. USA, Inc. v. McGregor,
282 F. Supp. 2d 209 (S.D.N.Y. 2003) ...............................................................14

Beth Isr. Med. Ctr. v. Verizon Bus. Network Servs.,
No. 11 Civ. 4509, 2013 WL 1385711 (S.D.N.Y. March 18, 2013)...................11

Beth Israel Med. Ctr. v. Horizontal Blue Cross Blue Shield of NJ, Inc.,
448 F.3d 573 (2d Cir. 2006)...............................................................................11

Byrd v. Goord,
No. 00 Civ. 2135, 2005 WL 2086321 (S.D.N.Y. Aug. 29, 2005) .......................8

Cacchillo v. Insmed Inc.,
833 F. Supp. 2d 218 (N.D.N.Y. 2011) ...............................................................25

Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.,
70 N.Y.2d 382 (1987) ..................................................................................11, 13

D'Ambrosio v. Engel,
292 A.D.2d 564 (2d Dept. 2002) .......................................................................19

Fabrizio v. Erie Ins. Co.,
No. 08-cv-816, 2009 WL 427102 (N.D.N.Y., Feb. 20, 2009)...........................12

Fleisher v. Phoenix Life Ins. Co.,
858 F. Supp. 2d 290 (S.D.N.Y. 2012)...........................................................23, 24

Hartford Courant Co. v. Pellegrino,
380 F.3d 83 (2d Cir. 2004)...................................................................................8

IMG Fragrance Brands, LLC. v. Houbigant, Inc.,
759 F. Supp. 2d 363 (S.D.N.Y. 2010)................................................................20

Indep. Asset Mgmt. LLC v. Zanger,
538 F. Supp. 2d 704 (S.D.N.Y. 2008)................................................................21

John Wiley & Sons, Inc. v. Visuals Unlimited, Inc.,
    No. 11-CV-5453, 2011 WL 5245192 (S.D.N.Y. Nov. 2, 2011)............................................24

Kagan v. HMC-New York, Inc.,
    No. 601306/09, 2010 WL 8470638 (N.Y. Sup. Ct., May 28, 2010).......................................12

Karmely v. Wertheimer,
    No. 11 Cv. 541, 2012 WL 3583141 (S.D.N.Y. Aug. 21, 2012) ..............................................8

KM Enters., Inc. v. McDonald,
    11-cv-5098, 2012 WL 4472010 (E.D.N.Y. Sept. 25, 2012)....................................................24

LaRoss Partners v. Contact 911 Inc.,
    874 F. Supp. 2d 147 (E.D.N.Y. 2012) .............................................................................12, 19

Leonard F. v. Israel Discount Bank,
    199 F.3d 99 (2d Cir. 1999).......................................................................................................8

Lojan v. Crumbsie,
    No. 12 cv. 0320, 2013 WL 411356 (S.D.N.Y. Feb. 1, 2013) .................................................23

Orbit One Commons v. Numerex Corp.,
    692 F. Supp. 2d 373 (S.D.N.Y. 2010)....................................................................................11

Paramount Film Dist. Corp. v. State,
    30 N.Y.2d 415 (1972) ............................................................................................................15

Paul v. Bank of Am. Corp.,
    No. 09-CV-1932, 2011 WL 684083 (E.D.N.Y. Feb. 16, 2011) ..........................................9, 10

Picture People, Inc. v. Imaging Fin. Servs.,
    735 F. Supp. 2d 12 (S.D.N.Y. 2010)......................................................................................11

Poplar Lane Farm LLC v. Fathers of Our Lady of Mercy,
    449 Fed. Appx. 57 (2d Cir. 2011) ..........................................................................................19

RJ Capital, S.A. v. Lexington Capital Funding III, Ltd.,
    No. 10 Civ. 25, 2011 WL 3251554 (S.D.N.Y. July 28, 2011) .........................................12, 24

Ross Univ. Sch. of Med., Ltd. v. Brooklyn-Queens Health Care, Inc.,
    No. 09-cv-1410, 2013 WL 1334271 (E.D.N.Y. March 28, 2013).........................................25

Schandler v. New York Life Ins. Co.,
    No. 09 Civ. 10463, 2011 WL 1642574 (S.D.N.Y. April 26, 2011).........................................9

Sergeants Benev. Ass'n Annuity Fund v. Renck,
    19 A.D.3d 107 (1st Dept. 2005)..............................................................................................14

Sokoloff v. Harriman Estates Dev. Corp.,
    96 N.Y.2d 409 (2001) ...........................................................................................25

Swan Media Group, Inc. v. Staub,
    841 F. Supp. 2d 804 (S.D.N.Y. 2012)..................................................................9, 10

Tierney v. Omnicom Group,
    No. 06 Civ. 14302, 2007 WL 2012412 (S.D.N.Y. July 11, 2007) ........................25

U.S. ex rel. Ryan, No. 04-CV-2483, 2011 WL 1841795 (E.D.N.Y. May 13, 2011)....................15

Uniroyal, Inc. v. Jetco Auto Service, Inc.,
    461 F. Supp. 350 (S.D.N.Y. 1978) .......................................................................15

Wolff v. Rare Medium, Inc.,
    210 F. Supp. 2d 490 (S.D.N.Y. 2002)..................................................................9, 10

**RULES**

Fed. R. Civ. P. 12(b)(6)...........................................................................................1, 3, 8

**STATUTES**

Declaratory Judgment Act, 28 U.S.C. §2201(a) ............................................................23

**OTHER AUTHORITIES**

Todd V. McMillan, Securitization and the Catastrophe Bond: A Transactional Integration
    of Industries Through a Capacity-Enhancing Product of Risk Management, 8 Conn.
    Ins. L.J. 131 (2001/2002) ........................................................................................4

<u>PRELIMINARY STATEMENT</u>

Pursuant to Fed. R. Civ. P. 12(b)(6), defendant American Family Mutual Insurance Company ("American Family") hereby moves to dismiss Counts 1 through 6 -- <u>i.e.</u>, all of the Counts asserted against American Family -- of the amended complaint (the "Amended Complaint") of plaintiff Mariah Re Ltd. ("Mariah").[1]

Contrary to Mariah's often misleading rhetoric, Mariah's allegations against American Family are limited, and they do not support any of the asserted causes of action. Mariah alleges primarily that American Family received "tens of millions of dollars" *not* as the result of American Family's conduct, but rather the conduct of two other entities -- ISO Services, Inc. ("PCS") and AIR Worldwide Corporation ("AIR") -- with whom Mariah separately contracted. Even assuming, *arguendo*, that the facts alleged by Mariah are true -- which they are not -- those allegations do not, and cannot, satisfy one or more of the elements of Mariah's causes of action against American Family, for at least the following reasons:

- <u>Breach of Contract.</u> Mariah alleges, in a conclusory fashion, that American Family breached the reinsurance agreement between American Family and Mariah (the "Reinsurance Agreement"). However, despite filing an Amended Complaint of 141 paragraphs, Mariah fails to identify either a single provision of the Reinsurance Agreement which it contends American Family breached, or any conduct by American Family that would constitute a breach of any such (unidentified) provision. *Infra* at 9-10.

