**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| MARIAH RE LTD. (in liquidation), acting by and through Geoffrey Varga and Jess Shakespeare, in their capacities as liquidators thereof, | 13 Civ. 4657 |
| | **ECF Case** |
| *Plaintiff*, | **Electronically Filed** |
| v. | |
| AMERICAN FAMILY MUTUAL INSURANCE CO., ISO SERVICES, INC. and AIR WORLDWIDE CORP., | |
| *Defendants*. | |

**MEMORANDUM OF LAW IN SUPPORT OF ISO SERVICES, INC. AND AIR WORLDWIDE CORP.'S JOINT MOTION TO DISMISS**

DAVIS POLK & WARDWELL LLP
Joel M. Cohen
Matthew B. Rowland
Richard R. Barker

450 Lexington Avenue
New York, New York  10017
(212) 450-4000

*Attorneys for Defendants ISO Services, Inc. and AIR Worldwide Corp.*

## TABLE OF CONTENTS

P̲AGE

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF FACTS .......................................................................................... 3

    I.      The Relevant Contracts............................................................................3

          A.      Reinsurance Agreement with American Family................................3

          B.      PCS License Agreement ...............................................................4

          C.      AIR Calculation Agent Agreement.................................................5

    II.      The April 2011 Storm .............................................................................6

          A.      PCS's Amended Bulletin .............................................................8

          B.      AIR's Event Report.....................................................................8

    III.      Mariah Files Suit...................................................................................9

LEGAL STANDARD................................................................................................ 10

ARGUMENT ......................................................................................................... 10

    I.      Mariah's Breach of Contract Claim Should Be Dismissed ........................10

          A.      Mariah Cannot State a Breach of Contract Claim Against PCS....................11

          B.      Mariah Cannot State a Breach of Contract Claim Against AIR ....................16

    II.      There Was No Breach of the Implied Covenant of Good Faith and Fair Dealing.......20

    III.      There Is No Basis for Declaratory Relief ...............................................21

    IV.      Specific Performance Is Not Available....................................................22

CONCLUSION....................................................................................................... 22

## TABLE OF AUTHORITIES

PAGE

CASES

Aetna Cas. & Sur. Co. v. Aniero Concrete Co.,
404 F.3d 566 (2d Cir. 2005).................................................................................. 11, 19

Ashcroft v. Iqbal,
556 U.S. 662 (2009).............................................................................................. 10, 16

Bell Atl. Corp. v. Twombly,
550 U.S. 544 (2007).............................................................................................. 10, 20

Bradco Homes, Inc. v. Gellert,
636 N.Y.S.2d 202 (App. Div. 1996)..................................................................... 14, 15

Chiste v. Hotels.com L.P.,
756 F. Supp. 2d 382 (S.D.N.Y. 2010)........................................................................ 21

Convergent Wealth Advisors, LLC v. Lydian Holding Co.,
No. 12 Civ. 119(SAS), 2012 WL 2148221 (S.D.N.Y. June 13, 2012)..................... 18

Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.,
837 F. Supp. 2d 162 (S.D.N.Y. 2011)........................................................................ 20

Ferrari v. Keybank Nat'l Ass'n,
No. 06 Civ. 6525(MAL), 2009 WL 35330 (W.D.N.Y. Jan. 5, 2009)....................... 12

Five Star Dev. Resort Cmtys., LLC v. iStar RC Paradise Valley LLC,
No. 09 Civ. 2085(LTS), 2010 WL 2697137 (S.D.N.Y. July 6, 2010)...................... 22

Harris v. Provident Life & Accident Ins. Co.,
310 F.3d 73 (2d Cir. 2002)................................................................................... 20, 21

Josepthal & Co. v. John Phillips & Co.,
No. 00 Civ. 3479(JSM), 2001 WL 1658207 (S.D.N.Y. Dec. 27, 2001).............. 20, 21

Leonard F. v. Israel Discount Bank,
199 F.3d 99 (2d Cir. 1999)......................................................................................... 10

LJL 33rd St. Assocs. v. Pitcairn Props. Inc.,
725 F.3d 184 (2d Cir. 2013).................................................................................. 20, 21

Lojan v. Crumbsie,
No. 12 Civ. 0320(LAP), 2013 WL 411356 (S.D.N.Y. Feb. 1, 2013)....................... 21

Maniolos v. United States,
   741 F. Supp. 2d 555 (S.D.N.Y. 2010),
   aff'd, 469 F. App'x 56 (2d Cir. 2012) .............................................................. 10, 12

R.J. Capital, S.A. v. Lexington Capital Funding III, Ltd.,
   10 Civ. 25(PGG), 2011 WL 3251554 (S.D.N.Y. July 28, 2011)............................... 22

Reiser Inc. v. Roberts Real Estate,
   739 N.Y.S.2d 753 (App. Div. 2002) ........................................................................ 12

Slattery Skanska Inc. v. Am. Home Assurance Co.,
   885 N.Y.S.2d 264 (App. Div. 2009) ......................................................................... 12

Wastemasters, Inc. v. Diversified Investors Servs. of N. Am, Inc.,
   159 F.3d 76 (2d Cir. 1998)........................................................................................ 19

Wolff v. Rare Medium, Inc.,
   210 F. Supp. 2d 490 (S.D.N.Y. 2002),
   aff'd, 65 F. App'x 736 (2d Cir. 2003) ...................................................................... 20

<u>STATUTES & RULES</u>

Fed. R. Civ. P. 12(b)(6).................................................................................... 1, 10, 22

Defendants ISO Services, Inc. ("PCS") and AIR Worldwide Corp. ("AIR") respectfully submit this memorandum of law in support of their joint motion to dismiss all claims asserted against them in the Amended Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