- <u>Unjust Enrichment.</u> Mariah's unjust enrichment claim fails for two independent reasons. <u>First</u>, under black letter New York law, an unjust enrichment claim is prohibited where (as here) the subject matter of the claim is governed by a valid and binding contract. <u>Second</u>, equity and good conscience do not require American Family to return funds to which it is entitled under the governing contracts and the operative facts. Instead, it is Mariah that seeks an "unjust" windfall here, at the expense of American Family and its policyholders. *Infra* at 11-19.

- <u>Conversion.</u> Like unjust enrichment, a conversion claim cannot be sustained where, as here, the subject matter of the claim is governed by a valid and binding contract between

---

[1] Mariah's initial complaint did not include a breach of contract claim against American Family. Its Amended Complaint includes such a claim, but no facts whatsoever to support it.

the parties. Also, conversion requires an "unauthorized assumption and exercise of the right of ownership over goods belonging to another." Here, American Family's receipt of funds was expressly authorized by the governing contracts, in accordance with the operative facts. *Infra* at 19-20.

- Tortious Interference. Mariah's tortious interference claim fails for two reasons. <u>First</u>, Mariah cannot allege that American Family acted with the requisite intent -- <u>i.e.</u>, the "intention to harm plaintiff without economic or other lawful excuse or justification." To the contrary, even if one were to assume, *arguendo*, that American Family acted improperly, the *only* possible explanation for American Family's conduct is that it furthered its economic self-interest. <u>Second</u>, Mariah's tortious interference claim is predicated on an alleged breach of an indenture agreement (the "Indenture Agreement"), but Mariah misstates both the terms and the operation of that Agreement. *Infra* at 20-23.

- Declaratory Judgment. Mariah's declaratory judgment claim fails, because a declaratory judgment action operates only prospectively, yet all of the conduct underlying Mariah's claims occurred almost two years ago. *Infra* at 23-24.

- Specific Performance. Specific performance is a remedy for a breach of contract, not an independent cause of action. Even as a remedy it fails as against American Family, because the Amended Complaint fails to set forth a viable basis for a breach of contract claim against American Family. Also, specific performance applies only where plaintiff lacks an adequate remedy at law -- <u>i.e.</u>, money damages. Here, plaintiff seeks *only* money damages, based on a contract that was fully performed years ago. *Infra* at 24-25.

In short, American Family is entitled to be dismissed from this action, with prejudice, based on Mariah's failure to allege one or more of the elements of each of its stated causes of action. Notably, this motion is not premised on technical pleading failures -- the facts, as alleged in the Amended Complaint and in reality, do not support any claims against American Family. Mariah's fundamental complaint is that the *process* by which PCS and AIR declared a specific catastrophic weather event ("CAT 42") a Metro Occurrence was flawed, because PCS issued a revised catastrophe bulletin on November 3, 2011 (the "Revised Original Bulletin"), *one day* after issuing its November 2, 2011 "final" bulletin (the "November 2 Bulletin"). Even assuming that this single day was relevant under the governing contracts -- and it was not, because PCS had discretion to issue, and AIR was contractually obligated to rely upon, the Revised Original Bulletin -- Mariah does not dispute that CAT 42 *actually was* a Metro Occurrence. Thus, Mariah

is seeking to deprive American Family of "tens of millions" of dollars to which it otherwise is entitled, due to an alleged *one-day* "delay" in which American Family is not alleged to have played any part. The fact that Mariah is asserting primarily equitable claims against American Family in these circumstances is, to put it bluntly, absurd.

STATEMENT OF FACTS[2]

I.     The Mariah Catastrophe Bond

    A.     The Structure of a CAT Bond

American Family is a mutual insurance company domiciled in Wisconsin, which offers a variety of insurance products to its customers. See Amended Complaint, ¶¶1, 12. Among other things, American Family provides insurance coverage for policyholders that suffer losses resulting from catastrophic weather events, such as severe thunderstorms or tornados. Id., ¶¶1, 16.

On or around November 15, 2010, American Family, Mariah, PCS and AIR (among others) entered into a series of contracts, one of which provided reinsurance coverage to American Family in connection with losses arising from severe weather events. Id., ¶¶17−18; 26. These contracts were executed in connection with what are commonly referred to in the insurance industry as Catastrophe Bonds, or CAT Bonds, which have been described as follows:

> The catastrophe bond transaction involves the creation of a Special Purpose Vehicle [here, Mariah] designed to provide reinsurance to a ceding company [here, American Family] and to issue the security to investors, i.e. capital markets. In other words, the SPV underwrites reinsurance upon payment of a premium by the ceding company. Investors, in turn, pay funds into the SPV or the "protected cell" and the funds are then deposited into a trust.

---

[2]     Pursuant to Fed. R. Civ. P. 12(b)(6), American Family assumes, for purposes of this motion only, that the facts set forth in the Amended Complaint and the documents attached thereto are true. *Infra* at 8. A copy of the Amended Complaint, and its exhibits, are attached as Exhibit A to the Declaration of Robert A. Kole ("Kole Decl.").

The investor has already contributed a certain amount of principal that was paid through the SPV and deposited in a trust. These funds will be maintained by the trust for purposes of investment over the course of the designated risk period. The principal is connected to a trigger event, the occurrence of which leads to indemnification from the trust and SPV structure. Simply, an investor's return on investment depends on the occurrence or non-occurrence of the event specified within the risk period covered by the catastrophe bond. In the event a catastrophe does not occur, then the bondholder receives his principal and interest earned over the course of the risk period. Likewise, should a catastrophe occur within the risk period, the bondholders will indemnify the insurance company from the principal deposited to cover the loss insured against.

See Todd V. McMillan, Securitization and the Catastrophe Bond: A Transactional Integration of Industries Through a Capacity-Enhancing Product of Risk Management, 8 Conn. Ins. L.J. 131, 140-41 (2001/2002).

The contracts at issue here involved a CAT Bond structure like the one described above. American Family and Mariah entered into the Reinsurance Agreement, by which Mariah agreed to reinsure American Family in connection with certain Covered Events, as defined by the Agreement. See Amended Complaint, Ex. 3, Art. 3.1.[3] The Reinsurance Agreement covered losses totaling between $825 million and $925 million. Id., ¶15. The $100 million available to cover potential losses was raised from investors. Id. Mariah was the special purpose vehicle, created solely for the "particular purpose" of effectuating this transaction. Id., ¶2.

B.    The Process for Paying Claims Under the CAT Bond

As noted in the Amended Complaint, Mariah's reinsurance obligations to American Family were contingent upon the occurrence of certain severe weather events, and the way in which those weather events were reported by PCS and analyzed by AIR. Id., ¶3. American

---

[3]    A Covered Event was defined as a Severe Thunderstorm, including "tornado, hail, rain, and/or wind." Id., Ex. 3, p. 3 (definition of Covered Event); p. 14 (definition of Severe Thunderstorm).