Plaintiff Mariah Re Ltd. ("Mariah") retained PCS to provide "Catastrophe Bulletins" that collected and reported information regarding catastrophic weather events. It hired AIR to prepare "Event Reports," which made calculations based on the Catastrophe Bulletins provided by PCS. Mariah then used the Event Reports to determine the amounts due to Defendant American Family Mutual Insurance Co. ("American Family") under the terms of a reinsurance agreement.[1]

This dispute involves the reporting of a severe thunderstorm system that struck Kansas in April 2011 (the "April Storm"). PCS reported, inter alia, that the storm impacted a number of specific cities. This was public information, and Mariah does not claim it was inaccurate. In turn, AIR prepared an Event Report based on the information provided by PCS. Because some of the affected cities were located in counties defined in the relevant agreements as "Metro" counties (and there is no dispute that they were), AIR classified the storm as a "Metro Occurrence" with respect to Kansas and made its calculations accordingly. Mariah does not allege that the calculations were inaccurate.

---

[1] Mariah is a "special purpose vehicle" created for the purpose of issuing a financial instrument known as a "catastrophe bond." Such an instrument permits an insurer (here, American Family) to hedge its risk with respect to the occurrence of certain types of severe weather events during a specified period of time. If the estimated insurance losses from those weather events exceed a certain threshold, the principal of the bonds is paid in whole or in part to the insurer. Investors in the bonds take the other side of the bet. If the estimated insurance losses are below the threshold, the investors earn a return on their investment in the bonds.

Mariah's claims are solely about process. It alleges that the Catastrophe Bulletin listing the affected counties in Kansas was prepared one day after PCS's "final estimate" of insured property damage from the April Storm and was backdated. Mariah further alleges that AIR should not have relied on the information in this Catastrophe Bulletin, and that, instead, the Kansas storm should have been classified as a Non-Metro Occurrence—even though demonstrably it was not.

In effect, Mariah claims a contractual right to receive an Event Report based on information that all parties agree was inaccurate, and to reduce its payments to American Family accordingly. Not surprisingly, the relevant contracts require no such thing. PCS was authorized to designate the geographic areas affected by the storm in its "sole discretion"—and to correct a Catastrophe Bulletin"[i]f, as and when" it chose to do so—and AIR was explicitly <u>required</u> by contract to rely upon the most recent Catastrophe Bulletin available five days prior to the Event Reporting Date, which is exactly what it did. Mariah's allegations regarding the process by which PCS and AIR reported accurate information, even if true, do not state a claim upon which relief can be granted.

At a preliminary conference on October 7, 2013, the Court offered Mariah the opportunity to file an Amended Complaint rather than defend its original Complaint against a motion to dismiss. Mariah thereafter filed an Amended Complaint that remains virtually unchanged with respect to PCS and AIR, other than the addition of a few conclusory and irrelevant assertions. For the reasons set forth below, Mariah cannot state a viable claim against PCS and AIR. The claims against PCS and AIR in the Amended Complaint should be dismissed with prejudice.

## STATEMENT OF FACTS[2]

Mariah's Amended Complaint relates to a November 2010 reinsurance agreement between Mariah and American Family.  Under the agreement, Mariah agreed to pay American Family up to $100 million in reinsurance proceeds to cover damages occurring from certain severe weather events during a three-year risk period.  (Am. Compl. ¶ 15.)  Mariah's payment obligations were triggered when covered losses reached $825 million and increased on a dollar-for-dollar basis until reaching $925 million.  (Id.)

Mariah entered into a series of contracts in November 2010 as part of the reinsurance arrangement and associated offering of Mariah's notes.  (Id. ¶ 16.)  These included, among others, separate agreements with American Family, PCS and AIR.  The relevant contracts, as well as the subsequent facts that Mariah alleges in support of its Amended Complaint, are described below.

## I.      The Relevant Contracts

### A.      Reinsurance Agreement with American Family

Mariah and American Family entered into a Catastrophe Excess of Loss Reinsurance Agreement (the "Reinsurance Agreement") in November 2010.  The Agreement required Mariah to cover insurance losses, up to $100 million, for insured property damage resulting from severe thunderstorms in certain states once such losses reached a certain threshold—$825 million.  (Id. ¶ 3; Reinsurance Agreement (Am. Compl. Ex. 3).)

Covered losses under the Reinsurance Agreement were calculated using a pre-determined formula.  (Reinsurance Agreement (Am. Compl. Ex. 3) at 4–5.)  Losses were calculated based on

---

[2] PCS and AIR assume the truth of the factual allegations of the Amended Complaint solely for purposes of this motion.

aggregate insured property and automotive losses that were caused by a Covered Event—i.e., a severe thunderstorm in one of the states covered under the Reinsurance Agreement. The calculation of covered losses also depended on whether the severe storm affected a location in a Metro area or Non-Metro area. (Id. Annex A-1.) The required payout was generally higher if the Covered Event affected a defined Metro county. (Id.) To identify severe weather events and calculate the payout, if any, owed to American Family, the Reinsurance Agreement contemplated that Mariah would retain a Reporting Agency and a Calculation Agent, which respectively were PCS and AIR. (Id. at 2, 13.)

**B.     PCS License Agreement**

In late 2010, Mariah purchased a license from PCS to obtain access to its Catastrophe Bulletins, which are reports that identify severe weather events and estimate corresponding insured property losses. (Am. Compl. ¶¶ 18–23; License Agreement (Am. Compl. Ex. 2).) The insurance industry relies on Catastrophe Bulletins to prepare for and respond to catastrophic events, including severe thunderstorms. (License Agreement (Am. Compl. Ex. 2) at 1.) To provide customers with further data regarding potential catastrophes, PCS also circulates daily Severe Weather Summaries, which identify areas that are affected by weather-related events based on information from the National Weather Service. (Am. Compl. ¶¶ 20, 65.) Mariah sought access to PCS's services for use in calculating covered losses owed to American Family under the Reinsurance Agreement. (Id. ¶¶ 18, 26.)