Family played no role in that process. Instead, PCS and AIR separately contracted with Mariah (but not American Family) to provide those services. Id., Exs. 2 and 4. The question at the heart of this case relates solely to the means by which CAT 42 was reported by PCS and analyzed by AIR, in accordance with their contracts with Mariah. American Family is alleged only to have received funds as a result of the indisputably accurate Catastrophe Bulletin and Event Report prepared by PCS and AIR, respectively. Id., ¶¶7, 111–12.

As alleged in the Amended Complaint, PCS and AIR played distinct roles with respect to that process. PCS purportedly was responsible for providing the basic facts about any covered weather event, including its severity and the locations where it caused damage, via issuance of Catastrophe Bulletins. Id., ¶19. PCS also provided estimates, on a state-by-state basis, of the losses caused by any particular event. Id., ¶¶22-23. AIR played no role in estimating losses.

By the same token, PCS played no role in determining the amounts owed to American Family under the Reinsurance Agreement -- AIR performed that function. Id., ¶27. AIR calculated the amount owed to American Family (the "Loss Payment Amount") by inputting PCS's estimates into a specific formula set forth in the Reinsurance Agreement. Id. Under that formula, AIR was required to multiply the insured losses occurring at a given location (as calculated by PCS) by a payment factor, depending on whether the location was in a Metro or Non-Metro area. Id., ¶30. Because the Metro Payment Factor is generally higher than the Non-Metro Payment Factor, whether a storm impacted a Metro or a Non-Metro location was significant in valuing that storm for purposes of the Reinsurance Agreement. Id.[4]

---

[4] A Metro area generally has a higher payment factor than a non-Metro area because more damage typically will occur in a more densely populated area -- which is why large Kansas cities such as Lawrence, Topeka and Overland Park are deemed to be in Metro Counties. See Amended Complaint, ¶30; *infra* at 15.

A weather event impacting a particular state is considered a Metro Occurrence for the entirety of that state if *either*: "(a) a Metro County is listed in the Catastrophe Bulletin relating to such Covered Event in such state or (b) the Calculation Agent [AIR], after using its reasonable efforts and based on information publicly available online from government entities or agencies, determines that any part of the locations listed on a Catastrophe Bulletin corresponds to a Metro County in such state." Id., Ex. 3, p. 10 (definition of "Metro Occurrence"). American Family plays no role in determining whether a storm constitutes a Metro or Non-Metro Occurrence.

The process by which AIR calculates the Loss Payment Amount is delineated in the Calculation Agent Agreement and the Reinsurance Agreement, both of which are attached to the Amended Complaint. Upon receipt of an Event Notice from American Family, Mariah provides written notice to AIR requesting an Event Report. Id., Ex. 3, Art. 16.2. The Event Report -- not the Event Notice -- triggers Mariah's payment obligations under the Reinsurance Agreement. Id., Art. 7. American Family plays no role in preparing an Event Report.

The Calculation Agent Agreement specifically sets forth the information on which AIR is obligated to rely in calculating the Loss Payment Amount for purposes of an Event Report:

> Upon receipt from the Issuer [Mariah] of written notice substantially in the form set forth in Exhibit A ... *using the latest Catastrophe Bulletins available as of five (5) Business Days prior to the Event Reporting Date* (as defined below), the Calculation Agent shall (1) use commercially reasonable effects to determine, based on information readily and publicly available online from government entities or agencies, whether any part of a location identified in a Catastrophe Bulletin belongs to a Metro County, thereby resulting in a Metro Occurrence; provided that should no Metro County or location within any Metro County be identified in any Catastrophe Bulletin relating to a Covered Event in a state, the Non-Metro Payment Factor will be used for such Covered Event in such state; and (2) obtain the Metro Insured Industry Loss Amounts or Non-Metro Insured Industry Loss Amounts as applicable, with respect to Severe Thunderstorms to which such Event Report relates for each state of the applicable Covered Area.

Id., Ex. 4, Section 3(a)(i)(A) (emphasis supplied).

- 6 -

C.    <u>CAT 42</u>

Although there were several weather-related events that triggered Mariah's payment obligations under the Reinsurance Agreement (<u>see</u> Amended Complaint, Ex. 5), Mariah's sole objection relates to the process by which AIR determined that CAT 42 was a Metro Occurrence in Kansas.  <u>Id.</u>, ¶4.  CAT 42 was a severe storm system that impacted much of the Midwestern and Southwestern United States, between April 3, 2011 and April 5, 2011.  <u>Id.</u>, Ex. 1.  **"This severe weather outbreak ranks as one of the top outbreaks of all time in terms of the sheer number of severe weather reports."**  <u>Id.</u> (emphasis in original).

As each of the Catastrophe Bulletins promulgated by PCS made clear, the largest amount of insured property damage arising from CAT 42 occurred in Kansas.  <u>Id</u>.  In fact, the estimated insured property damage in Kansas more than *tripled* the estimated damage occurring in the next most impacted state.  <u>Id.</u> (November 2 Bulletin).  Due to the magnitude of CAT 42 in Kansas, as well as the fact that if a storm causes damage in *any* Metro County in a state it qualifies as a Metro Occurrence in that state (*supra* at 6), it should have been immediately evident that CAT 42 properly qualified as a Metro Occurrence in Kansas.

Mariah does not address any of those real world facts, but instead complains that there was a flaw in the *process* by which PCS and AIR (correctly) declared CAT 42 a Metro Occurrence, because PCS issued the Revised Original Bulletin *one day* after issuing its "final" November 2 Bulletin, and AIR relied on the Revised Original Bulletin to determine the amounts owed to American Family under the Reinsurance Agreement.  In substance, the Revised Original Bulletin simply amended the initial Catastrophe Bulletin (dated April 5, 2011) for CAT 42 by adding two pages listing specific locations where the historic storm caused damage in Kansas.  <u>Id.</u>, ¶55.  It is undisputed that all of the facts set forth in the Revised Original Bulletin concerning

CAT 42, including the locations impacted by the storm, were accurate. Thus, it is undisputed that CAT 42 was, as a matter of fact, a Metro Occurrence in Kansas.

II.  Mariah's Claims Against American Family

Mariah's initial complaint asserted five quasi-contractual causes of action against American Family -- unjust enrichment (Count 2), conversion (Count 3), tortious interference (Count 4), declaratory judgment (Count 5), and specific performance (Count 6). Its Amended Complaint added a breach of contract claim against American Family (Count 1), without adding any facts that would support such a claim. Each cause of action is addressed below.