The License Agreement makes clear that PCS retains broad discretion with respect to its Catastrophe Bulletins, consistent with the guidelines attached as Exhibit C to the Agreement. In particular, the License Agreement provides that "the designation of a geographic area or territories affected by a PCS Identified Catastrophe is . . . <u>a matter within PCS's judgment and</u>

sole discretion." (License Agreement (Am. Compl. Ex. 2) Ex. C, at 2 (emphasis added).)  In

addition, PCS can exercise its discretion to revise a Catastrophe Bulletin to address any error,

omission, or mistake "[i]f, as and when" it becomes aware of such error, omission, or mistake.

(Id. § 6(c).)  PCS also has discretion to modify "its general loss estimation methodology at any

time and modify application of its methodology in connection with any particular catastrophe."

(Id. Ex. C, at 6; see also id. § 1(e).)  The License Agreement further affords PCS full discretion

regarding the "official date(s)" of an identified Catastrophe as well as "whether insured property

losses occurring close in time to one another are to be considered the result of a single or

multiple and separate PCS identified Catastrophes."  (Id. Ex. C, at 2–3.)

      **C.**     **AIR Calculation Agent Agreement**

      Mariah retained AIR to use the information contained in the PCS Catastrophe Bulletins to

issue Event Reports calculating, based on a pre-determined formula, the amount of reinsurance

proceeds owed to American Family.  (Am. Compl. ¶¶ 26–30; Calculation Agent Agreement

(Am. Compl. Ex. 4).)  In a November 15, 2010, Calculation Agent Agreement (the "Calculation

Agent Agreement"), AIR agreed to use for this purpose the "latest Catastrophe Bulletins

available as of five (5) Business Days prior to the Event Reporting Date."  (Calculation Agent

Agreement (Am. Compl. Ex. 4) § 3(a)(i)(A).)  In this regard, the term "Catastrophe Bulletin"

was defined as:

> [A]ny catastrophe bulletin originated and disseminated by the
> Reporting Agency (including through ISOnet PCS) that identifies
> and assigns a catastrophe number to a Peril and/or gives
> preliminary, or subsequently, resurvey estimates of insured
> property losses arising from a Peril.

(Am. Compl. ¶ 101; Reinsurance Agreement (Am. Compl. Ex. 3) at 2.)[3]  AIR was also required

under the Calculation Agent Agreement to treat covered losses as either Metro or Non-Metro,

depending on whether the relevant Catastrophe Bulletins identified a location in a defined Metro

area.  (Am. Compl. ¶¶ 31–32).  A weather event would be deemed a Metro Occurrence for the

entirety of a given state if either:

> (a) a Metro County is listed in the Catastrophe Bulletin relating to
> such Covered Event in such state or (b) [AIR], after using its
> reasonable efforts and based on information publicly available
> online from government entities or agencies, determines that any
> part of the locations listed on a Catastrophe Bulletin corresponds to
> a Metro County in such state.

(Reinsurance Agreement (Am. Compl. Ex. 3) at 10.)

After AIR determined whether an event was a Metro or Non-Metro Occurrence, it would

prepare an Event Report identifying the "Insured Industry Loss Amount," which, by definition,

was the sum of insured industry property losses occurring in Metro and Non-Metro areas:

> Insured Industry Loss Amount shall mean the sum of the Metro
> Insured Industry Loss Amount together with the Non-Metro
> Industry Insured Loss Amount.

(Reinsurance Agreement (Am. Compl. Ex. 3) at 8.)  The Metro and Non-Metro Insured Industry

Loss Amounts for each event would then be used to calculate the total reinsurance payout owed

by Mariah to American Family.  (Calculation Agent Agreement (Am. Compl. Ex. 4) §3(a)(i).)

## II.     The April 2011 Storm

In early April 2011, a severe thunderstorm system struck several states in the Midwest,

causing approximately $1.3 billion in insured property losses in states covered under Mariah's

---

[3] The Calculation Agent Agreement specifies that "[c]apitalized terms used herein but not
otherwise defined shall have the meanings ascribed to them in the Reinsurance Agreement."
(Calculation Agent Agreement (Am. Compl. Ex. 4) § 1.)

Reinsurance Agreement with American Family.  (Am. Compl. ¶ 35; AIR Event Report (Am. Compl. Ex. 5).)  PCS contemporaneously issued a Severe Weather Summary that contained detailed geographic information from the National Weather Service regarding the impact of the April Storm in Kansas and nine other states.  (Am. Compl. ¶¶ 65, 93.)

On April 5, PCS issued an initial Catastrophe Bulletin for the April Storm, designating the storm "Catastrophe Serial 42."  (Am. Compl. Ex. 1.)  This Bulletin, which Mariah refers to as the "Original Bulletin," described the April Storm "as one of the top outbreaks of all-time in terms of the shear [sic] number of severe weather reports," and identified Kansas as one of the states impacted.  (Id. at 2 (emphasis omitted).)  The Original Bulletin did not list specific cities or counties affected by the storm.  (Id.)