ARGUMENT

I.  Standards Applicable to a Motion to Dismiss

In deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must accept all allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor. See Hartford Courant Co. v. Pellegrino, 380 F.3d 83, 89−90 (2d Cir. 2004). However, a claim will survive a motion to dismiss only if it has "'facial plausibility' -- meaning that 'the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Karmely v. Wertheimer, No. 11 Cv. 541, 2012 WL 3583141, at *6 (S.D.N.Y. Aug. 21, 2012) (quoting Ashcroft v. Iqbal, 556 U.S. 662 (2009)). "In order to avoid dismissal, a plaintiff must do more than plead mere 'conclusory allegations or legal conclusions masquerading as factual conclusions.'" Byrd v. Goord, No. 00 Civ. 2135, 2005 WL 2086321, at *2 (S.D.N.Y. Aug. 29, 2005) (citation omitted).

In considering a motion to dismiss, a court is not limited only to the allegations set forth in the complaint. Rather, a court may also consider "documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." Leonard F. v. Israel Discount Bank, 199 F.3d 99, 107 (2d Cir. 1999) (citation omitted).

II.    <u>Breach of Contract</u>

"Under New York law, the elements of a breach of contract claim are (1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages." <u>Swan Media Group, Inc. v. Staub</u>, 841 F. Supp. 2d 804, 807 (S.D.N.Y. 2012).[5]    When pleading these elements, "a plaintiff must identify the specific provision of the contract that was breached as a result of the acts at issue." <u>Wolff v. Rare Medium, Inc.</u>, 210 F. Supp. 2d 490, 494 (S.D.N.Y. 2002); <u>Paul v. Bank of Am. Corp.</u>, No. 09-CV-1932, 2011 WL 684083, at *5 (E.D.N.Y. Feb. 16, 2011) ("A claim for breach of contract must allege, at a minimum, the terms of the contract, each element of the alleged breach and the resultant damages").    Simply "stating in a conclusory manner that an agreement was breached does not sustain a claim of breach of contract." <u>Schandler v. New York Life Ins. Co.</u>, No. 09 Civ. 10463, 2011 WL 1642574, at *7 (S.D.N.Y. April 26, 2011).

Mariah's breach of contract claim fails as a matter of law.  Although Mariah added, via its Amended Complaint, a conclusory allegation that "American Family breached [its] contract agreements" (Amended Complaint, ¶116), it did not adduce any facts to support such an allegation.    In fact, the Amended Complaint does not identify even one provision of the Reinsurance Agreement which Mariah alleges American Family breached, nor does it assert how

<hr>

[5]    New York law applies to this dispute.  <u>See</u>, <u>e.g.</u>, Amended Complaint, Ex. 3, Sec. 17.1.

American Family purportedly breached any such (unidentified) provision.[6]  Instead, the four paragraphs of the Amended Complaint listed immediately after the heading "American Family's Conduct" -- which are the only paragraphs directed to the actions of American Family -- focus solely on the Indenture Agreement.  See Amended Complaint, ¶¶109-112.  American Family is not a party to the Indenture Agreement, and therefore is not alleged to have breached that Agreement.  Id., ¶¶113−117.[7]  Absent any allegations identifying the provision(s) of the *Reinsurance Agreement* that American Family is alleged to have breached, or the conduct that would support such a breach, Mariah's breach of contract claim against American Family necessarily fails.  See Staub, 841 F. Supp. 2d at 807 (dismissing breach of contract claim because "the Complaint does not specify which clause of the Agreement Defendant is alleged to have breached or through what actions or inactions"); Wolff, 210 F. Supp. 2d at 496 (dismissing breach of contract claim because "the Amended Complaint does not identify the specific provision of the [at-issue contract] breached by [defendant]").[8]

---

[6]     The Amended Complaint makes passing reference to the implied covenant of good faith and fair dealing.  To the extent Mariah's breach of contract claim is predicated on an alleged breach of the implied covenant, Mariah's claim must also fail as a matter of law.  New York law is clear that "the obligation of good faith does not create obligations that go beyond those intended and stated in the language of the contract."  Wolff, 210 F. Supp. 2d at 497.  Moreover, "[w]here the conduct complained of does not breach any express provision [of the contract], the implied covenant of good faith will not be breached without some showing of intent to harm the other contracting party or a reckless disregard of it."  Paul, 2011 WL 684083, at *6.  Mariah presents no such allegation of fact here.

[7]     Mariah's allegations concerning the Indenture Agreement also misrepresent the operation of that Agreement.  *Infra* at 21-23.

[8]     In addition, because Mariah's claims against American Family are predicated entirely on AIR's and PCS's alleged conduct, if the claims against AIR and PCS fail, the claims against American Family necessarily fail.  See *infra* at 17-19.

III.     Unjust Enrichment

"To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that 'equity and good conscience' require restitution." Beth Israel Med. Ctr. v. Horizontal Blue Cross Blue Shield of NJ, Inc., 448 F.3d 573, 586 (2d Cir. 2006) (citations omitted). Mariah's unjust enrichment claim fails to state a claim against American Family for two independent reasons, each of which, standing alone, is sufficient to warrant dismissal: (1) under black letter New York law, an unjust enrichment claim does not lie where, as here, the subject matter of the claim is governed by a valid and binding contract between the parties; and (2) equity and good conscience do not require restitution, because American Family was entitled to recover the precise amounts it received, both under the governing contracts and in accordance with the actual facts relating to CAT 42.

A.     Mariah's Unjust Enrichment Claim Falls Within the Subject Matter of, and Therefore Is Precluded by, the Reinsurance Agreement

"The theory of unjust enrichment lies as a quasi-contract claim. It is an obligation the law creates *in the absence of any agreement*." Picture People, Inc. v. Imaging Fin. Servs., 735 F. Supp. 2d 12, 20 (S.D.N.Y. 2010) (citing Beth Israel, 448 F.3d at 586-87) (emphasis supplied). Thus, "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi-contract for events arising out of the same subject matter." Orbit One Commons v. Numerex Corp., 692 F. Supp. 2d 373, 380 (S.D.N.Y. 2010) (citing Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 388 (1987)).

New York courts, following this well-established principle of New York law, routinely dismiss unjust enrichment claims where the subject matter of the claim falls within the scope of a valid contract between the parties. See, e.g., Beth Isr. Med. Ctr. v. Verizon Bus. Network Servs.,

No. 11 Civ. 4509, 2013 WL 1385711 (S.D.N.Y. March 18, 2013) (granting defendant's motion to dismiss plaintiff's unjust enrichment claim where plaintiff's supporting facts fall within, and were not extraneous to, the parties' contracts).[9]

The above-referenced authority is directly on point, and mandates dismissal of Mariah's unjust enrichment claim. The sole basis for Mariah's unjust enrichment claim is its allegation that American Family "was paid tens of millions of dollars more than it was *contractually entitled* to receive and would have received if the amount had been tabulated using the Original [April 5, 2011] Bulletin." See Amended Complaint, ¶7 (emphasis supplied); see also id., ¶120 ("All the payments provided to American Family based upon or related to Defendants' actions in light of the [Amended Original Bulletin] were unjustly awarded and at the expense of Plaintiff, resulting in substantially unearned benefits."). Thus, Mariah acknowledges in its Amended Complaint, as it must, that American Family's right to obtain a recovery in connection with a severe weather event like CAT 42 falls squarely within the subject matter of a valid contract between the parties -- the Reinsurance Agreement.[10] In fact, the Reinsurance Agreement sets