From April through November 2011, PCS issued a series of additional Catastrophe Bulletins, which refined its estimate of insured property losses from the April Storm.  (See AIR Event Report (Am. Compl. Ex. 5).)  On November 2, 2011, PCS issued a "Final Estimate," which reflected the following insured property losses resulting from the April Storm in states covered by the Reinsurance Agreement:

**Table 1:  Final Estimate of Insured Property Losses for the April Storm**

| Covered State | Personal Property Losses | Automobile Property Losses | Insured Industry Loss Amount |
|---|---|---|---|
| Georgia | $121,000,000 | $9,000,000 | $130,000,000 |
| Iowa | $76,000,000 | $21,000,000 | $97,000,000 |
| Illinois | $46,000,000 | $4,000,000 | $50,000,000 |
| Kansas | $635,000,000 | $75,000,000 | $710,000,000 |
| Missouri | $178,000,000 | $22,000,000 | $200,000,000 |
| Wisconsin | $154,000,000 | $14,000,000 | $168,000,000 |
| **TOTAL:** | $1,210,000,000 | $145,000,000 | **$1,355,000,000** |

### A.     PCS's Amended Bulletin

On November 3, 2011, PCS amended its Original Bulletin for the April Storm and posted an amended Catastrophe Bulletin (the "Amended Bulletin") to ISOnet.  (Am. Compl. ¶ 54.)  The Amended Bulletin, which Mariah describes as "falsified" (id.), was "identical in all respects to the Original Bulletin," except that PCS added an accurate list of those cities in Kansas that were "affected by" the April Storm, but which were not specified in the Original Bulletin (id. at ¶ 5; AIR Event Report (Am. Compl. Ex. 5) at Catastrophe Bulletin 42-1).  The cities referenced in the Amended Bulletin (including Topeka, Lawrence, and Olathe, Kansas) are located in "Metro" counties as identified in the Mariah agreements.  (Reinsurance Agreement (Am. Compl. Ex. 3) Annex B-1.)

On December 9, 2011, PCS issued a public statement describing its reasons for amending the Original Bulletin.  (Am. Compl. ¶ 64.)  The detailed geographic information was added "[t]o assist customers in understanding the magnitude of the final damage estimate" for the April Storm.  (Id. ¶ 65.)  PCS explained that the geographic information, which was obtained from the National Weather Service, was "consistent with the type of publicly available information PCS has published in connection with other events."  (Id.)

### B.     AIR's Event Report

Approximately three weeks after PCS issued the Amended Bulletin, AIR issued a November 23, 2011, Event Report calculating the payout owed by Mariah to American Family. (AIR Event Report (Am. Compl. Ex. 5).)  Using the latest Catastrophe Bulletins, including the Amended Bulletin, AIR determined that the April Storm impacted cities in Kansas, such as Topeka, Lawrence, and Olathe, located in defined Metro counties.  (See id.)  Pursuant to the Calculation Agent Agreement, all insured property losses in Kansas resulting from the April

8

Storm were therefore deemed Metro losses.  (<u>Id.</u>)  AIR then determined that the total Insured Industry Loss Amount for the April Storm was $1,355,000,000, including $710,000,000 in Metro areas and $645,000,000 in Non-Metro areas.  (<u>Id.</u> at 2.)  Under the pre-determined formula for calculating covered losses, AIR concluded that Mariah was obligated to pay American Family the entire proceeds of the $100 million reinsurance policy.  (Am. Compl. ¶ 123.)  Mariah agreed to the payout in early 2012.  (See <u>id.</u>)

## III.   Mariah Files Suit

More than a year after agreeing to the $100 million payout, Mariah filed suit seeking a return of these proceeds (which went to American Family, not to PCS or AIR).  Mariah claims that PCS improperly amended its Original Bulletin for the April Storm by adding accurate geographic information about that storm.  (<u>See</u> <u>id.</u> ¶¶ 54–55.)

On September 16, 2013, PCS and AIR requested a pre-motion conference seeking leave to file a motion to dismiss the original Complaint.  At the conference, the Court offered Mariah the opportunity to amend its Complaint rather than defending it against a motion to dismiss. Mariah accepted the Court's offer and filed an Amended Complaint on October 18, 2013.  Other than adding unsupported allegations that PCS "falsified documentation" and acted with "ulterior motives," Mariah's substantive allegations with respect to PCS and AIR are unchanged. (<u>Compare</u> Compl. ¶¶ 70, 72(i)–(ii) <u>with</u> Am. Compl. ¶¶ 70, 72(i)–(iii).)[4]  In addition, the

---

[4] The Amended Complaint alleges that PCS knew about the geographic scope of the April Storm "months earlier" than the Amended Bulletin, but does not suggest how that superfluous allegation (which simply demonstrates that the relevant geographic information was publicly reported by the National Weather Service and was not controversial) supports its claim. (Am. Compl. ¶ 55.)  It also adds a reference to one additional Catastrophe Bulletin (CAT 47) to the list of two in the Original Complaint (CAT 43 and CAT 53), in which Mariah claims PCS did not provide the same level of geographic detail as it did for the April Storm.  (<u>Id.</u> ¶ 72.)  Mariah's implicit suggestion that CAT 42 was the only Catastrophe Bulletin that included city-specific information is not only incorrect, it is irrelevant, given PCS's sole discretion as to the inclusion (….continued)

Amended Complaint adds conclusory references to a purported breach of the implied covenant of good faith and fair dealing, but does not allege any facts that would support such a claim.  (Id. ¶¶ 7, 114, 116.)

## LEGAL STANDARD

Under Rule 12(b)(6), a complaint must set forth "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  The complaint must be dismissed if "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct."  Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).  "[L]abels and conclusions" or "naked assertions devoid of further factual enhancement" are not sufficient to state a claim.  Id. at 678 (internal quotation marks omitted).  In resolving a motion to dismiss, a court may consider the allegations in the complaint as well as "documents appended to the complaint or incorporated in the complaint by reference, and . . . matters of which judicial notice may be taken."  Leonard F. v. Israel Discount Bank, 199 F.3d 99, 107 (2d Cir. 1999).