---

[9]    See also RJ Capital, S.A. v. Lexington Capital Funding III, Ltd., No. 10 Civ. 25, 2011 WL 3251554 (S.D.N.Y. July 28, 2011) (granting defendant's motion to dismiss unjust enrichment claim, where the gravamen of plaintiff's claim was that a party to the contract improperly discharged its contractual obligations); Kagan v. HMC-New York, Inc., No. 601306/09, 2010 WL 8470638 (N.Y. Sup. Ct., May 28, 2010) (dismissing plaintiff's unjust enrichment cause of action, where it related to the defendants' breach of an agreement); Fabrizio v. Erie Ins. Co., No. 08-cv-816, 2009 WL 427102 (N.D.N.Y., Feb. 20, 2009) (dismissing plaintiff's claim for unjust enrichment, where the existence of a valid contract covering the dispute was established).

[10]    The subject matter of Mariah's unjust enrichment claim also falls within the scope of the PCS License Agreement and the AIR Calculation Agent Agreement, which provides further support for its dismissal. See LaRoss Partners v. Contact 911 Inc., 874 F. Supp. 2d 147, 166 (E.D.N.Y. 2012) ("'decisions both in New York State courts and in this district have consistently held that claims for unjust enrichment may be precluded by the existence of a contract governing the subject matter of the dispute even if one of the parties to the lawsuit is not a party to the contract.'") (citations omitted).

- 12 -

forth in detail both the types of claims for which American Family is entitled to payment, and the process American Family must follow in order to obtain such payments. See, e.g., id., Ex. 3 at Art. III (Business Covered); Art. VI (Loss Payments); Art. 10.5 (withdrawal from the Reinsurance Trust Account); *supra* at 6 (describing the process).

Faced with the fatal fact that the subject matter of its unjust enrichment claim against American Family falls within the scope of the Reinsurance Agreement (as well as the PCS License Agreement and Calculation Agent Agreement), Mariah has argued that the basis for its claim is not American Family's **receipt** of funds (which was expressly authorized by the Reinsurance Agreement), but rather its **retention** of those same funds. See 9/25/13 Pre-Motion Ltr. at 2 ("the claim is not that American Family breached a contractual obligation but rather that it unjustly retained funds after becoming aware that it was not entitled to keep them as a result of PCS's and AIR's misconduct."). Mariah's argument fails, for (at least) three reasons.

First, as Mariah admits, Mariah fully performed its obligations under the Reinsurance Agreement more than 16 months before filing suit, when the funds in the Reinsurance Trust Account were released to American Family. See Amended Complaint, ¶115 ("Mariah fully performed under the Reinsurance Agreement"); id., ¶123. Having fully performed under the governing contract, Mariah's unjust enrichment claim is barred. See Clark-Fitzpatrick, 70 N.Y.2d at 389 (affirming dismissal of unjust enrichment claim: "It is impermissible, however, to seek damages in an action sounding in quasi-contract where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties.").

Second, Mariah's argument is wholly illogical. As Mariah admits in its Amended Complaint, both Mariah and American Family were aware of *all* of the facts underlying Mariah's

current claims in November 2011 (when all of the parties received the November 23, 2011 Event Report (the "November Event Report") and the Revised Catastrophe Bulletin) and December 2011 (the date of the so-called PCS apology). <u>See</u> Amended Complaint, ¶¶64-65; 75. American Family did not receive payment under the Reinsurance Agreement until (according to the Amended Complaint) February 10, 2012. <u>Id.</u>, ¶123.[11] Thus, nothing happened after the date on which American Family received payment that could have even arguably transformed the proper receipt of funds into the improper retention of those same funds.

    <u>Third</u>, if the mere act of retaining funds somehow could take a claim outside the scope of the contract pursuant to which those funds were received, that exception would swallow the rule prohibiting quasi-contract claims in the face of a valid and binding contract.[12] Accordingly, the cases focus on the "subject matter" of the claim, not on an irrelevant distinction between receipt and retention of funds. <u>Supra</u> at 11-12; <u>see also</u> <u>Bates Adver. USA, Inc. v. McGregor</u>, 282 F. Supp. 2d 209, 217 (S.D.N.Y. 2003) (the "Agreement specifically addresses the amount to be paid to [defendant] -- the true subject of the dispute here, even if it is framed as repayment to [plaintiff] -- which precludes a claim for unjust enrichment"). As described above, the subject matter of Mariah's unjust enrichment claim against American Family inarguably falls within the

---

[11]     It should be noted that the Amended Complaint does not allege that Mariah did anything to stop the release of funds to American Family in February 2012, despite: (a) knowing all of the facts that underlie its current claims; and, (b) the availability of contractual mechanisms for addressing defaults under the Reinsurance Agreement. <u>See</u> Amended Complaint, Ex. 3. Art. XV. Instead, with full knowledge of the relevant facts, Mariah "fully performed under the Reinsurance Agreement." <u>Id.</u>, ¶115.

[12]     The lone case cited by Mariah does not support its position. <u>See</u> 9/25/13 Ltr. at 2 (<u>citing</u> <u>Sergeants Benev. Ass'n Annuity Fund v. Renck</u>, 19 A.D.3d 107, 111-12 (1st Dept. 2005)). <u>Sergeants</u> involved unjust enrichment claims asserted against individuals who were not parties to the governing contracts, based on conduct (breach of fiduciary duty) that was not within the scope of those contracts. <u>Id</u>. The facts at issue here, therefore, bear no resemblance to those which drove the decision in <u>Sergeants</u>.

scope of the Reinsurance Agreement, the PCS License Agreement and the Calculation Agent Agreement and is, therefore, barred. *Supra* at 12-13.

B.    Equity and Good Conscience Preclude Restitution

The essential inquiry in an action for unjust enrichment is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered. See Paramount Film Dist. Corp. v. State, 30 N.Y.2d 415, 421 (1972). Accordingly, a plaintiff is not able to recover under an unjust enrichment theory where "circumstances exist which make such recovery inequitable." U.S. ex rel. Ryan, No. 04-CV-2483, 2011 WL 1841795, *6 (E.D.N.Y. May 13, 2011). Here, Mariah's claim fails as a matter of equity for at least two separate reasons.