## ARGUMENT

### I.    Mariah's Breach of Contract Claim Should Be Dismissed

Mariah's breach of contract claims against PCS and AIR are foreclosed by the plain language of the License and Calculation Agent Agreements.  "Where a contract's language is clear and unambiguous, a court may dismiss a breach of contract claim on a Rule 12(b)(6) motion to dismiss."  Maniolos v. United States, 741 F. Supp. 2d 555, 567 (S.D.N.Y. 2010), aff'd,

---

(continued….)

of geographic information in each of its Catastrophe Bulletins.  In any event, Mariah's reference to a third irrelevant Bulletin in the Amended Complaint does not add anything of substance to the Original Complaint.

469 F. App'x 56 (2d Cir. 2012).[5]  In this regard, "the language of a contract is not made ambiguous simply because the parties urge different interpretations.  Nor does ambiguity exist where one party's view strains the contract language beyond its reasonable and ordinary meaning."  Aetna Cas. & Sur. Co. v. Aniero Concrete Co., 404 F.3d 566, 598 (2d Cir. 2005) (internal quotation marks and alteration omitted).

### A.   Mariah Cannot State a Breach of Contract Claim Against PCS

Mariah's claim against PCS fails because the License Agreement contains no restrictions as to the time, date, or geographic information contained in PCS's Catastrophe Bulletins.  Under the License Agreement, "[t]he designation of a geographic area or territories affected by a PCS Identified Catastrophe is . . . a matter within PCS's judgment and sole discretion."  (License Agreement (Am. Compl. Ex. 2) Ex. C, at 2.)  The License Agreement further affords PCS discretion to amend its Catastrophe Bulletins when it deems it appropriate to do so to address omissions.  (Id. § 6(c).)  Even assuming the truth of Mariah's allegations as to the timing and form of PCS's last Catastrophe Bulletin for the April Storm, Mariah cannot as a matter of law state a viable claim against PCS for publishing a Catastrophe Bulletin that Mariah concedes was entirely accurate.

### i.   The Amended Bulletin did not violate PCS's current business practices.

The License Agreement affords PCS broad discretion with respect to the form and content of its Catastrophe Bulletins.  (Id. Ex. C, at 2.)  It does not, as Mariah seems to allege, impose upon PCS an obligation to adhere to vague and malleable standards such as "standard practice" or "normal business practice."  (See Am. Compl ¶¶ 63, 103(v).)  Instead, the License

---

[5] New York law governs this dispute.  (License Agreement (Am. Compl. Ex. 2) § 16(e); Calculation Agent Agreement (Am. Compl. Ex. 4) § 16.)

Agreement requires PCS to act "in accordance with its current business practices, as described in

. . . Exhibit C" to the License Agreement.  (License Agreement (Am. Compl. Ex. 2) § 6(b); <u>see</u>

<u>also</u> <u>id.</u> Ex. C.)  Those practices emphasize discretion and flexibility, and do not mandate any

particular timing or procedure for amending or disseminating Catastrophe Bulletins.  <u>See</u> <u>Reiser</u>

<u>Inc. v. Roberts Real Estate</u>, 739 N.Y.S.2d 753, 755 (App. Div. 2002) (holding that contract

language affording "full discretion" to defendants was "clear and unambiguous"); <u>Ferrari v.</u>

<u>Keybank Nat'l Ass'n</u>, No. 06 Civ. 6525(MAL), 2009 WL 35330, at *8 (W.D.N.Y. Jan. 5, 2009)

(describing "sole discretion" as "magic words" that "clear[ly] and unambiguous[ly] . . . provide[]

in no uncertain terms" that the defendant had "discretionary authority" to take the actions

contemplated in the parties' agreement).  The fact that Mariah appears to "attach a particular,

subjective meaning to" the definition of PCS's current business practices "does not render the

term ambiguous."  <u>Slattery Skanska Inc. v. Am. Home Assurance Co.</u>, 885 N.Y.S.2d 264, 274

(App. Div. 2009); <u>see also</u> <u>Maniolos</u>, 741 F. Supp. 2d at 568 ("Clear contractual language does

not become ambiguous simply because the parties to the litigation argue different

interpretations.").

     The Amended Complaint does not contain a single allegation that, if true, would give rise

to a claim that PCS breached its obligations under the License Agreement.  Instead, it seeks to

create and impose restrictions as to the content, timing, and methods of disseminating PCS

Catastrophe Bulletins that are not contained in and would contradict the License Agreement.

     <u>Content</u>:  According to the Amended Complaint, "[t]he sudden and deliberate inclusion

of county-specific geographical information" constituted "a stark deviation from PCS's current

business practices for estimating insured losses related to Catastrophe 42."  (Am. Compl. ¶ 92

(internal quotation marks omitted).)  However, nothing in the License Agreement prohibited PCS

from including city- or county-specific information in its Catastrophe Bulletins.  To the contrary, as explained above, PCS's current business practices explicitly provide that "[t]he designation of a geographic area or territories affected by a PCS Identified Catastrophe is . . . a matter within PCS's judgment and sole discretion."  (License Agreement (Am. Compl. Ex. 2) Ex. C, at 2.) [6]

Timing:  Mariah next alleges that PCS violated its current business practices by revising and "backdating" the Amended Bulletin after issuing its Final Estimate.  (Am. Compl. ¶ 94(i).) Mariah cannot point to a single provision in the License Agreement that would limit PCS's discretion to amend and revise its Catastrophe Bulletins as it saw fit to add or revise geographic or other information, before or after providing its Final Estimate of insured losses.