1.    CAT 42 Was, In Fact, a Metro Occurrence

Mariah's unjust enrichment claim is predicated on AIR's reliance on the Revised Original Bulletin in characterizing CAT 42 as a Metro Occurrence, and the corresponding increase in the valuation of CAT 42 as a result. See Amended Complaint, ¶120. Yet, glaringly absent from Mariah's Amended Complaint is any suggestion that CAT 42 was not *in fact* a Metro Occurrence -- i.e., that, in the real world, it did not impact one or more counties in Kansas delineated by the parties as a Metro County. To the contrary, CAT 42 hit some of the most populated areas of Kansas, including Lawrence, Leavenworth, Overland Park and Topeka, all of which are located in Metro Countries. See Amended Complaint, Ex. 5, Revised Original Bulletin, p. 4.[13] Despite its overreaching criticisms of the Revised Original Bulletin, Mariah does not allege that the locations identified in that Bulletin are inaccurate in any way. Nor could it, because:

---

[13]    The Court may take judicial notice of the counties in which each of the following cities is located: Lawrence -- Douglas County; Topeka -- Shawnee County; Overland Park -- Johnson County; Leavenworth -- Leavenworth County. See Uniroyal, Inc. v. Jetco Auto Service, Inc., 461 F. Supp. 350, 356 (S.D.N.Y. 1978) (Court takes judicial notice that Poughkeepsie is included within Dutchess County). Douglas, Shawnee, Johnson and Leavenworth County were all designated by the parties as Metro Counties. See Amended Complaint, Ex. 3, Annex B.

(a) CAT 42 "rank[ed] as one of the top outbreaks of all time in terms of the sheer number of weather reports," such that it could not practically have missed *every* Metro County in Kansas -- the state in which it caused (by far) the most significant insured property damage; and (b) the path of CAT 42 is a matter of public record. Id., pp. 1-2; Amended Complaint, ¶65 (noting that locations were published by the National Weather Service). Rather, Mariah complains that the information set forth in the Revised Original Bulletin was available to PCS before November 3 -- not that it was inaccurate. See Amended Complaint, ¶¶55, 93.

Mariah does not explain in its Amended Complaint how or why it was "inequitable" for American Family to receive payment based on AIR's characterization of CAT 42 as a Metro Occurrence, when Mariah cannot dispute that CAT 42 was in fact a Metro Occurrence. To the extent Mariah takes issue with the process followed by PCS and AIR -- but not American Family -- in determining under their separate contracts with Mariah that CAT 42 was a Metro Occurrence, such issues can be resolved in the context of Mariah's breach of contract claim against those entities.[14] However, American Family cannot be punished, in the context of an equitable claim, where: (a) it received exactly what it was contractually entitled to receive based on the operative facts; and (b) Mariah's claim is predicated solely on a process objection, and American Family is not alleged to have played any part in that process.

Conversely, allowing Mariah's preferred result plainly would be inequitable. Mariah seeks to rely on an alleged one-day "delay" in PCS's issuance of the Revised Original Bulletin to force AIR to retroactively characterize a storm that undisputedly was a Metro Occurrence as a Non-Metro Occurrence. If successful, Mariah will obtain a windfall -- at the expense of American Family and its policyholders -- because CAT 42 would be valued at "tens of millions

---

[14]     As described herein, and in PCS's and AIR's motion to dismiss filed contemporaneously herewith, Mariah's breach of contract claim is wholly without merit. See *infra* at 17-19.

of dollars" less than it should have been valued, based on the actual facts and the relevant contract language. As between the positions of American Family and Mariah, it is clear where equity -- and inequity -- lies.

>    2.    PCS Had Discretion to Issue the Revised Original Bulletin, and AIR Was Contractually Obligated to Rely on It

Even if Mariah could reasonably argue that it was somehow inequitable for American Family to obtain payment for a Metro Occurrence that *actually was* a Metro Occurrence, based solely on the process followed by PCS and AIR, Mariah's process objection finds no support in the contracts. Although Mariah uses increasingly aggressive and often misleading rhetoric, its allegations boil down to the following: AIR was not permitted to rely on the Revised Original Bulletin in its November Event Report, because PCS allegedly issued the Revised Original Bulletin one day after the November 2 Bulletin. See Amended Complaint, ¶¶4-7.[15]

Although Mariah strains to undermine the Revised Original Bulletin at every turn, it is constrained to admit that, in substance, the Revised Original Bulletin simply amended the initial April 5, 2011 Catastrophe Bulletin for CAT 42 by adding two pages accurately listing the specific locations where that historic storm caused damage in Kansas. Id., ¶55. Thus, Mariah's ultimate complaint is that PCS allegedly waited one day too long in amending its April 5, 2011

---

[15]    Mariah also draws the unreasonable inference that AIR, PCS and American Family may have "conspired to wipe out Mariah," based *solely* on an alleged "business relationship" between Verisk (AIR and PCS's alleged parent company) and American Family. See Amended Complaint, ¶¶76-78. Of course, Mariah does not (and cannot) assert a cause of action for conspiracy, because the potential existence of a generic business relationship between these entities is insufficient to support such a claim. In fact, such business relationships were anticipated and authorized by the relevant contracts. See, e.g., id., Ex. 4, Sec. 7(a) ("During the term of this Agreement, the Calculation Agent [AIR] and its affiliates shall not be prohibited or otherwise limited from engaging in any aspect of the insurance or reinsurance business … on behalf of or with respect to persons other than the Issuer [Mariah].").

Original Bulletin to provide accurate -- and publicly-available -- factual information about the locations within Kansas where CAT 42 struck.[16]

One would assume that before a party would seek to rely on an alleged reporting delay of a single day to recover "tens of millions" of dollars from an innocent third-party like American Family, it would have an ironclad contractual argument. Yet, Mariah points to no contractual language precluding PCS from issuing or amending, or AIR from relying upon, Catastrophe Bulletins after a so-called "final estimate."[17] There is no such prohibition in any of the relevant contracts. See Amended Complaint, Exs. 2-4. To the contrary, the PCS License Agreement grants PCS "sole discretion" to designate the geographic areas or territories affected by a catastrophe (id., Ex. 2, Ex. C at 2), and AIR is contractually obligated to accept that designation, as long as it is available to AIR more than five (5) business days before it issues an Event Report. Supra at 6. Accordingly, Mariah's reliance on a contractual technicality as a means to deprive

---

[16]     Mariah also emphasizes the *means* by which PCS issued the Revised Original Bulletin. See Amended Complaint, ¶¶60-62. Once again, American Family is not alleged to have played any part in the issuance of the Revised Amended Bulletin, and the means by which PCS issued that Bulletin are immaterial to American Family's right to receive payment under the Reinsurance Agreement.

[17]     Mariah also argues that the Revised Original Bulletin is not a Catastrophe Bulletin at all. See Amended Complaint, ¶46. This argument is a red herring. Mariah acknowledges that the April 5, 2011 Original Bulletin qualified as a Catastrophe Bulletin. Id., ¶37. As Mariah admits, the Revised Original Bulletin was substantively identical to the Original Bulletin, except that it added two new pages identifying the locations where CAT 42 caused damage in Kansas. Id., ¶55. Mariah further acknowledges that information concerning where and when a storm hit is precisely the type of information that belongs in a Catastrophe Bulletin. Id., ¶19. Accordingly, Mariah's argument is nothing but a repackaging of its claim that PCS could not issue, and AIR could not rely on, a Catastrophe Bulletin issued or amended after the Final Development Date.