Moreover, the License Agreement does not impose upon PCS any restriction against issuing or revising a Catastrophe Bulletin after the "Final Development Date."  (See Am. Compl. ¶ 98.)  This term, which appears in Mariah's contracts with American Family and AIR, is not contained anywhere in the License Agreement and did not apply to PCS.  In any event,  even if the Final Development Date did apply to PCS, Mariah's allegations would not support a claim for breach of contract.  As explained below, the Final Development Date establishes a cutoff for taking into account changes in the estimate of insured losses flowing from a storm (the Insured Industry Loss Amount).  It has no relevance to an amendment or revision of a Catastrophe Bulletin that simply added geographic information that had no impact on the Insured Industry Loss Amount.  See infra at 18–19.

---

[6] As noted supra at 9 n.4, Mariah's allegation that three other Catastrophe Bulletins (CATs 43, 47, and 53) did not include the same level of detail as the Amended Bulletin is irrelevant in light of PCS's broad discretion with respect to the designation of geographic areas affected by each identified Catastrophe.  (License Agreement (Am. Compl. Ex. 2) Ex. C, at 2.)

<u>Dissemination</u>:  The Amended Complaint next alleges that PCS violated its current business practices by posting the Amended Bulletin on PCS's ISOnet database, rather than also emailing the Bulletin to PCS subscribers.  (Am. Compl. ¶ 94(iii).)  PCS's current business practices, however, required no such thing.  The License Agreement provides only that "Preliminary Estimates and Resurvey Estimates are officially disseminated by PCS to PCS subscribers via ISOnet PCS, an Internet service, with limited distribution by electronic mail." (License Agreement (Am. Compl. Ex. 2) Ex. C, at 4.)  The Agreement further provides that "PCS also releases to subscribers via ISOnet PCS a variety of textual reports, bulletins and updates regarding PCS Identified Catastrophes."  (<u>Id.</u>)  The License Agreement did not dictate any particular procedure for PCS to follow in disseminating the Amended Bulletin, and did not in any way proscribe the particular method used by PCS to convey the straightforward geographical information at issue in this case.  See <u>Bradco Homes, Inc. v. Gellert</u>, 636 N.Y.S.2d 202, 204 (App. Div. 1996) (refusing to find a breach of contract where it was clear that the defendant "complied with its terms").

ii.   <u>The Amended Bulletin Did Not Breach Section 1(e) of the License Agreement.</u>

Section 1(e) of the License Agreement required PCS to inform Mariah of alterations, amendments, or changes to PCS's "general methodology for estimating insured property losses attributable to Catastrophes."  (Am. Compl. ¶ 97.)  This provision is irrelevant in this case.  The Amended Bulletin had no effect on the "methodology for estimating insured property losses attributable to [the April Storm]."  Prior to the Amended Bulletin, total estimated insured property and automotive losses for Kansas were $710 million.  The Amended Bulletin did not change that amount.  (<u>See</u> AIR Event Report (Am. Compl. Ex. 5).)  Neither the methodology nor

14

the estimate was altered, amended, or changed.  As PCS complied with this provision, there can

be no breach.  See, e.g., Bradco Homes, 636 N.Y.S.2d at 204.

        iii.   The Amended Bulletin was retained by PCS as required under Section
               6(g) of the License Agreement.

Mariah's argument under Section 6(g) of the License Agreement also fails.  That

provision simply required PCS to "keep a record of each Designation, Preliminary Estimate and

Resurvey Estimate disseminated through ISOnet PCS while such Designated Securities were

outstanding and the initial date of dissemination of each such Preliminary Estimate or Resurvey

Estimate."  (License Agreement (Am. Compl. Ex. 2) § 6(g).)  According to the Amended

Complaint, PCS violated this provision by removing the Original Bulletin from PCS's ISOnet

database and replacing it with the Amended Bulletin.  (Am. Compl. ¶ 96.)

Mariah's argument fails because this provision identifies which types of documents must

be maintained (i.e., those that were disseminated through ISOnet), but does not mandate a

method by which a record of such a document must be kept.  This provision did not require PCS

to continue to make the superseded Original Bulletin available through the ISOnet database.

(See License Agreement (Am. Compl. Ex. 2) § 6(g).)  Mariah does not (and cannot) allege that

PCS has discarded the Original Bulletin from its files.

In any event, the record-keeping requirements of Section 6(g) have nothing to do with the

dispute in this case.  As described below, AIR was required to take account of the information

set forth in the latest PCS Catastrophe Bulletin.  Accordingly, whether and how the Original

Bulletin was maintained on ISOnet would have no impact whatsoever on the information that

AIR considered in preparing the Event Report.

**B.     Mariah Cannot State a Breach of Contract Claim Against AIR**

The Calculation Agent Agreement required AIR to use the "latest Catastrophe Bulletins available as of five (5) Business Days prior to the Event Reporting Date" to determine whether a covered event affected a Metro area. (Calculation Agent Agreement (Am. Compl. Ex. 4) § 3(a)(i)(A).)  The Amended Complaint acknowledges that AIR relied upon geographic information contained in a PCS Catastrophe Bulletin that was available more than five business days before the relevant Event Report (dated November 23, 2011). (See Am. Compl. ¶ 5 (noting that the Amended Bulletin was posted on November 3, 2011).)  The allegation that the Catastrophe Bulletin was "backdated" to April 5 is irrelevant.

i.     AIR Was Required to Consider the Amended Bulletin.

Under the plain terms of the Calculation Agent Agreement, AIR properly considered the Amended Bulletin in preparing its Event Report.  Indeed, it was required to do so.  To do otherwise would have been to prepare and disseminate an Event Report that AIR knew would inaccurately categorize the April Storm as a Non-Metro Occurrence in Kansas.