American Family of funds to which it is entitled is not only grossly inequitable, it is technically wrong.[18]

IV.   Conversion

To plead a claim for conversion under New York law, a plaintiff must establish:  "(1) the property subject to conversion is a specific, identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of plaintiff's rights."  LaRoss Partners LLC v. Contact 911 Inc., 874 F. Supp. 2d 147, 164 (E.D.N.Y. 2012) (internal quotations omitted).  Mariah's conversion claim fails for (at least) three reasons.

First, like unjust enrichment, a claim for conversion is prohibited where the substance of the claim falls within the subject matter of a valid and binding contract.  See, e.g., Poplar Lane Farm LLC v. Fathers of Our Lady of Mercy, 449 Fed. Appx. 57, 59 (2d Cir. 2011) ("Under New York law, when a valid agreement governs the subject matter of a dispute between parties, claims arising from that dispute are contractual; attempts to repackage them as sounding in fraud, *conversion* and other torts, as well as unjust enrichment, implied and quasi contract, and quantum meruit, are generally precluded") (emphasis supplied); D'Ambrosio v. Engel, 292 A.D.2d 564, 565 (2d Dept. 2002) (dismissing conversion claim where claims fell within subject matter of a valid and binding contract).  As set forth herein, Mariah's claims fall within the subject matter of the Reinsurance Agreement, as well as the Calculation Agent Agreement and the PCS License Agreement.  See Amended Complaint, Exs. 2-4.

---

[18]    Based on the instructions from the Court at the pre-hearing conference, American Family will address the contractual arguments only briefly, and otherwise joins in the arguments made in the motion to dismiss filed today by AIR and PCS.

Second, as explained above, American Family's "dominion" over the funds at issue was "authorized" under the governing contracts. *Supra* at 17-19. In fact, Mariah expressly consented to the transfer of funds to American Family. See Amended Complaint, Ex. 3, Art 6.1 ("For Covered Events … the Ceding Insurer shall be entitled to a transfer of funds pursuant to Section 10.4, and the Reinsurer hereby consents to such transfer"); id. ("Following the transfer of funds pursuant to Section 10.4, the Ceding Insurer may withdraw amounts from the Reinsurance Trust Account pursuant to Section 10.5.").

Third, Mariah did not have "possession or control over the property before its conversion." The Amended Complaint alleges that "$100,000,000 was transferred to Defendant American Family out of the Reinsurance Trust Account on or around February 10, 2012." Id., ¶123. Mariah did *not* have "ownership, possession or control" over property in the Reinsurance Trust Account. Rather, all assets in the Reinsurance Trust Account were "within the dominion and control of the Trustee [Deutsche Bank Trust Company Americas] for the benefit of the Beneficiary [American Family]." See Kole Decl., Exhibit B, Reinsurance Trust Agreement, Sections 1.02 and 1.05. Prior to being transferred to the Reinsurance Trust Account, the funds were contained in the Collateral Account, where they were "under the sole dominion and control of the Collateral Agent." See Amended Complaint, Ex. 4, Sec. 1.05. Because the assets in question were not in the possession or control of Mariah before the alleged "conversion," Mariah cannot satisfy the second element above.

V.      Tortious Interference

"Under New York law, a claim for tortious interference requires 'the existence of a valid contract between plaintiff and a third party, defendant's knowledge of the contract, defendant's intentional procurement of the third-party's breach without justification, actual breach of the contract, and damages resulting therefrom.'" IMG Fragrance Brands, LLC. v. Houbigant, Inc.,

759 F. Supp. 2d 363, 377 (S.D.N.Y. 2010) (internal quotations omitted). Mariah's Amended Complaint fails to sufficiently allege at least two of those elements: (1) defendant's intentional procurement of the third party's breach without justification; and (2) actual breach of contract.

A. Mariah Cannot Allege That American Family Intentionally Procured a Breach of the Indenture Agreement Without Justification

Mariah has not sufficiently alleged that American Family acted with the requisite "intention" under the third prong of a tortious interference claim. "The New York Court of Appeals has described the 'intention' required by the third prong as 'an intention to harm plaintiff without economic or other lawful excuse or justification.'" Indep. Asset Mgmt. LLC v. Zanger, 538 F. Supp. 2d 704, 711 (S.D.N.Y. 2008) (quoting Alvord & Swift v. Stewart M. Muller Constr. Co., 46 N.Y.2d 276 (1978)).

The Amended Complaint does not, except in wholly conclusory fashion, allege that American Family acted with any such intention to harm Mariah. See Amended Complaint, ¶130. Nor would any such intention logically exist, where Mariah was nothing more than a special purpose vehicle, which American Family had no reason to seek to harm. Supra at 4. To the extent any intent could be inferred from the Amended Complaint as a whole, it would be American Family's intent to withdraw funds for purposes of paying catastrophe losses to its policyholders arising from CAT 42. Such an intention falls squarely within American Family's economic self-interest, which cannot form the predicate of a tortious interference claim. See Zanger, 538 F. Supp. 2d at 711 (dismissing tortious interference claim where complaint alleged conduct within defendant's economic self-interest).

B. Mariah's Allegations Are Insufficient to Establish an Actual Breach of Contract

Mariah fails to specifically allege conduct which would constitute a viable claim for breach of the Indenture Agreement by Deutsche Bank Trust Company Americas ("DB

Americas") or Deutsche Bank AG ("DB AG"). As an initial matter, the Amended Complaint contains no cause of action for breach of the Indenture Agreement by DB Americas, DB AG or anyone else. Instead, Mariah alleges that DB Americas breached Article IX, Section 9.5 of the Indenture Agreement by transferring funds to American Family without first receiving "written notice from American Family setting forth the calculations supporting transfer of funds from DB Americas to American Family." See Amended Complaint, ¶¶110–111. Specifically, Mariah alleges that American Family demanded payment via letter dated January 3, 2012, which did not contain any such calculations. Id.

Whether intentionally or not, Mariah misrepresents the requirements of Section 9.5 of the Indenture Agreement, the substance of which Mariah (tellingly) neither quotes in its Amended Complaint, nor attaches thereto. Section 9.5 references the process by which funds are transferred to and from the Collateral Account and the Reinsurance Trust Account. See Kole Decl., Exhibit C, Indenture Agreement. The "written notice" to which Mariah refers in its Amended Complaint presumably refers to the Event Notice, by which American Family provides Mariah with an estimate of losses relating to a particular Covered Event. Id.; see also Amended Complaint, Ex. 3, Sec. 16.2 (describing the Event Notice).