Mariah's suggestion that the Amended Bulletin was not a "true" Catastrophe Bulletin (Am. Compl. ¶ 103) is a baseless legal conclusion that is not supported by the language of the agreement.  Iqbal, 556 U.S. at 678 (legal conclusions are not accepted as true for purposes of a motion to dismiss).  The definition of Catastrophe Bulletin is straightforward:

> [A]ny catastrophe bulletin originated and disseminated by the
> Reporting Agency (including through ISOnet PCS) that identifies
> and assigns a catastrophe number to a Peril and/or gives
> preliminary, or subsequently, resurvey estimates of insured
> property losses arising from a Peril.

(Am. Compl. ¶ 101; Reinsurance Agreement (Am. Compl. Ex. 3) at 2.)

The Amended Bulletin, which is labeled "CATASTROPHE BULLETIN," plainly satisfies this definition.  (AIR Event Report (Am. Compl. Ex. 5) at Catastrophe Bulletin 42-1.)

16

There is no dispute that it was originated and disseminated by PCS.  In addition, it identifies and assigns a "catastrophe number"—No. 42—to certain "Perils" (flooding, hail, tornados, and wind).  (Id.)  Indeed, the Amended Bulletin possesses the same characteristics as the other bulletins that Mariah concedes to be Catastrophe Bulletins.

The arguments offered by Mariah to support an assertion than the Amended Bulletin is not a Catastrophe Bulletin are inconsistent with the plain meaning of the definition.  The definition makes no reference to timing (before or after the Final Estimate) or whether or how the Bulletin is dated (correct or incorrect) or whether it is an amendment or revision to a prior Bulletin.  (See Am. Compl. ¶ 103.)  Nor does the definition turn on the precise method of dissemination, only that it must emanate from PCS.  (Id.)  In this regard, there is no dispute that the Amended Bulletin was disseminated by PCS.

Mariah's assertion that PCS had not previously issued an Amended Bulletin is irrelevant.  (See id.)  The definition of Catastrophe Bulletin make no reference to any particular form, style, or precedent.  Nor does the definition require that the bulletin be the equivalent of a "birth certificate" for the April Storm.  (Id.)  That is simply another way of arguing that an amendment or revision of an "original" bulletin can never be considered a Catastrophe Bulletin, and there is nothing in the definition to support such a reading.  Mariah's claims clearly turn on the timing of the Amended Bulletin (i.e., after the Final Estimate), not the fact that it is an amendment.   As noted above, the definition of Catastrophe Bulletin makes no reference to the timing of the Bulletin.

In sum, Mariah's various allegations suggesting that the Amended Bulletin was not a Catastrophe Bulletin are patently wrong in light of the plain language of the relevant contracts.  Mariah's arguments are variations on the theme that AIR should have been required to ignore

information contained in the Amended Bulletin and issue an inaccurate Event Report.  Such an

absurd result cannot be squared with the central obligation of a Calculation Agent—to prepare a

report based on the latest data available.  See Convergent Wealth Advisors, LLC v. Lydian

Holding Co., No. 12 Civ. 119(SAS), 2012 WL 2148221, at *4 (S.D.N.Y. June 13, 2012)

(refusing to interject a contract interpretation that would "produce[] an absurd result").

    ii.   The Final Development Date did not proscribe AIR from basing its
Event Report on the Amended Bulletin.

Mariah's principal substantive argument appears to be that once PCS issued its "final"

resurvey report, and therefore triggered a Final Development Date, AIR was not permitted to

take into account any subsequent Catastrophe Bulletin issued by PCS with respect to the April

Storm.  This argument misconstrues the meaning of Final Development Date.

The Calculation Agent Agreement defines "Final Development Date" as the day after

which no changes may be made to the "Insured Industry Loss Amount for a Covered Event."

(Calculation Agent Agreement (Am. Compl. Ex. 4) at 2.)  "Insured Industry Loss Amount," in

turn, is defined as the total dollar amount of Metro and Non-Metro losses, regardless of whether

any particular storm is considered a Metro Occurrence or a Non-Metro Occurrence.

(Reinsurance Agreement (Am. Compl. Ex. 3) at 8.)  In other words, once PCS has determined

that its overall estimate of damages caused by the storm is "final," subsequent changes in that

number will not be taken into account by AIR.  The distinction between Metro and Non-Metro

Occurrences within that overall estimate is irrelevant for purposes of the Final Development

Date.

Here, there can be no dispute that the Amended Bulletin had no impact on the Insured

Industry Loss Amount for the April Storm.  As reflected in Table 1, supra at 7, and in AIR's

November Event Report, the Insured Industry Loss Amount with respect to the April Storm was

$1,355,000,000 before and after the Amended Bulletin.  (See AIR Event Report (Am. Compl. Ex. 5) at 2, Catastrophe Bulletin 42-5.)

The Amended Bulletin had nothing to do with the overall estimate of loss from the April Storm (i.e., the Insured Industry Loss Amount), only with the undisputed geographic scope of the storm.  While the latter impacted how the Insured Industry Loss Amount ultimately was apportioned between Metro and Non-Metro amounts, that apportionment is not impacted by the Final Development Date.  Accordingly, AIR was permitted (indeed, required) to consider the latest available geographical information contained in the Amended Bulletin, whether the bulletin was issued before or after the Final Development Date.