The Event Notice does not, however, trigger a payment obligation to American Family. Upon receipt of an Event Notice from American Family, Mariah is obligated to give written notice to AIR, requesting an Event Report. Id. ("Upon receipt of an Event Notice from the Ceding Insurer ... the Reinsurer shall give written notice ... to the Calculation Agent requesting the Calculation Agent provide an Event Report."). Id., Art. VII ("No claims shall be made upon the Reinsurer under the Coverage in effect, and the Reinsurer has no liability for any losses hereunder, unless and until the Reinsurer has received an Event Report"). It is the Event Report,

not the Event Notice, which triggers payment to American Family under the Reinsurance Trust Account. Thus, the allegation that DB Americas could transfer funds in response to the January 3, 2012 letter -- or any letter other than an Event Report -- is simply false, under the plain terms of the governing contracts.[19]

## VI. Declaratory Judgment

Under the Declaratory Judgment Act, 28 U.S.C. §2201(a) (the "DJA"), a court "may declare the rights and other legal relations of any interested party seeking such a declaration" in "a case of actual controversy." Fleisher v. Phoenix Life Ins. Co., 858 F. Supp. 2d 290, 300 (S.D.N.Y. 2012). Even where an actual controversy has been established, a court still must decide whether it will exercise discretion to entertain a request for declaratory relief, as the DJA confers discretion upon the courts, rather than an absolute right upon the litigant. Id. at 301. When deciding whether to entertain a declaratory judgment action, a court should consider "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." Id. (internal quotations omitted).

Mariah's DJA claim fails here, because the DJA is intended to operate prospectively. Courts regularly dismiss claims under the DJA seeking to recover damages that have accrued based on conduct that has already occurred. See, e.g., Lojan v. Crumbsie, No. 12 cv. 0320, 2013 WL 411356, at *5 (S.D.N.Y. Feb. 1, 2013) ("[D]eclaratory relief is intended to operate prospectively. There is no basis for declaratory relief where only past acts are involved.")

---

[19]    In addition, Mariah's Amended Complaint is predicated in large measure on the November Event Report, issued by AIR on November 23, 2011. See Amended Complaint, ¶¶75-88. The January 3, 2012 letter referenced in the Amended Complaint -- delivered more than one month *after* AIR issued the November Event Report -- could not constitute an Event Notice in connection with that Event Report, since by definition any such Event Notice would had to have been issued *before* the corresponding Event Report.

(internal quotations omitted); <u>Fleisher</u>, 858 F. Supp. 2d at 301 ("Plaintiffs note, correctly, that 'declaratory relief is intended to operate prospectively.'") (internal quotations omitted).[20]

Mariah's claim here is predicated solely on past conduct. The latest potentially relevant action identified in the Amended Complaint took place in February 2012, when American Family is alleged to have received funds from the Reinsurance Trust Account. <u>See</u> Amended Complaint, ¶123. AIR's and PCS's alleged conduct took place largely in 2011. <u>Id.</u>, ¶¶89-103. Thus, the specific declaration sought by Mariah relates *entirely* to past acts -- it does not guide the future conduct of the parties at all. <u>Id.</u>, ¶135; <u>see</u> <u>KM Enters.</u>, 2012 WL 4472010, at *19 ("the 'real value of the judicial [declaratory] pronouncement ... is the settling of some dispute which affects the behavior of the defendant towards the plaintiff'") (internal quotations omitted); <u>Wiley & Sons,</u> 2011 WL 5245192, at *4 ("The main purpose of the DJA is to 'avoid the accrual of avoidable damages to one not certain of his rights and to afford him an early adjudication without waiting until his adversary should see fit to begin suit, after damage has accrued.'") (internal quotations omitted). Thus, if a viable cause of actions exists here -- and it does not -- the only potential avenue for relief is a claim for breach of contract, not a claim under the DJA.

VII.  <u>Specific Performance</u>

Mariah's final cause of action sounds in specific performance. In addition to the arguments asserted herein, *supra*, Mariah's specific performance claim fails for three reasons.

<u>First</u>, "[s]pecific performance is an equitable remedy for a breach of contract, rather than a separate cause of action." <u>RJ Capital, S.A. v. Lexington Capital Funding III, Ltd.</u>, No. 10 Civ.

---

[20]    <u>See also</u> <u>KM Enters., Inc. v. McDonald</u>, 11-cv-5098, 2012 WL 4472010, at *19 (E.D.N.Y. Sept. 25, 2012) ("The main barrier in a declaratory judgment action is that it cannot be used 'solely to adjudicate [a defendant's] past conduct.'") (internal quotations omitted); <u>John Wiley & Sons, Inc. v. Visuals Unlimited, Inc.</u>, No. 11-CV-5453, 2011 WL 5245192, at *4–5 (S.D.N.Y. Nov. 2, 2011) (dismissing DJA claim, where only past acts were involved).

25, 2011 WL 3251554, at *16 (S.D.N.Y. July 28, 2011) (internal quotations omitted); see also Cacchillo v. Insmed Inc., 833 F. Supp. 2d. 218, 236 n.18 (N.D.N.Y. 2011) ("Specific performance is a remedy, not an independent claim."). Because specific performance is not a standalone cause of action, the claim must be dismissed. See, e.g., Tierney v. Omnicom Group, No. 06 Civ. 14302, 2007 WL 2012412, at *10 (S.D.N.Y. July 11, 2007) (granting a motion to dismiss plaintiff's specific performance cause of action because "[s]pecific performance is a remedy, and a remedy itself cannot be a cause of action") (citation omitted).

Second, to obtain the remedy of specific performance, Mariah must prove "the existence of an enforceable contract, [and] the defendant's breach of that contract by non-performance." Ross Univ. Sch. of Med., Ltd. v. Brooklyn-Queens Health Care, Inc., No. 09-cv-1410, 2013 WL 1334271, at *19 (E.D.N.Y. March 28, 2013). Here, Mariah has not alleged a viable breach of contact claim against American Family. *Supra* at 9-10.

Third, "specific performance will not be ordered where money damages 'would be adequate to protect the expectation interest of the injured party.'" Sokoloff v. Harriman Estates Dev. Corp., 96 N.Y.2d 409, 415 (2001) (citations omitted). Here, the only remedy Mariah seeks is money damages. Specifically, Mariah seeks return of the funds previously distributed to American Family relating to CAT 42. Those funds represent an easily calculable sum of money. Specific performance, therefore, is not warranted.

CONCLUSION

For the reasons set forth herein, American Family respectfully requests that this Court: (a) dismiss Counts 1-6 of Mariah's Amended Complaint against American Family, with prejudice; and (b) grant such other and proper relief as the Court deems just and proper.


Dated: November 20, 2013

GALLET DREYER & BERKEY, LLP


By:     */s/ David S. Douglas*
       David S. Douglas
       845 Third Avenue
       New York, New York 10022
       (212) 935-3131
*Attorneys for Defendant American*
*Family Mutual Insurance Company*

Of Counsel:

Robert A. Kole, Esq. *pro hac vice*
J.P. Jaillet, Esq., *pro hac vice*
Choate, Hall & Stewart LLP
Two International Place
Boston, Massachusetts 02110
(617) 248-5000