Under  New York law, ambiguity does not exist "where one party's view strain[s] the contract language beyond its reasonable and ordinary meaning."  See Aetna Cas. & Sur. Co., 404 F.3d at 598 (internal quotation marks omitted).  Yet that is precisely what Mariah attempts to do here.  Mariah contends, as noted in its pre-motion letter, that the Amended Bulletin "significantly impacted key components of the formula used to determine the amount Mariah had to pay to American Family."  (Mariah Pre-Motion Letter at 3 n.2 (Sept. 25, 2013); see also Am. Compl. ¶ 48.)  Even if this is true, it is irrelevant for the reasons set forth above, and represents an improper request by Mariah for the Court to rewrite the Calculation Agent Agreement.  See Wastemasters, Inc. v. Diversified Investors Servs. of N. Am, Inc., 159 F.3d 76, 79 (2d Cir. 1998) ("[C]ourts should not rewrite the contracts before them.").  Mariah has no contractual right to mandate AIR to issue an inaccurate Event Report that ignored relevant and indisputably accurate information.[7]

---

[7] The Amended Complaint also alleges generally that PCS, AIR, and American Family "conspired to wipe out Mariah."  (Am. Compl. ¶¶ 6, 76.)  To support this allegation, Mariah alleges only that AIR (in Boston, Massachusetts) and PCS (in Jersey City, New Jersey) are
(….continued)

**II.      There Was No Breach of the Implied Covenant of Good Faith and Fair Dealing**

In its Amended Complaint, Mariah alleges, without explanation, that AIR and PCS breached an implied covenant of good faith and fair dealing.  New York law is clear that this implied covenant "does not create obligations that go beyond those intended and stated in the language of the contract."  Wolff v. Rare Medium, Inc., 210 F. Supp. 2d 490, 497 (S.D.N.Y. 2002), aff'd, 65 F. App'x 736 (2d Cir. 2003).  The covenant is breached only if "a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement." Josepthal & Co. v. John Phillips & Co., No. 00 Civ. 3479(JSM), 2001 WL 1658207, at *2 (S.D.N.Y. Dec. 27, 2001) (internal quotation marks omitted).

New York law "does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." Harris v. Provident Life & Accident Ins. Co., 310 F.3d 73, 81 (2d Cir. 2002); Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc., 837 F. Supp. 2d 162, 205 (S.D.N.Y. 2011) ("A claim for breach of the implied covenant can be maintained in conjunction with a breach of contract claim only if the damages sought by the plaintiffs for breach of the implied covenant are not intrinsically tied to the damages allegedly resulting from breach of contract.").  Likewise, "the implied covenant of good faith cannot create duties that negate explicit rights under a contract." LJL 33rd St. Assocs. v. Pitcairn Props. Inc., 725 F.3d 184, 195 (2d Cir. 2013).

---

(continued….)

subsidiaries of the same parent, Verisk, and that Verisk has a business relationship with American Family.  (Id. ¶¶ 77–78.)  Such unexplained, unsupported allegations of a legitimate business relationship cannot support a plausible inference of conspiracy necessary to survive a motion to dismiss.  See Twombly, 550 U.S. at 570.

Mariah's claim that PCS and/or AIR breached an implied covenant of good faith and fair dealing must be dismissed.  First, Mariah's claim fails as a matter of law because it rests on the same facts as the alleged breach of contract.  See Harris, 310 F.3d at 81.  This claim further lacks merit because it attempts to negate PCS's express rights under the License Agreement—to include geographic information in its sole discretion, and to amend or revise its Catastrophe Bulletins—as well as AIR's explicit obligation to use the latest information available to prepare an accurate Event Report.  See LJL 33rd St. Assocs., 725 F.3d at 195.

In addition, the Amended Bulletin did not deprive Mariah of a benefit to which it was entitled.  See Josepthal & Co., 2001 WL 1658207, at *2.  Mariah cannot point to any right, implied or otherwise, that entitled it to an Event Report that all parties agree would have been inaccurate.

## III.    There Is No Basis for Declaratory Relief

Mariah's Amended Complaint does not allege a legal basis for declaratory relief.  This Court has explained that a claim for declaratory judgment generally cannot withstand a motion to dismiss, if the determination sought serves no useful purpose or would otherwise be "adjudicated" in plaintiff's other alleged causes of action.  Chiste v. Hotels.com L.P., 756 F. Supp. 2d 382, 407 (S.D.N.Y. 2010).  Indeed, "[d]eclaratory relief is intended to operate prospectively.  There is no basis for declaratory relief where only past acts are involved."  Lojan v. Crumbsie, No. 12 Civ. 0320(LAP), 2013 WL 411356, at *5 (S.D.N.Y. Feb. 1, 2013) (internal quotation marks omitted).

Mariah's claim for declaratory relief is derivative and duplicative of its claim for breach of contract, and fails for the same reasons.  Moreover, because Mariah's alleged harm, if any, happened in the past, it has no basis for declaratory relief.

21

**IV.     Specific Performance Is Not Available**

Mariah's claim for specific performance is not a claim at all.  The law is well settled that specific performance is a remedy, not an independent cause of action.  See R.J. Capital, S.A. v. Lexington Capital Funding III, Ltd., 10 Civ. 25(PGG), 2011 WL 3251554, at *16 (S.D.N.Y. July 28, 2011); see also Five Star Dev. Resort Cmtys., LLC v. iStar RC Paradise Valley LLC, No. 09 Civ. 2085(LTS), 2010 WL 2697137, at *4 (S.D.N.Y. July 6, 2010).  Because Mariah cannot establish a claim for breach of contract or for breach of the implied covenant of good faith and fair dealing, Mariah has no basis for any remedy, let alone for specific performance.

**CONCLUSION**

For the foregoing reasons, PCS and AIR respectfully submit that this Court should dismiss with prejudice all claims asserted against them in the Amended Complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.


Dated:   New York, New York
         November 20, 2013


By:   /s/ Matthew B. Rowland

Joel M. Cohen
Matthew B. Rowland
Richard R. Barker

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone:     (212) 450-4000
Facsimile:     (212) 701-5800

*Attorneys for Defendants ISO Services,*
*Inc. and AIR Worldwide Corp.*