**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

MARIAH RE LTD. (IN LIQUIDATION), acting by
and through GEOFFREY VARGA and JESS
SHAKESPEARE, in their capacities as Liquidators
thereof,

                    Plaintiff,

v.

AMERICAN FAMILY MUTUAL INSURANCE
COMPANY, ISO SERVICES, INC., and AIR
WORLDWIDE CORPORATION,

                    Defendants.

Case No. 13-cv-4657 (RJS)

---

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT

KOBRE & KIM LLP
Michael S. Kim
Jonathan D. Cogan
Megha J. Charalambides
800 Third Avenue
New York, New York 10022
Tel: +1 212 488 1200
*Attorneys for Mariah Re Ltd. (In Liquidation)*

# TABLE OF CONTENTS

**Page**

**PRELIMINARY STATEMENT** ............................................................................1

**STATEMENT OF FACTS** ...................................................................................3

   1.  Relevant Parties ...........................................................................................3

   2.  The Reinsurance Product Purchased By American Family.................................4

   3.  The Relevant Contracts..................................................................................4

       a.     The Reporting Agency Agreement ......................................................5

       b.     The Calculation Agent Agreement ......................................................6

   4.  The Storm At Issue In This Litigation ............................................................7

   5.  The Falsified Inception Bulletin And Its Consequences.....................................8

**ARGUMENT** ......................................................................................................9

I.  DEFENDANTS BREACHED THEIR RESPECTIVE CONTRACTS
   WITH PLAINTIFF ............................................................................................10

  A.  PCS BREACHED THE REPORTING AGENCY AGREEMENT ..................................10

     1.  PCS Breached Section 6(b) Of The Reporting Agency Agreement ..........................10

     2.  PCS Breached Section 6(g) Of The Reporting Agency Agreement ..........................13

     3.  PCS Breached Section 1(e) Of The Reporting Agency Agreement ..........................14

  B.  SECTION 6(C) OF THE REPORTING AGENCY AGREEMENT DOES
     NOT REQUIRE DISMISSAL OF THE CLAIMS AGAINST PCS .................................15

     1.  Section 6(c) Contains A Temporal Requirement.........................................15

     2.  PCS May Have Consciously Chosen Not To Include Geographical
         Information In The Catastrophe Bulletins .................................................16

     3.  PCS Failed To Utilize Reasonable Commercial Efforts...............................19

  C.  AIR BREACHED THE CALCULATION AGENT AGREEMENT...............................20

     1.  AIR Breached Calculation Agent Agreement Section 3(a)(i) By Treating
         The Falsified Inception Bulletin As A True Catastrophe Bulletin .............................20

2.  AIR Breached Calculation Agent Agreement Section 3(a)(i) By Miscalculating The Metro And Non-Metro Insured Industry Loss Amounts As Well As The Event Index Value ............................................................22

D.  PCS AND AIR BREACHED THE COVENANT OF GOOD FAITH AND FAIR DEALING ...........................................................................................25

E.  AMERICAN FAMILY BREACHED THE REINSURANCE AGREEMENT ................27

II. MARIAH HAS STATED QUASI-CONTRACT AND TORT CLAIMS AGAINST AMERICAN FAMILY ........................................................................................29

A.  MARIAH HAS STATED A CLAIM FOR UNJUST ENRICHMENT ...........................29

B.  MARIAH HAS STATED A CLAIM FOR CONVERSION...........................................34

C.  MARIAH HAS STATED A CLAIM FOR TORTIOUS INTERFERENCE ...................36

III. DECLARATORY RELIEF IS APPROPRIATE...................................................................40

**CONCLUSION** ................................................................................................................41

# TABLE OF AUTHORITIES

**Cases**                                                                                                                    **Page(s)**

*Abundance Partners LP v. Quamtel, Inc.*, 840 F. Supp. 2d 758 (S.D.N.Y. 2012) .......................34

*AFBT-II, LLC v. Country Vill. on Mooney Pond, Inc.*, 759 N.Y.S.2d 149
   (App. Div. 2003)................................................................................................26

*Albany Eng'g Corp. v. Hudson River*, 973 N.Y.S.2d 391 (App. Div. 2013) ...............................33

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................9

*Bank of N.Y. Trust, N.A. v. Franklin Advisors, Inc.*,
   522 F. Supp. 2d 632 (S.D.N.Y. 2007) .....................................................10, 15, 25

*Barbagallo v. Marcum LLP*, 820 F. Supp. 2d 429 (E.D.N.Y. 2011)..........................................31

*Blusal Meats, Inc. v. U.S.*, 638 F. Supp. 824 (S.D.N.Y. 1986)........................................30

*Caleb & Co. v. E.I. DuPont de Nemours & Co.*, 599 F. Supp. 1468
   (S.D.N.Y. 1984)................................................................................................16

*Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41 (2d Cir. 2003)..................................9

*Clark-Fitzpatrick, Inc. v. L.I.R.R. Co.*, 516 N.E.2d 190 (N.Y. 1987)..........................................31

*Colavito v. N.Y. Organ Donor Network, Inc.*, 860 N.E.2d 713 (N.Y. 2006)..................................34

*Dalton v Educ. Testing Serv.*, 663 N.E.2d 289 (N.Y. 1995)........................................26

*Dorset Indus., Inc. v. Unified Grocers, Inc.*, 893 F. Supp. 2d 395
   (E.D.N.Y. 2012)................................................................................................25, 28

*Duane Reade Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384
   (2d Cir. 2005)................................................................................................40

*Eastman Kodak Co. v. STWB Inc.*, 232 F. Supp. 2d 74 (S.D.N.Y. 2002)..............................13, 14

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*,
   375 F.3d 168 (2d Cir. 2004) ................................................................................10

*Ginx, Inc. v. Soho Alliance*, 720 F. Supp. 2d 342 (S.D.N.Y. 2010)....................................9, 15, 25

*Goldin-Feldman Co., Inc. v. Blum & Fink, Inc.*, No. 99 CIV 11637 (VM),
   2000 WL 1182798 (S.D.N.Y. Aug. 18, 2000)..........................................................10

*Guiffrida v. Storico Dev., LLC*, 876 N.Y.S.2d 793 (App. Div. 2009) ..........................................35

**Cases**      **Page(s)**

*Hallmark Aviation Ltd. v. AWAS Aviation Servs., Inc.*, No. 12 CIV. 7688 (JFK),
   2013 WL 1809721 (S.D.N.Y. Apr. 30, 2013) ...................................................31, 33

*Havel v. Kelsey-Hayes Co.*, 445 N.Y.S.2d 333 (App. Div. 1981)...............................29

*Hildene Capital Mgmt., LLC v. Friedman, Billings, Ramsey Grp., Inc.*,
   No. 11 Civ. 5832 (AJN), 2012 WL 3542196 (S.D.N.Y. Aug. 15, 2012) ...................33

*Int'l Minerals & Res., S.A. v. Pappas*, 96 F.3d 586 (2d Cir. 1996) ..................36, 39, 40

*Jews for Jesus, Inc. v. Jewish Cmty. Relations Council of N.Y., Inc.*,
   968 F.2d 286 (2d Cir. 1992) .........................................................................39, 40

*Jin v. Metro. Life Ins. Co.*, 310 F.3d 84 (2d Cir. 2002) ..............................................41

*LeBlanc v. Nortel Networks Corp.*, Civ. A. 3:03-CV-65, 2006 WL 839180
   (M.D. Ga. Mar. 30, 2006).......................................................................................16

*Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc.*,
   87 F.3d 44 (2d Cir. 1996) .......................................................................................34

*Maniolos v. U.S.*, 741 F. Supp. 2d 555 (S.D.N.Y. 2010)
   *aff'd*, 46 F. App'x 56 (2d Cir. 2012).......................................................................10

*Mickle v. Christie's, Inc.*, 207 F. Supp. 2d 237 (S.D.N.Y. 2002)................................26

*Okyere v. Palisades Collection, LLC*, __ F. Supp. 2d __, 2013 WL 5085148
   (S.D.N.Y. Sept. 16, 2013)................................................................................34, 35

*Orange Cnty. Choppers, Inc. v. Olaes Enters., Inc.*, 497 F. Supp. 2d 541
   (S.D.N.Y. 2007)......................................................................................................28

*Orbit One Commc'ns, Inc. v. Numerex Corp.*, 692 F. Supp. 2d 373
   (S.D.N.Y. 2010)......................................................................................................33

*U.S. v. Paladin,* 539 F. Supp. 100 (W.D.N.Y. 1982)..................................................35

*Quanta Specialty Lines Ins. Co. v. Investors Capital Corp.*,
   No. 06 CIV 4624 (PKL), 2008 WL 1910503 (S.D.N.Y. Apr. 30, 2008) .................40

*Salatino v. Salatino*, 881 N.Y.S.2d 721 (App. Div. 2009)...........................................34

*Sergeants Benev. Ass'n Annuity Fund v. Renck*, 796 N.Y.S.2d 77
   (App. Div. 2005).....................................................................................................32

*Sorenson v. Bridge Capital Corp.*, 861 N.Y.S.2d 280 (App. Div. 2008) ....................26

**Cases**                                                                         **Page(s)**

*Sperry v. Crompton Corp.*, 863 N.E.2d 1012 (N.Y. 2007)....................................29

*St. John's Univ., N.Y. v. Bolton,* 757 F. Supp. 2d 144 (E.D.N.Y. 2010).......................31

*State Farm Mut. Auto. Ins. Co. v. James M. Liguori, M.D., P.C.*,
   589 F. Supp. 2d 221 (E.D.N.Y. 2008) ......................................................29

*State Farm Mut. Auto. Ins. Co. v. Rabiner*, 749 F. Supp. 2d 94 (E.D.N.Y. 2010) ........30

*TechnoMarine SA v. Jacob Time, Inc.*, 905 F. Supp. 2d 482 (S.D.N.Y. 2012) ..............37

*Vertex Constr. Corp. v. T.F.J. Fitness L.L.C.,* No. 10 CIV 683 (CBA),
   2011 WL 5884209 (E.D.N.Y. Nov. 23, 2011)............................................33

*Vinas v. Chubb Corp.*, 499 F. Supp. 2d 427 (S.D.N.Y. 2007).................................37

*Waldman v. New Chapter, Inc.*, 714 F. Supp. 2d 398 (E.D.N.Y. 2010)......................29

*White Plains Coat & Apron Co., Inc. v. Cintas Corp.*, 867 N.E.2d 381 (N.Y. 2007) ..............37

*White v. City of Mount Vernon,* 633 N.Y.S.2d 369 (App. Div. 1995)..........................34

*Zuccarini v. Ziff-Davis Media, Inc.*, 762 N.Y.S.2d 621 (App. Div. 2003) ...................31

*Zurakov v. Register.Com, Inc.*, 760 N.Y.S.2d 13 (App. Div. 2003).............................26

**Rules**

F.R.C.P. 8(d) .......................................................................................31

F.R.C.P. 12(b)(6) ................................................................................9, 10

Plaintiff Mariah Re Ltd. ("Mariah") respectfully submits this memorandum of law, together with the Declaration of Jonathan D. Cogan and the exhibits annexed thereto, in opposition to the motions of Defendants ISO Services, Inc. (d/b/a Property Claim Service ("PCS" or the "Reporting Agency")), AIR Worldwide Corp. ("AIR" or the "Calculation Agent"), and American Family Mutual Insurance Company ("American Family") (collectively, "Defendants") to dismiss the Amended Complaint (the "Amended Complaint"). For the reasons set forth below, Plaintiff respectfully submits that the Court should deny Defendants' motions.

## PRELIMINARY STATEMENT

A central theme of Defendants' motions to dismiss is that Plaintiff Mariah is suing over a perceived technicality and that fairness and equity are on the Defendants' side. As American Family puts it, Mariah's complaint is simply about "process"; it "seeks to rely on an alleged one-day 'delay'" to "obtain a windfall … at the expense of American Family and its policyholders;" nobody disputes that the storm at issue "actually" was a Metro[1] occurrence; and everyone agrees that the untimely bulletin that is at the heart of this litigation was not "inaccurate in any way." Am. Family Mem. at 2, 15-16.

Laying aside the irony of an insurance company complaining that it is unfair to take advantage of a technicality in an insurance contract, Defendants' motions reflect a fundamental mischaracterization of both the reinsurance product Mariah was designed to provide as well as the allegations contained in the Amended Complaint regarding the supposed "accuracy" of the untimely bulletin. As set forth in the Amended Complaint and discussed below, Mariah was designed to be a "synthetic" reinsurance product, meaning that American Family's entitlement to

---

[1] Capitalized terms in this Preliminary Statement are defined in the Statement of Facts section below.

receive money from it was ***not*** predicated in any way on actual claims it needed to pay its policyholders.   Rather, American Family's entitlement to receive money from Mariah was triggered exclusively by a detailed set of rules that all the parties agreed would govern regarding (1) what information Defendant PCS decided in its discretion to include in reports it was contractually required to generate concerning severe weather events; and (2) calculations Defendant AIR was contractually required to make based on PCS's reports.   In fact, the arrangement was such that, even if American Family determined it was not obligated to pay claims submitted by its own policyholders for a given weather event, it would nonetheless be eligible to receive money from Mariah if that weather event was reported on and analyzed by PCS and AIR in such a way as to call for a payment.   In this way, Defendants' pre-occupation with windfalls and technicalities is misplaced.

And contrary to Defendants' repeated refrain in their motions to dismiss, Mariah does ***not*** concede that the information contained in the untimely bulletin was "accurate" or that the information contained in the earlier, timely reports was "inaccurate."   Instead, Mariah alleges that PCS exercised its discretion in generating a series of reports over the course of several months regarding the severe weather event at issue in this case.   In exercising that discretion, it apparently chose to include certain information in those reports and, importantly, ***not*** to include other information.   Once PCS issued its final report, AIR was required to base its calculations on the reports PCS had generated.

Strict adherence to the set of rules to which the parties all agreed was of critical importance to Mariah and its Investors.   Indeed, Mariah's Investors were permitted to trade their interests on the secondary market.   Mariah and its Investors were entitled to assume that PCS's apparent decision not to include certain information about this storm in its reports likely was ***not***

based on some oversight, but rather likely was based on an assessment by PCS that the information did not belong in the reports (either because, in the exercise of its discretion, it found it was inaccurate or unreliable, or for some other reason). To be sure, the Amended Complaint references documents (*e.g.*, Severe Weather Summaries) that, on their face, indicate the storm at issue struck Metro locations. But while American Family's motion papers assert as an absolute given that this means that, in the "real world," the storm struck Metro locations, they gloss over the fact that PCS's reports — not just with respect to this storm but with respect to others as well — rarely, if ever, included information about the totality of a given storm's impact in the "real world." Am. Family Mem. at 15.

Placed in their proper context, Defendants' various arguments in support of their motions to dismiss fail and, for the reasons discussed in detail below, their motions must be denied.

## STATEMENT OF FACTS

1. *Relevant Parties*

Defendant American Family is an insurance company that, among other things, provides insurance coverage for policyholders who suffer losses resulting from severe weather events. Am. Compl. ¶ 1. Plaintiff Mariah is a special purpose vehicle that was established to provide reinsurance to American Family for certain losses resulting from severe weather events covered under a reinsurance agreement between the parties. *Id*. ¶¶ 2, 17. Investors in Mariah (the "Investors") purchased notes pursuant to a November 2010 offering circular and supplement to the offering circular (together, the "Offering Circular") that provided reinsurance for covered losses between $825 million and $925 million, contingent on certain factors. *Id*. ¶ 15. Mariah's governing documents, including the Offering Circular, contemplated a secondary market for these notes and set rules for transferring them. J. Cogan Decl. ¶ 2, Ex. A, Offering Circular at iii; J. Cogan Decl. ¶ 3, Ex. B, Indenture at Annex 1-1.

Defendants PCS and AIR are entities that contracted with Mariah to provide it services related to its reinsurance of American Family. Am. Compl. ¶ 3. Upon information and belief, contrary to representations made in connection with Mariah's note offering that PCS and AIR were not affiliated with one another, PCS and AIR were both subsidiaries of Verisk Analytics ("Verisk"). *Id.* ¶ 77. Moreover, upon information and belief, Verisk had a business relationship with American Family. *Id.* ¶ 78.

2. *The Reinsurance Product Purchased By American Family*

Unlike certain types of traditional reinsurance arrangements, Mariah did not simply agree to pay American Family for a share of the claims it incurred. Am. Compl. ¶ 3. In other words, the triggering event for payment of money by Mariah to American Family was not tied to the fact that American Family had claims it needed to pay to its customers. *Id.* Rather, Mariah's reinsurance obligations to American Family were contingent and triggered upon (1) the occurrence of certain severe weather events; *and* (2) significantly, how those weather events were reported and analyzed by Defendant PCS and Defendant AIR. *Id.*

3. *The Relevant Contracts*

On or about November 15, 2010, Mariah entered into a number of agreements, including (1) the Catastrophe Excess of Loss Reinsurance Agreement with American Family (the "Reinsurance Agreement"); (2) the Reinsurance Trust Agreement (the "Reinsurance Trust Agreement") with American Family and Deutsche Bank Trust Company Americas ("DB Americas"); and (3) an indenture agreement (the "Indenture") and series supplement agreement (the "Series Supplement") with DB Americas and Deutsche Bank AG, London Branch ("DB AG"). Am. Compl. ¶ 17; J. Cogan Decl. ¶ 4, Ex. C, Reins. Trust Agreement.

That same day, Mariah also entered into the PCS License Agreement (the "Reporting Agency Agreement") with PCS and the Calculation Agent Agreement (the "Calculation Agent

Agreement") with AIR for services to assist in determining if and how much Mariah owed American Family for a Covered Event.[2]  Am. Compl. ¶¶ 18, 26.

a.  The Reporting Agency Agreement

As the Reporting Agency, "PCS was obligated to provide (i) a 'Bulletin' in which the first notice of its assignment of a catastrophe serial number to a severe storm event was reported, and (ii) 'Estimates,' that is, reports providing 'Preliminary,' 'Resurvey,' and 'Final' Estimates of property damage attributable to the relevant catastrophe on a state-by-state basis."  Am. Compl. ¶ 18.  The initial Catastrophe Bulletin is analogous to a birth certificate in that it is typically issued within 24-48 hours of a storm, assigns a designated name in the form of a serial number, and provides basic information about the storm.  *Id.* ¶ 19.  This information is largely based on Severe Weather Summaries, which are reports describing severe weather and current weather information that PCS publishes daily on its website, ISOnet PCS ("ISOnet"), a limited-access website that PCS utilizes to disseminate contractually required reports.  *Id.* ¶¶ 20, 25.

The estimate of losses stemming from a Covered Event evolves from the initial bulletin through the resurvey estimates, and until the issuance of the final estimate.  Am. Compl. ¶¶ 21-24.  The final estimate is meant to provide just that — PCS's final estimate of damages for a particular Covered Event.  PCS's reports also detail the geographic locations impacted by a Covered Event — a key factor in determining the amount due from Mariah to American Family.  *Id.* ¶¶ 18-19, 28-29.

---

[2] "Covered Event" is defined in the Reinsurance Agreement as "any event that (a) is identified as a Severe Thunderstorm and (b) has an Event Index Value greater than or equal to $10,000,000 and (c) has a Date of Loss within the Risk Period."  Am. Compl. Ex. 3 at 3.

b. <u>The Calculation Agent Agreement</u>

Under the Calculation Agent Agreement, "AIR was obligated to review and analyze the data compiled in the reports prepared by PCS, and to translate that data into estimated losses that would trigger Mariah's obligation to make reinsurance payments." Am. Compl. ¶ 26. Significantly, AIR was to use the information contained in PCS's reports — and no other external information — to calculate the Loss Payment Amount, *i.e.* the amount owed by Mariah to American Family. *Id*. ¶¶ 27, 32-33. The formula used to calculate the Loss Payment Amount required AIR to determine whether the locations set forth in PCS's bulletins for a particular storm were "Metro" or "Non-Metro" areas, and to then multiply the estimated losses from a storm by a Metro or Non-Metro "Payout Factor" for each state. *Id*. ¶¶ 27-33.

Specifically, AIR calculated the Loss Payment Amount using the Aggregate Loss Amount (*i.e.*, the sum of the Event Loss Amounts for all Covered Events in a given period). Am. Compl. ¶ 27. Under the relevant agreements, the Event Loss Amount was calculated as the lesser of the Event Index Value and $300 million. The Event Index Value, in turn, is based on two products: (1) the Metro Insured Industry Loss Amount for each state with a Metro occurrence in the Covered Area multiplied by a contractually-determined Metro Payout Factor (unique for each state); *and*, (2) the Non-Metro Insured Industry Loss Amount for each state without a Metro Occurrence in the Covered Area multiplied by a contractually-determined Non-Metro Payout Factor (again, unique for each state).[3] *Id*.

_____

[3] Please note that the Amended Complaint contains a typographical error. In paragraph 27, the definition for the term "$I^N_S$" should instead read "the Non-Metro Insured Industry Loss Amount for each state (S) *without* a Metro Occurrence in the Covered Area." (emphasis added).

4. *The Storm At Issue In This Litigation*

Between April 3 and April 5, 2011, a severe storm struck the United States, which PCS denominated "Catastrophe Serial No. 42" ("CAT 42") in its original bulletin ("Original Bulletin") for the purposes of tracking and developing expected losses. Am. Compl. ¶¶ 35, 37. Among the locations CAT 42 impacted was Kansas, which was covered under the Reinsurance Agreement. *Id*. ¶ 36.

The Original Bulletin, issued on April 5, 2011, contained "no information about the geographical locations of loss in Kansas." Am. Compl. ¶ 38. PCS published subsequent estimates on April 25, 2011 (the "Preliminary Estimate"), June 27, 2011 (the "First Resurvey Estimate"), and on August 31, 2011 (the "Second Resurvey Estimate"). As with the Original Bulletin, none of these estimates provided information specifying the geographical impact of CAT 42 within Kansas. *Id*. ¶¶ 39-41. Then, on November 2, 2011, PCS issued its "Final Estimate of Insured Property Damage" with respect to CAT 42 (the "Final Estimate"). *Id*. ¶ 42. All five reports, from the Original Bulletin through to the Final Estimate, were posted online to ISOnet. *Id.* ¶¶ 38-44. In the Final Estimate, PCS stated that "[t]his estimate is…fully developed"; and, accordingly, "[n]o further surveys will be conducted." *Id*. ¶ 43. Again, this report contained no information indicating the geographical impact of CAT 42 on Metro areas in Kansas. *Id*. ¶ 42. As such, AIR was contractually required to apply the relevant Non-Metro Payout Factor in calculating estimated losses in Kansas. *Id*.

Because November 2, 2011 was "the date that [PCS] release[d] a Catastrophe Bulletin with its final resurvey estimate" for CAT 42, it constituted the Final Development Date for CAT 42. Am. Compl. ¶¶ 49-50. As specified in the Reinsurance Agreement, there could be no change in the Insured Industry Loss Amount for purposes of calculating the Event Index Value after the Final Development Date. *Id*. ¶ 49.

7

5. *The Falsified Inception Bulletin And Its Consequences*

On November 3, 2011 (*i.e.*, the day after PCS issued what was supposed to be its final report), PCS "swapped out" the Original Bulletin on ISOnet and replaced it with a new bulletin (the "Falsified Inception Bulletin") containing detailed information regarding the supposed geographical impact of CAT 42 on Metro areas within Kansas. Am. Compl. ¶¶ 5, 54-55. The added information did not include geographical information concerning any state other than Kansas. *Id.* ¶ 69. Instead of dating the Falsified Inception Bulletin November 3, 2011 and providing it with a bulletin number that was the next in sequential order (*i.e.*, 42-6), PCS backdated it to April 5, 2011 (*i.e.*, the same date the Original Bulletin was issued) and assigned it the same identifying number as the Original Bulletin — "CB 42-1." *Id.* ¶¶ 5, 59-61. Moreover, PCS removed the Original Bulletin from ISOnet and did not provide ISOnet website subscribers ("Subscribers") with notice that the Falsified Inception Bulletin had been issued, even though these Subscribers had specifically enrolled to receive such notice. *Id.* ¶¶ 5, 25, 60, 62-63.

AIR thereafter issued an Event Report (the "Improper Event Report"), basing its calculations on the information contained in the Falsified Inception Bulletin. Am. Compl. ¶¶ 75-85. Specifically, based on the locations newly listed in the Falsified Inception Bulletin, and for the first time for CAT 42, AIR applied the Metro Payout Factor to losses in Kansas, grossly inflating its original estimate for purported Metro losses for CAT 42 from $0 to $710 million. *Id.* ¶¶ 81-85.

On or about December 9, 2011, in response to questions regarding the Improper Event Report, PCS issued an undated statement (the "Apology"). Am. Compl. ¶ 64. In the Apology, PCS claimed that it revised the Original Bulletin "[t]o assist its customers in understanding the magnitude of the final damage estimate" and that "[i]n future catastrophe bulletins, where PCS believes the publication of additional information will assist its customers in understanding the

event, PCS expects to publish such information in an update bulletin, rather than by way of revision to a previously published bulletin." *Id*. ¶ 65. PCS further suggested in its Apology that this was the first and only time that PCS ever issued a report for a designated catastrophe after the Final Estimate was issued. *Id.* ¶ 67.

Although aware that PCS's and AIR's conduct were under investigation, American Family demanded payment by letter on January 3, 2012 under the Reinsurance Agreement from DB Americas, with whom Mariah had entered into the Indenture and Series Supplement, contending that there was "no basis for withholding, delaying or otherwise impeding the release of funds from the Reinsurance Trust Account to American Family." Am. Compl. ¶¶ 17, 109. Though American Family sent no Event Notice, DB Americas transferred $100 million from the Reinsurance Trust Account for withdrawal by American Family in contravention of the Indenture. *Id*. ¶¶ 110-11. Despite Mariah's request for the return of the funds in question, American Family continues to retain those funds. *Id*. ¶¶ 7, 112, 125.

## ARGUMENT

In evaluating a Rule 12(b)(6) motion to dismiss, the Court must construe the complaint in favor of the plaintiff, accept the well-pled factual allegations as true, and determine whether, given the totality of the circumstances alleged, plaintiff has pled "sufficient factual matter…to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted). In determining whether a claim has facial plausibility, a court "must liberally construe all claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff." *Ginx, Inc. v. Soho Alliance*, 720 F. Supp. 2d 342, 351 (S.D.N.Y. 2010); *see also Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 44 (2d Cir. 2003).

# I. DEFENDANTS BREACHED THEIR RESPECTIVE CONTRACTS WITH PLAINTIFF

To make out a viable claim for breach of contract, a "complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) (citation omitted). While a court may properly consider a Rule 12(b)(6) motion to dismiss a breach of contract claim if the terms of the relevant contracts are unambiguous, if the court finds ambiguity regarding the meaning of any contractual terms or agreements, those ambiguities must be resolved in favor of the non-moving party. *Bank of N.Y. Trust, N.A. v. Franklin Advisors, Inc.*, 522 F. Supp. 2d 632, 637-38 (S.D.N.Y. 2007); *Goldin-Feldman Co., Inc. v. Blum & Fink, Inc.*, No. 99 CIV 11637 (VM), 2000 WL 1182798, at *3 (S.D.N.Y. Aug. 18, 2000). The existence of questions of fact as to breach requires denial of a motion to dismiss. *See, e.g., Maniolos v. U.S.*, 741 F. Supp. 2d 555, 567 (S.D.N.Y. 2010), *aff'd*, 46 F. App'x 56 (2d Cir. 2012).

## A. PCS BREACHED THE REPORTING AGENCY AGREEMENT

PCS's conduct constitutes a breach of at least three different provisions of the Reporting Agency Agreement. For the reasons set forth below, Mariah has adequately pled breach of contract, and PCS's arguments to the contrary are all unavailing.

### 1. PCS Breached Section 6(b) Of The Reporting Agency Agreement

Section 6(b) of the Reporting Agency Agreement provides, in relevant part, as follows:

> During the term of this Agreement, ISO will use reasonable commercial efforts to obtain information for use in the preparation of the PCS Designations and Estimates from its traditional insurance company sources, to continue to prepare the Designations and Estimates, to disseminate such Designations and Estimates and the Compilations through ISOnet PCS and/or the PCS Catastrophe History Database **in accordance with its current business practices**, as described in the then-

current version of <u>Exhibit C</u> hereto, and to provide such Designations, Estimates and Compilations to Licensee through its subscription to ISOnet PCS.

Am. Compl. Ex. 2 § 6(b) (emphasis added).

Mariah adequately alleges that PCS breached this provision of the contract. Indeed, the Amended Complaint sets forth in detail (far beyond what is required under the law to state a claim for breach of contract) how PCS's issuance and dissemination of the Falsified Inception Bulletin constituted a radical departure from its then-"current business practices." For example:

- PCS issued and disseminated a new purported Catastrophe Bulletin for CAT 42 *after* a Final Estimate already had been issued. Am. Compl. ¶¶ 54-55, 92, 94. This was highly unusual.

- PCS backdated the Falsified Inception Bulletin to April 5, 2011, the date of the Original Bulletin. *Id*. ¶¶ 59, 94. This ran contrary to PCS's usual practice of dating and posting bulletins in sequential order according to the date they actually were created. *Id.* ¶ 61.

- PCS provided the Falsified Inception Bulletin with the same name as the Original Bulletin (*i.e.*, "CB 42-1"). *Id*. ¶¶ 60, 94. This act, when combined with the backdating, was designed to make it appear to onlookers that the Falsified Inception Bulletin had actually been issued and disseminated months earlier, rather than after the Final Estimate. *Id.* ¶¶ 59-60. Presumably, PCS would concede that deceptive conduct such as this, if true, is contrary to its business practices.

- PCS replaced the Original Bulletin with the Falsified Inception Bulletin on its website, deleting the Original Bulletin altogether. *Id*. ¶¶ 60, 96. To do so, PCS reformatted the hyperlink for the Original Bulletin so that, when clicked on, it took users to the Falsified Inception Bulletin. Also, the release date displayed on ISOnet for the Falsified Inception Bulletin remained the same as that of the Original Bulletin, April 5, 2011 (though PCS actually released the Falsified Inception Bulletin on November 3, 2011). *Id.* ¶ 96. PCS thereby not only broke from its practice of posting bulletins in sequential order, but also further obfuscated the evolution of its bulletins and the existence of the Original Bulletin as distinct from the Falsified Inception Bulletin. *Id*. ¶¶ 60-61.

- Upon information and belief, PCS did not e-mail ISOnet website Subscribers notice that the Falsified Inception Bulletin had been issued. These Subscribers specifically enrolled for automatic e-mail notifications when PCS issued new Catastrophe Bulletins, and PCS's failure to notify them about the Falsified

Inception Bulletin marked the first and only time PCS failed to e-mail Subscribers a notification. *Id.* ¶¶ 62-63, 67, 94.

Indeed, the Apology, which was issued only after questions began to be raised with respect to PCS's conduct, reflects PCS's cognizance of its significant departure from its current business practice. PCS, in fact, tacitly admitted in its Apology that it had deviated from its current business practices when it issued the Falsified Inception Bulletin and vowed to never again revise "a previously issued bulletin." Am. Compl. ¶¶ 64-65, 67, 94.

Further, the Apology is riddled with inaccuracies and other indications of PCS's consciousness of guilt. For example, although PCS claims in the Apology that it issued the Falsified Inception Bulletin "to assist its customers in understanding the magnitude of the final damage estimate," even a cursory review of the Falsified Inception Bulletin indicates that it was not issued for that purpose. Am. Compl. ¶ 65. For instance, CAT 42 impacted at least nine states in addition to Kansas according to the Original Bulletin, and severe weather was reported in twenty-four different states according to PCS's Severe Weather Summaries published for the days between April 3 and April 5, 2011. Am. Compl. ¶ 69; J. Cogan Decl. ¶¶ 5-7, Exs. D-F, CAT 42 Severe Weather Summs. Yet, PCS did not include information for any of these other states in the Falsified Inception Bulletin. Obviously, if its purpose was to provide customers with information about the magnitude of the storm, it would have done so.

In its motion, PCS improperly attempts to narrow Section 6(b)'s meaning by arguing (1) that the "current business practices" with which it was required to comply are limited to those set forth in Exhibit C to the Reporting Agency Agreement; and (2) that the practices set forth in Exhibit C "emphasize discretion and flexibility, and do not mandate any particular timing or procedure for amending or disseminating Catastrophe Bulletins." PCS/AIR Mem. at 11-12. In other words, according to PCS's view of the contract, the "business practices" with which it was

compelled to comply were nothing more than the "practice" that it was permitted to exercise unfettered discretion. Of course, such a reading would render the provision meaningless. *See Eastman Kodak Co. v. STWB Inc.,* 232 F. Supp. 2d 74, 91 (S.D.N.Y. 2002) ("a court should avoid…render[ing] contractual language meaningless or superfluous").

In reality, Section 6(b), when read together with Exhibit C, does not give PCS carte blanche to do whatever it wants. Exhibit C, for example, references a "program" that PCS maintains and describes typical activities followed as part of this program, including but not limited to the release of a Final Estimate. Am. Compl. Ex. 2 at C-1 – C-6. The Amended Complaint clearly alleges that PCS significantly departed from its normal "program" in this case. That is all that is required to state a claim.

## 2. PCS Breached Section 6(g) Of The Reporting Agency Agreement

Section 6(g) of the Reporting Agency Agreement requires PCS to "keep a record of each Designation, Preliminary Estimate and Resurvey Estimate disseminated through ISOnet PCS." Am. Compl. Ex. 2 § 6(g). As alleged in the Amended Complaint and in glaring contravention of this provision, PCS intentionally deleted any trace of the Original Bulletin from ISOnet. Am. Compl. ¶¶ 60, 96.

PCS argues in its motion that this provision only required it to keep a record of the Original Bulletin somewhere in its files, and not necessarily on ISOnet. PCS/AIR Mem. at 15. In other words, according to PCS, the phrase "disseminated through ISOnet PCS" must be interpreted as the trigger for when the record-keeping obligations kick in, not a requirement for where such records must be kept. Such an interpretation, however, would render that phrase superfluous since other provisions of the Reporting Agency Agreement already make clear that *all* "Designation[s], Preliminary Estimate[s] and Resurvey Estimate[s]" must be disseminated through ISOnet. *See, e.g.,* Am. Compl. Ex. 2 § 1(a)(vi) (defining "Estimate" as "a proprietary

judgment made by [PCS] ***and disseminated through ISOnet PCS*** concerning the total insured property losses…") (emphasis added); *id.* § 6(b) (providing that PCS is obligated to "provide such Designations, Estimates and Compilations to Licensee ***through its subscription to ISOnet PCS***") (emphasis added).  In other words, under the contract, PCS cannot validly issue a "Designation, Preliminary Estimate [or] Resurvey Estimate" unless it is disseminated through ISOnet.  Thus, the phrase "disseminated through ISOnet" would not be needed to explain when the record-keeping requirement was triggered.

The better reading of this provision is that it provides that, for each "Designation, Preliminary Estimate and Resurvey Estimate" that is disseminated, PCS must keep a record posted "through ISOnet."  Am. Compl. Ex. 2 § 6(g).  Such an interpretation is preferable because it gives meaning to all the words in the provision.  *Eastman Kodak Co.,* 232 F. Supp. 2d at 91-92.  Further, it is logical given the importance to Mariah and its Investors to be able to monitor through ISOnet the Designations, Preliminary Estimates and Resurvey Estimates as they are issued.  Indeed, notwithstanding PCS's claim that record-keeping is "irrelevant" to this case, ISOnet is critical to Mariah's Investors as they utilize it to make ongoing investment decisions.

### 3.  PCS Breached Section 1(e) Of The Reporting Agency Agreement

Section 1(e) of the Reporting Agency Agreement obligated PCS to notify Mariah of any plans to "alter, amend or change in any way its general methodology for estimating insured property losses attributable to Catastrophes, including preparing Estimates and…to vary from such methodology in preparing Estimates for individual Catastrophes…" prior to the implementation of such plans.  Am. Compl. Ex. 2 § 1(e).

PCS's issuance of the Falsified Inception Bulletin after the Final Estimate, and the obfuscating manner in which it did so (as described at I.A(1) *supra*) was an alteration in its general methodology without notice to Mariah, and thus a breach of this provision.  PCS's focus

in its motion, however, seems not to be on general methodology, but rather on general *loss estimation* methodology. For example, in its motion PCS quotes the last sentence of the "Methodology" section of Exhibit C to the Reporting Agency Agreement to claim that it has discretion to modify "its general loss estimation methodology at any time and modify application of its methodology in connection with any particular catastrophe." PCS/AIR Mem. at 5. But this section pertaining to loss estimation methodology only provides guidance on how PCS quantifies losses on the ground; PCS's motion thus fails to address PCS's changes to its general methodology, as detailed in the Amended Complaint. Am. Compl. ¶¶ 97-98.[4]

## B. SECTION 6(C) OF THE REPORTING AGENCY AGREEMENT DOES NOT REQUIRE DISMISSAL OF THE CLAIMS AGAINST PCS

PCS argues that its conduct with respect to the Falsified Inception Bulletin should not be deemed a breach of contract, because it had the contractual right to correct errors pursuant to Section 6(c) of the Reporting Agency Agreement. PCS/AIR Mem. at 11. Section 6(c) provides "[i]f, as and when ISO discovers or is informed of any matter that it deems in its discretion to constitute an error, omission or mistake, it will use reasonable commercial efforts to correct or cause to be corrected any such error, omission or mistake." Am. Compl. Ex. 2 § 6(c). PCS's reliance on this provision is misguided for at least three reasons.

### 1. Section 6(c) Contains A Temporal Requirement

Section 6(c) does not permit PCS to correct "errors, omissions or mistakes" whenever it wants. Rather, assuming an actual error, omission or mistake is made, it requires the correction to take place "if, as and *when*" PCS discovers it. Am. Compl. Ex. 2 § 6(c). Here, there is no

---

[4] To the extent the Reporting Agency Agreement is ambiguous as to what Section 6(b), 6(g) or 1(e) require, all reasonable inferences should be drawn in favor of Mariah at the motion to dismiss stage and the motion should be denied. *See Ginx,* 720 F. Supp. 2d at 351; *Bank of N.Y. Trust*, 522 F. Supp. 2d at 637-38.

allegation in the Amended Complaint that suggests (let alone compels the conclusion) that the Falsified Inception Bulletin was published "if, as and when" an error, omission or mistake was discovered.[5]

If anything, the allegations in the Amended Complaint suggest just the opposite. As alleged in the Amended Complaint, PCS learned of the geographical details that were ultimately inserted into the Falsified Inception Bulletin *months prior* to the date it published the Falsified Inception Bulletin. Am. Compl. ¶¶ 55, 98. Aware of these details months earlier, PCS could have added geographical details to any of its Catastrophe Bulletins up through and including the Final Estimate if it deemed it appropriate to do so.[6] Notably, in CB 42-2, PCS revised the Original Bulletin by *excluding* passages that contained certain geographical information and descriptions of the storm's damage. This indicates that PCS was actively monitoring the purported accuracy or relevance of its previously published information as early as April 25, 2011. Am. Compl. Ex. 1 at 2; Am. Compl. Ex. 5 at CB 42-2 p. 3.

## 2. PCS May Have Consciously Chosen Not To Include Geographical Information In The Catastrophe Bulletins

Contrary to the assumption laced throughout Defendants' briefs, the Amended Complaint does *not* allege that the decision by PCS to exclude from its Catastrophe Bulletins certain

---

[5] *See Caleb & Co. v. E.I. DuPont de Nemours & Co.*, 599 F. Supp. 1468, 1474 (S.D.N.Y. 1984) (whether an action was performed promptly, as contractually required, is a question of fact); *LeBlanc v. Nortel Networks Corp.*, Civ. A. 3:03-CV-65, 2006 WL 839180, at *4 (M.D. Ga. Mar. 30, 2006) (recognizing that phrases like "as soon as practicable" or "as promptly as practicable" are inherently ambiguous under New York law). This temporal requirement is no mere technicality. A reinsurance agreement cannot operate without a date at which calculations are deemed final.

[6] *Cf., e.g.,* CB 46-5 to CB 46-1. J. Cogan Decl. ¶ 8, Ex. G, CAT 46 Bulletins (showing addition of detailed information regarding impact of damage of Catastrophe 46 on numerous locations following release of initial bulletin).

geographical information for CAT 42 was an error, omission or mistake. Defendants repeatedly assert that Mariah somehow concedes that PCS's Catastrophe Bulletins should have included information about Metro locations in Kansas all along. PCS/AIR Mem. at 11. In reality, the Amended Complaint contains no such concession.

Rather, as noted above, PCS was closely monitoring developments related to this storm and actually chose in CB 42-2 to revise the Original Bulletin by excluding passages that included certain geographical information and descriptions of the storm's damage.[7] This suggests that PCS — in an apparent exercise of the contractual discretion that its motion papers spend so much time trumpeting it was afforded — consciously chose not to include the geographical information contained in the Falsified Inception Bulletin in any of the Catastrophe Bulletins, either because it did not believe all of the information contained in Severe Weather Summaries was accurate or relevant, or for some other reason.[8]

---

[7] In support of the proposition that everyone knew from the beginning that CAT 42 was, in reality, a Metro occurrence, American Family sets forth in its brief (in bold letters) a sentence from the Original Bulletin that stated "[t]his severe weather outbreak ranks as one of the top outbreaks of all time in terms of the [sheer] number of severe weather reports." Am. Family Mem. at 7. American Family ignores the fact that PCS apparently deemed it appropriate to **remove** that sentence from CAT 42-2. Am. Compl. Ex. 5 at CB 42-2.

[8] A comparison of the Severe Weather Summaries with the Catastrophe Bulletins for CAT 42 provides additional support for the proposition that PCS was actively managing information to make determinations about what was reliable enough to include in CAT 42's Catastrophe Bulletins. For example, the Original Bulletin references three locations in Kentucky that were impacted by the storm — Greenville, Hopkinsville and Kevil. Am. Compl. Ex. 1 at 2. These three Kentucky locations were all mentioned in the Severe Weather Summary dated April 5, 2011, which suggests (consistent with its standard practices) that PCS had been selecting information from the Severe Weather Summaries to put in the original CB 42-1. J. Cogan Decl. ¶ 6, Ex. E, Apr. 5 Severe Weather Summ. That PCS proactively chose to include these three Kentucky locations but **not** other locations contained in the Severe Weather Summaries (including Kansas locations) gives rise to an inference that PCS was actively reviewing and analyzing the information contained in Severe Weather Summaries and making determinations about which locations were appropriate to include in formal catastrophe bulletins (and which locations were not).

This is not surprising. Defendants insist in their motion papers that because Severe Weather Summaries indicated that CAT 42 struck Metro locations, it must mean that the Falsified Inception Bulletin is accurate. PCS/AIR Mem. at 1, 7-8. But in advancing this argument, Defendants overlook the fact that PCS routinely exercises its discretion not to include in its Catastrophe Bulletins details regarding geographic areas reported in Severe Weather Summaries. Am. Compl. ¶ 72. For instance, PCS did not report Metro locations as having been impacted in Catastrophe Bulletins for Catastrophe 43 ("CAT 43") even though the Severe Weather Summaries for CAT 43 detailed information of the storm's impact on cities located in Metro counties. Am. Compl. ¶ 72. Likewise, Catastrophes 47 and 53 were also classified as purely Non-Metro by AIR based on PCS's decision to exclude Metro locations in those storms' catastrophe bulletins despite its inclusion of geographic information in their associated Severe Weather Summaries. *Id*. Such discretion comports with the Offering Circular, which makes clear that as a result of the "imprecision, variability and the exclusions" involved in this synthetic reinsurance product, "as well as the inherently judgmental nature of the estimating process, PCS estimates may be materially different from the actual insured property losses experienced by the industry." J. Cogan Decl. ¶ 2, Ex. A, Offering Circular at 41.

Moreover, nowhere on the face of the Falsified Inception Bulletin does it suggest that it is a mere correction or amendment of an error, mistake or omission. Instead, the deliberate lengths and efforts PCS took to hide this so-called correction — by deleting the Original Bulletin from ISOnet, not notifying Subscribers of the new bulletin, backdating the Falsified Inception Bulletin

and then lying in the Apology — strongly suggests that PCS understood that this was no benign, contractually-permitted error correction at all.[9]  Am. Compl. ¶¶ 56-63, 94-96; *see supra* I.A.

### 3. PCS Failed To Utilize Reasonable Commercial Efforts

In addition, PCS ignores that while it may have discretion in determining what is an error, mistake or omission, any correction applied must utilize "reasonable commercial efforts." Am. Compl. Ex. 2 § 6(c).  PCS failed to utilize reasonable commercial efforts for the reasons listed at I.A.(1) *supra* and the following reasons, among others:

- While PCS added geographical information regarding Kansas after the Final Estimate, it omitted information on a number of other states.[10]  Am. Compl. ¶¶ 69-71.

- As alleged in the Amended Complaint, this selective publication of additional information for CAT 42 after the Final Estimate is highly suspicious because whereas the Final Estimate would not have caused Mariah to pay the maximum amount of money to American Family under the Reinsurance Agreement, this additional information ostensibly provided AIR with a basis by which it could calculate losses that were just enough to procure maximum payment.  *Id*. ¶¶ 56, 88.

Therefore, taking these allegations as true, as the Court must on a motion to dismiss, it cannot be said as a matter of law that PCS undertook "reasonable commercial efforts" in issuing its Falsified Inception Bulletin.

---

[9] In contrast, in a prior instance where PCS revised a Catastrophe Bulletin, which it then reissued, PCS clearly identified on the face of the Catastrophe Bulletin — in bold, underlined, on the first page — that the bulletin was revised.  J. Cogan Decl. ¶ 9, Ex. H, CB 19-1.

[10] Notably, among the states PCS continued to omit from bulletins was Missouri, which was the second largest state in terms of estimated insurance losses for CAT 42 and a state for which PCS had published the name of thirty-seven towns, some of which were located in Metro counties, in the Severe Weather Summaries.  Had Missouri been included, there would have been an $18.6 million **reduction** in the loss to Mariah given that the Metro Payout Factor in Missouri is lower than the Non-Metro one.  Am. Compl. Ex. 3 at A-1 - B-3; J. Cogan Decl. ¶¶ 5-7, Exs. D-F, CAT 42 Severe Weather Summs.; Am. Compl. Ex. 5 at CB 42-1, CB 42-5.

## C. AIR BREACHED THE CALCULATION AGENT AGREEMENT

AIR breached Section 3(a)(i) of the Calculation Agent Agreement in two respects. First, it breached this provision by treating the Falsified Inception Bulletin as a true Catastrophe Bulletin, even though plainly it is not. Second, it breached this provision by miscalculating the Metro and Non-Metro Insured Industry Loss Amounts as well as the Event Index Value.

### 1. AIR Breached Calculation Agent Agreement Section 3(a)(i) By Treating The Falsified Inception Bulletin As A True Catastrophe Bulletin

Section 3(a)(i) of the Calculation Agent Agreement provides, in relevant part, as follows:

> [U]sing the latest ***Catastrophe Bulletins*** available as of five (5) Business Days prior to the Event Reporting Date (as defined below), the Calculation Agent shall (1) use commercially reasonable efforts to determine, based on information readily and publicly available online from government entities or agencies, whether any part of a location identified in a ***Catastrophe Bulletin*** belongs to a Metro County, thereby resulting in a Metro Occurrence; *provided,* that should no Metro County or location within any Metro County be identified in any ***Catastrophe Bulletin*** relating to a Covered Event in a state, the Non-Metro Payout Factor will be used for such Covered Event in such state, and (2) obtain the Metro Insured Industry Loss Amounts or Non-Metro Insured Industry Loss Amounts, as applicable, with respect to the Severe Thunderstorms to which such Event Report Request relates, for each state of the applicable Covered Area.

Am. Compl. Ex. 4 § 3(a)(i) (emphasis added).

Under the plain language of this provision, AIR was only permitted to look at actual "Catastrophe Bulletins" to determine whether a particular storm constituted a "Metro Occurrence." Am. Compl. Ex. 4 § 3(a)(i). The Falsified Inception Bulletin, however, was not a real Catastrophe Bulletin and, accordingly, AIR's use of it constituted a breach of contract.

The Reinsurance Agreement defines a "Catastrophe Bulletin" as a "bulletin originated and disseminated by the Reporting Agency (including through ISOnet PCS) that ***identifies and assigns a catastrophe number*** to a Peril and/or gives ***preliminary, or subsequently, resurvey***

*estimates* of insured property losses arising from a Peril."[11] Am. Compl. Ex. 3 at 2 (emphasis added). The Falsified Inception Bulletin fails to meet this definition as it did not either (1) identify or assign a catastrophe number to a Peril (*i.e.,* the Original Bulletin was the birth certificate that identified and assigned number 42 to the Peril); or (2) give any preliminary or resurvey estimates of insured property losses arising from a Peril, as demonstrated by the fact that it contains no insured loss data.

In its motion to dismiss, AIR argues that the Falsified Inception Bulletin is a true Catastrophe Bulletin, because it was labeled by AIR as a "Catastrophe Bulletin." PCS/AIR Mem. at 16. Of course, simply giving a document the title of "Catastrophe Bulletin" does not automatically cause it to meet the contractual definition of that term. AIR's further argument that the Falsified Inception Bulletin is a real Catastrophe Bulletin because it "identifies and assigns a 'catastrophe number' — No. 42" is factually wrong. *Id.* at 17. The Falsified Inception Bulletin did not "assign" a catastrophe number to CAT 42. Rather, the Original Bulletin, which was released nearly seven months earlier, was the document that assigned the catastrophe number of 42. [12]

AIR argues that it complied with its contractual obligations because, pursuant to Calculation Agent Agreement Section 3(a)(i), it was required to rely upon the "***most recent*** Catastrophe Bulletin." PCS/AIR Mem. at 2 (emphasis added). As an initial matter, as noted above, the Falsified Inception Bulletin is not a Catastrophe Bulletin at all, let alone the "most

---

[11] The Calculation Agent Agreement, to which AIR is a party, uses numerous terms defined in the Reinsurance Agreement, including "Catastrophe Bulletin". *See* Am. Compl. Ex. 4.

[12] Notably, the Original Bulletin was released on April 5, 2011, which timing is in line with the practice described in Exhibit C of the Reporting Agency Agreement for assigning a catastrophe number. Am. Compl. Ex. 2 at C-2 ("The assigned serial number is generally released to subscribers within 24-48 hours after the occurrence of a PCS Identified Catastrophe").

recent" Catastrophe Bulletin. Moreover, due to the backdating of the Falsified Inception Bulletin, it is *not* dated as the "most recent" bulletin. Rather, CB 42-5 is dated November 2, 2011, whereas the Falsified Inception Bulletin is backdated to April 2011. In addition, if AIR relied on the Falsified Inception Bulletin, no losses should be applied because the Falsified Inception Bulletin contains no loss estimates and AIR could not have calculated any resulting loss.

**2. AIR Breached Calculation Agent Agreement Section 3(A)(i) By Miscalculating The Metro And Non-Metro Insured Industry Loss Amounts As Well As The Event Index Value**

Calculation Agent Agreement Section 3(a)(i) further requires that AIR:

> [D]etermine whether the Severe Thunderstorms referenced in the Event Report Request are Covered Events, and if so, calculate for all such Covered Events, the Event Index Value, the Event Loss Amount, the Loss Payment Amount … in accordance with the procedures set forth in <u>Schedule I</u>.

Am. Compl. Ex. 4 § 3(a)(i).

The calculations contemplated by this provision are of critical importance; they ultimately determine the amount payable by Mariah to American Family. As described below, in order to calculate the Event Index Value, which is then used to calculate the Loss Payment Amount, AIR was required to consider the definitions of two terms: (1) the "Final Development Date;" and (2) "Insured Industry Loss Amount."

Under the Calculation Agent Agreement, "Final Development Date" is defined as follows:

> *[T]he date after which any change in the Insured Industry Loss Amount for a Covered Event will not be taken into account for purposes of calculating the Event Index Value* and any corresponding Event Loss Amount, which date shall be the earliest of (a) eighteen (18) months from the Date of Loss for such Covered Event, *(b) the date that the Reporting Agency releases a Catastrophe Bulletin with its final resurvey estimate*

> **for such Covered Event** and (c) ten (10) Business Days prior to the Final
> Extended Redemption Date.

Am. Compl. Ex. 4 at 2 (emphasis added).

For CAT 42, the Final Development Date was November 2, 2011 — the date that PCS, as Reporting Agency, released its Final (Resurvey) Estimate for CAT 42. Thus, under the plain language of the contract, AIR was not permitted to take into account any change in the Insured Industry Loss Amount that took place after November 2, 2011.

The Insured Industry Loss Amount, in turn, is defined in the Reinsurance Agreement as "the sum of the Metro Insured Industry Loss Amount together with the Non-Metro Insured Industry Loss Amount." Am. Compl. Ex. 3 at 8. In this case, the Metro and Non-Metro Insured Industry Loss Amounts changed when the Falsified Inception Bulletin was published, due to the inclusion in the Falsified Inception Bulletin of Metro locations in Kansas. Am. Compl. ¶¶ 5, 55, 81-85, 105-07. AIR's reliance upon these changed numbers to calculate the Event Index Value (and, ultimately, how much money Mariah owed to American Family) was improper, because the changes were made after the Final Development Date. By issuing an Event Report that did take these changes into account, AIR breached the Calculation Agent Agreement.

In its motion, AIR argues that the Insured Industry Loss Amount "is defined as the total dollar amount of Metro and Non-Metro losses, regardless of whether any particular storm is considered a Metro Occurrence or a Non-Metro Occurrence." PCS/AIR Mem. at 18. AIR appears to be relying here on the term "sum" in the definition of Insured Industry Loss Amount. Am. Compl. Ex. 3 at 8. That is, AIR appears to be arguing that the definition of Insured Industry Loss Amount allows the component parts of the Insured Industry Loss Amount (*i.e.,* the Metro Insured Industry Loss Amount and the Non-Metro Insured Industry Loss Amount) to change

after the Final Development Date as long as the *sum*-total of those two figures does not change. The Court should reject this narrow interpretation of the contract.

As a threshold matter, AIR's interpretation is illogical, given the express reference in the definition of Final Development Date to Event Index Value. As noted above, the definition of Final Development Date provides that changes in the Insured Industry Loss Amount will not be considered after the Final Development Date "***for purposes of calculating the Event Index Value***." (emphasis added). If the contract means what AIR argues it means, one would assume, based on this definition, that the Event Index Value must be computed using the Insured Industry Loss Amount rather than merely its component parts (otherwise, it would make no sense to freeze the Insured Industry Loss Amount "for purposes of calculating" the Event Index Value). In fact, that is not how the computation works. As set forth *supra* 3.B, the definition of Event Index Value makes no mention whatsoever of Insured Industry Loss Amount. Instead, the Event Index Value is calculated using the component parts of the Insured Industry Loss Amount (*i.e.*, the Metro Insured Industry Loss Amount and the Non-Metro Insured Industry Loss Amount).[13]

While the illogic of AIR's argument should lead this Court to reject its interpretation of the contract as a matter of law, at a bare minimum, there is ambiguity in the definition of Insured Industry Loss Amount that cannot be resolved in AIR's favor on a motion to dismiss. In particular, the definition of Insured Industry Loss Amount contained in the Reinsurance Agreement uses the terms "sum" and "together," and it is not clear from the face of the definition

---

[13] Further support that the parties contemplated using the component parts of Insured Industry Loss Amount can be found in the fact that (i) the parties included Metro Insured Industry Loss Amount and Non-Metro Insured Industry Loss Amount as separate line items to be included in the calculations for an Event Report at Calculation Agent Agreement Exhibit B and (ii) Step 1 of Schedule I to the Calculation Agent Agreement requires AIR to, among other things, "verify the Metro Insured Industry Loss Amounts or Non-Metro Insured Industry Loss Amounts…" Am. Compl. Ex. 4 at B-3, Schedule I-1.

exactly what these terms, taken together, were intended to mean. Both of these terms have multiple dictionary definitions. "Together" can mean (i) "into or in a condition of unity", or it can mean (ii) "taken or considered collectively or conjointly". J. Cogan Decl. ¶ 10, Ex. I, Dictionary.com "Together" Definition. "Sum" can mean (i) "the aggregate of two or more numbers" or (ii) "a series of numbers or quantities to be added up." J. Cogan Decl. ¶ 11, Ex. J, Dictionary.com "Sum" Definition. This ambiguity is amplified by the fact that "Insured Industry Loss Amount" is defined slightly differently in the supplement to the Offering Circular. Specifically, in that document, the term is defined (without use of the word "sum") as follows: "'Non-Metro Insured Industry Loss Amount' and, **together** with the Metro Insured Industry Loss Amount, the 'Insured Industry Loss Amount.'" (emphasis added). J. Cogan Decl. ¶ 2, Ex. A, Offering Circular at S-7.

Given these ambiguities, the motion should be denied. *See Ginx,* 720 F. Supp. 2d at 351; *Bank of N.Y. Trust*, 522 F. Supp. 2d at 637-38.

### D. PCS AND AIR BREACHED THE COVENANT OF GOOD FAITH AND FAIR DEALING

In the alternative to the above described breaches of the Reporting Agency Agreement and Calculation Agent Agreement, Mariah also adequately alleges that PCS and AIR respectively breached the covenant of good faith and fair dealing. "New York law implies in every contract a covenant of good faith and fair dealing pursuant to which neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Dorset Indus., Inc. v. Unified Grocers, Inc.*, 893 F. Supp. 2d 395, 405 (E.D.N.Y. 2012) (internal quotations omitted). While there are no elements required to plead breach of the covenant of good faith and fair dealing, in assessing such a claim courts examine the express language of the underlying contracts as well as the parties'

performance and course of dealing under the contract to determine whether the alleged conduct violates the duty of good faith and fair dealing.  *Id*. at 406.

New York courts have found that the covenant places limits on a party's exercise of discretion accorded to it under a contract.  *Dalton v Educ. Testing Serv.*, 663 N.E.2d 289, 290-91 (N.Y. 1995).  Importantly, the party may not exercise that discretion in an arbitrary or irrational manner.  *Sorenson v. Bridge Capital Corp.*, 861 N.Y.S.2d 280, 282 (App. Div. 2008); *AFBT-II, LLC v. Country Vill. on Mooney Pond, Inc.*, 759 N.Y.S.2d 149, 151 (App. Div. 2003).  The presence of unilateral discretion in a contract does not excuse the parties from fulfilling their duties under the contract fairly and in good faith.  *Zurakov v. Register.Com, Inc.*, 760 N.Y.S.2d 13, 15 (App. Div. 2003).  Whether an exercise of discretion violates the implied covenant would necessarily depend on a close examination of the facts and may include analysis of certain "legally recognized measures" to make a determination as to whether the discretionary action was in good or bad faith, such as if the action was taken for a reason that was a pretext for an underlying bad faith motivation.  *Mickle v. Christie's, Inc.*, 207 F. Supp. 2d 237, 249-50 (S.D.N.Y. 2002); *see also Zurakov*, 760 N.Y.S.2d at 15.

As the Amended Complaint alleges, PCS's actions in publishing a Falsified Inception Bulletin after the Final Estimate, its obfuscation of the Falsified Inception Bulletin's existence (by backdating the bulletin, not notifying Subscribers of its existence and not preserving the Original Bulletin on ISOnet, among other things), and AIR's improper reliance on the same evince an arbitrary, irrational and/or bad faith effort to wipe out Mariah's principal.  Am. Compl. ¶¶ 5-6, 75-76.

## E. AMERICAN FAMILY BREACHED THE REINSURANCE AGREEMENT

American Family breached the covenant of good faith and fair dealing with respect to the Reinsurance Agreement by demanding that it be paid $100 million in reinsurance on January 3, 2012 based on the conclusions made by PCS and AIR in the Falsified Inception Bulletin and Improper Event Report, and by thereafter issuing a notice of early redemption terminating the Reinsurance Agreement, despite knowing that substantial questions regarding the facts and circumstances surrounding the issuance of the Falsified Inception Bulletin and Improper Event Report had been raised. Am. Compl. ¶¶ 109-12; J. Cogan Decl. ¶ 12, Ex. K, Jan. 3 Letter; J. Cogan Decl. ¶ 13, Ex. L, Jan. 26 Not. of Early Redemption; s*ee supra* I.A-I.C.

The Reinsurance Agreement specifies that American Family, as the "Ceding Insurer," "may withdraw from the Reinsurance Trust Account, at any time … for", among other purposes, payment or reimbursement of American Family "for the amounts payable by [Mariah] to [American Family] under this Reinsurance Agreement." Am. Compl. Ex. 3 § 10.5(a). At the time American Family demanded payment from the Reinsurance Trust Account, American Family was on notice regarding the misconduct of PCS and AIR. Am. Compl. ¶ 109. Despite knowledge of this misconduct, American Family demanded $100 million from the Reinsurance Trust Account, constituting the entire principal of Mariah. *Id.* ¶¶ 88, 109-12. American Family thereby violated the covenant of good faith and fair dealing with respect to the Reinsurance Agreement.[14]

---

[14] The Reinsurance Agreement also incorporates by reference the provisions of the Reinsurance Trust Agreement requiring that American Family provide a notice of withdrawal prior to withdrawing funds from the Reinsurance Trust Account. Specifically, the Reinsurance Agreement states that "[t]he Reinsurance Trust Account, and the application and withdrawal of funds and assets therefrom, shall be subject to the terms hereof and of the Reinsurance Trust Agreement." Am. Compl. Ex. 3 § 10.3. The Reinsurance Trust Agreement, in turn, permits

Moreover, as referenced in the Notice of Early Redemption issued by American Family on January 26, 2012, Section 2.2 of the Reinsurance Agreement states that the "Reinsurance Agreement shall terminate prior to the Scheduled Redemption Date" if "at any time the Outstanding Principal Amount is equal to or less than 10% of the Original Principal Amount." Am. Compl. Ex. 3 § 2.2(a)(i); *see* J. Cogan Decl. ¶ 13, Ex. L, Jan. 26 Not. of Early Redemption. The only reason the Outstanding Principal Amount, as defined in the Reinsurance Agreement, was reduced to less than 10% of the Original Principal Amount was because American Family withdrew $100 million from Mariah based on the Improper Event Report and Falsified Inception Bulletin. Am. Compl. ¶¶ 109-12. Therefore, American Family also acted in contravention of the covenant of good faith and fair dealing with respect to its issuance of the Early Redemption Notice terminating the Reinsurance Agreement.

Courts have held that "the covenant is violated when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other of the right to receive the benefits under the agreement." *Orange Cnty. Choppers, Inc. v. Olaes Enters., Inc.*, 497 F. Supp. 2d 541, 560 (S.D.N.Y. 2007) (quotations omitted).[15] American

---

American Family to withdraw funds "to satisfy amounts due … to pay or reimburse [American Family] for the amounts payable by [Mariah] to [American Family]," but further requires that any such withdrawal "be made in accordance with [a withdrawal] notice from" American Family. J. Cogan Decl. ¶ 4, Ex. C, Reins. Trust Agreement § 1.04. Again, despite knowing that the veracity of PCS and AIR's reports related to CAT 42 was in question, American Family demanded in its January 3, 2012 letter that Mariah forfeit its entire principal based on the Falsified Inception Bulletin and Improper Event Report. Am. Compl. ¶¶ 6, 109-12. In making this demand, American Family stated that there was "no basis for withholding, delaying or otherwise impeding the release of funds from the Reinsurance Trust Account to American Family." *Id.* ¶ 109; J. Cogan Decl. ¶ 12, Ex. K, Jan. 3 Letter at 1. By issuing a withdrawal notice under these circumstances, American Family acted in bad faith in violation of the Reinsurance Trust Agreement, as well as the Reinsurance Agreement.

[15] Contrary to American Family's assertions, "New York does not [even] require that a breach of the duty of good faith and fair dealing be tied to a specific contractual provision." *Dorset*, 893 F.

Family's conduct does exactly that — by demanding payment from Mariah based on the Falsified Inception Bulletin and Improper Event Report and thereafter preemptively terminating the Reinsurance Agreement, American Family deprived Mariah of the benefits of the Reinsurance Agreement.

## II.    MARIAH HAS STATED QUASI-CONTRACT AND TORT CLAIMS AGAINST AMERICAN FAMILY

Mariah alleges — alternatively to its breach of contract claim — that American Family was unjustly enriched at the expense of Mariah and that American Family is liable to Mariah for conversion and tortious interference.

### A.  MARIAH HAS STATED A CLAIM FOR UNJUST ENRICHMENT

To state a claim for unjust enrichment under New York law, plaintiff need only show that the defendant benefited at the plaintiff's expense and that equity and good conscience require restitution. *See State Farm Mut. Auto. Ins. Co. v. James M. Liguori, M.D., P.C.*, 589 F. Supp. 2d 221, 236 (E.D.N.Y. 2008).  Notably, courts have held that "[t]he essential inquiry in any action for unjust enrichment … is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered." *Waldman v. New Chapter, Inc.*, 714 F. Supp. 2d 398, 403 (E.D.N.Y. 2010) (*quoting Sperry v. Crompton Corp.*, 863 N.E.2d 1012, 1018 (N.Y. 2007).

American Family's motion to dismiss Mariah's unjust enrichment claim should be denied because Mariah states a prima-facie case for unjust enrichment in the Amended Complaint.  First, the Amended Complaint alleges that American Family received $100 million

---

Supp. 2d at 407 (*citing Havel v. Kelsey-Hayes Co.,* 445 N.Y.S.2d 333, 335 (App. Div. 1981) ("[T]hat a specific promise has not been expressly stated does not always mean that it was not intended.").

in reinsurance from Mariah, and was thereby enriched at Mariah's expense. *See* Am. Compl. ¶¶ 109-12, 118-21; *see supra* Section I.E. Second, the Amended Complaint alleges that American Family's enrichment was unjust because it was based on PCS and AIR's misconduct and breaches of contract in estimating losses stemming from CAT 42. Am. Compl. ¶¶ 7, 111, 118-21.[16] Third, assuming that the allegations in the Amended Complaint are credited (which they must be at this stage of the proceedings), equity and good conscience require that American Family return the $100 million to Mariah. Obviously, if PCS and AIR ultimately are found not to have committed the breaches alleged, then equity and good conscience presumably would not require American Family to return the money to Mariah. If, on the other hand, the Court ultimately finds that PCS and AIR breached the contracts and that, as a result of those breaches, American Family received tens of millions to which it was not entitled, then it clearly would be inequitable for American Family to keep the money. *Id*. ¶¶ 118-21; *see State Farm Mut. Auto. Ins. Co. v. Rabiner*, 749 F. Supp. 2d 94, 102 (E.D.N.Y. 2010) (finding that plaintiff sufficiently alleged claim of unjust enrichment "when and because acts of the parties *or others* have placed in the possession of one person money … under such circumstances that in equity and good conscience he ought not to retain it") (emphasis added).

American Family's arguments in support of its motion are unavailing. First, contrary to its contention, the existence of the Reinsurance Agreement does not invalidate Mariah's unjust enrichment claim. Am. Family Mem. at 11-12. As noted above, Mariah's breach of contract and unjust enrichment claims are pled in the alternative. In other words, Mariah asserts that it has a

---

[16] It is irrelevant whether American Family itself acted properly in receiving and retaining the funds in question as it is well established that unjust enrichment does not require proof of any wrongdoing by the enriched party. *See Blusal Meats, Inc. v. U.S.*, 638 F. Supp. 824, 831 (S.D.N.Y. 1986) (confirming that "[p]roof of wrongful conduct by the defendant is not required" to prevail on a claim for unjust enrichment).

contractual cause of action but that, if it does not, it has a quasi-contractual cause of action. Notwithstanding American Family's suggestion to the contrary, there is nothing improper about including both a breach of contract claim and unjust enrichment claim in the same complaint. *See Hallmark Aviation Ltd. v. AWAS Aviation Servs., Inc.*, No. 12 CIV. 7688 (JFK), 2013 WL 1809721, at *5-6 (S.D.N.Y. Apr. 30, 2013) (holding that breach of contract claims and unjust enrichment claims can be pled alternatively and noting that this is consistent with Rule 8(d) of the Federal Rules of Civil Procedure permitting inconsistent pleading); *St. John's Univ., N.Y. v. Bolton,* 757 F. Supp. 2d 144, 183-84 (E.D.N.Y. 2010) (denying dismissal of unjust enrichment claim because "Plaintiff is not required to guess whether it will be successful on its contract, tort, or quasi-contract claims").

Under New York law, "where the contract does not cover the dispute in issue, a plaintiff may proceed upon a theory of quasi contract [such as unjust enrichment] as well as contract, and will not be required to elect his or her remedies." *Zuccarini v. Ziff-Davis Media, Inc.*, 762 N.Y.S.2d 621, 622 (App. Div. 2003); *see also Barbagallo v. Marcum LLP*, 820 F. Supp. 2d 429, 443 (E.D.N.Y. 2011) (the existence of a valid contract does *not* preclude a claim of unjust enrichment where "the contract does not cover the dispute in question"). Therefore, to the extent American Family's misconduct (*i.e.*, relying on PCS and AIR's misconduct to drain Mariah of its entire principal) is not governed by the Reinsurance Agreement, it is nevertheless an adequate basis for Mariah's unjust enrichment claim.[17]

---

[17] American Family's reliance on *Clark-Fitzpatrick, Inc. v. L.I.R.R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987), is misguided. That case bears no resemblance to this one. There, the plaintiff was suing for unjust enrichment where defendant breached the contract, and plaintiff chose not to rescind at the time of the breach but rather to continue on and perform under the contract and then sued upon completion of the performance. *Id.*

In addition to the foregoing, Mariah alleges that American Family was unjustly enriched by its retention of the funds it drew from Mariah despite its knowledge of AIR and PCS's improper reporting and calculation of the Loss Payment Amount and a demand for the return of the funds by Mariah. Am. Compl. ¶¶ 7, 109.  American Family's argument that "nothing happened after the date on which American Family received payment that could have even arguably transformed the proper receipt of funds into the improper retention of those same funds" misses the mark. Am. Family Mem. at 14.  Assuming *arguendo* that American Family's receipt of $100 million from Mariah was technically proper under the Reinsurance Agreement, American Family nevertheless should have returned those funds upon Mariah's demand knowing full well that its retention of those funds was based on AIR and PCS's improper actions.  *See Sergeants Benev. Ass'n Annuity Fund v. Renck*, 796 N.Y.S.2d 77, 81 (App. Div. 2005) (finding that plaintiff properly pled unjust enrichment where defendant improperly retained funds at issue).

American Family's generalization that permitting Mariah's unjust enrichment claim for retention, in accordance with New York law, would "swallow the rule prohibiting quasi-contract claims in the face of a valid and binding contract," is equally misguided.  Am. Family Mem. at 14.  *Sergeants* makes clear that unjust beneficiaries involved in misconduct cannot hide behind a contract with plaintiff where such actions (including misconduct and unjust retention) are not covered by the scope of the contract.[18]  *See Sergeants*, 796 N.Y.S.2d at 81 (reversing dismissal

_____

[18] American Family's attempt to distinguish *Sergeants*, 796 N.Y.S.2d at 81, is confusing.  In reversing the dismissal of plaintiffs' unjust enrichment claim, the court in *Sergeants* focuses solely on the fact that the conduct alleged was not covered by the contract and makes no mention of who the parties to the contract were.  *Id*.

of unjust enrichment claim where the unjust enrichment claim was "predicated on conduct not covered by the contract").[19]

Likewise, American Family's contention that equity and good conscience somehow require dismissal of Mariah's unjust enrichment claim as a matter of law ignores the fact that questions regarding equity and fairness are classically fact-specific. *See, e.g., Albany Eng'g Corp. v. Hudson River*, 973 N.Y.S.2d 391, 393 (App. Div. 2013) ("defendant's contention that equity does not support a finding of unjust enrichment is … fact-intensive"). American Family argues that "Mariah's preferred result plainly would be inequitable…. If successful, Mariah will obtain a windfall — at the expense of American Family and its policyholders … [a]s between the positions of American Family and Mariah, it is clear where equity — and inequity — lies." Am. Family Mem. at 16-17. Of course, in advancing this argument, American Family simply assumes facts that are not alleged in the Amended Complaint.

---

[19] The cases cited by American Family in support of its motion are inapposite as they refer to situations wherein the subject matter of the unjust enrichment claim is clearly and indisputably governed by a contract. *See, e.g., Orbit One Commc'ns, Inc. v. Numerex Corp.*, 692 F. Supp. 2d 373, 380-81 (S.D.N.Y. 2010) (dismissing unjust enrichment claim where funds were retained by defendants improperly under the governing contract). Such is not the case here where there is a dispute as to whether American Family's conduct is governed by the Reinsurance Agreement. And, to the extent that American Family argues that its conduct — either the receipt or retention of the funds in question — is covered by the Reinsurance Agreement, that is an issue of fact, and not a ground for dismissal, at this stage. *See Hallmark Aviation*, 2013 WL 1809721, at *5-6 (holding "that it [is] premature to dismiss the unjust enrichment cause of action" at the pleading stage given that "the applicability of the contract" to the conduct at hand is in dispute). Indeed, New York courts have cautioned against the dismissal of unjust enrichment claims at the pleading stage "because it is difficult to determine the validity or scope of the contract" prior to any discovery. *Id.* (citing *Vertex Constr. Corp. v. T.F.J. Fitness L.L.C.,* No. 10 CIV 683 (CBA), 2011 WL 5884209, at *4 (E.D.N.Y. Nov. 23, 2011)); *see also Hildene Capital Mgmt., LLC v. Friedman, Billings, Ramsey Grp., Inc.,* No. 11 Civ. 5832 (AJN), 2012 WL 3542196, at *11 (S.D.N.Y. Aug. 15, 2012) (denying motion to dismiss unjust enrichment claim where scope of contract was undetermined).

Indeed, the assertion that Mariah would obtain a "windfall" and that this windfall would be at the expense of American Family's policyholders implies that American Family used Mariah's money to pay claims related to CAT 42. That fact, however, is not alleged. Instead, as noted above, what is alleged is that Mariah was not a traditional form of reinsurance tied to the amount of policyholder claims American Family was required to pay. Indeed, it may very well be that American Family denied the claims of its policyholders, or that many of its policyholders did not even submit claims, or that exclusions in American Family's insurance policies protected it from paying claims that were submitted such that American Family only paid a fraction of damages actually sustained by CAT 42.

## B. MARIAH HAS STATED A CLAIM FOR CONVERSION

A claim of conversion requires plaintiff to show "(1) legal ownership or an immediate superior right of possession to a specific identifiable thing" and "(2) that the defendant exercised an unauthorized dominion over the thing in question … to the exclusion of the plaintiff's rights".[20] As alleged in the Amended Complaint, $100 million in Mariah's funds were transferred to American Family in February 2012. Am. Compl. ¶ 123. This transfer was made

---

[20] *Abundance Partners LP v. Quamtel, Inc.*, 840 F. Supp. 2d 758, 772 (S.D.N.Y. 2012) (internal quotations omitted); *see Okyere v. Palisades Collection, LLC*, __ F. Supp. 2d __, 2013 WL 5085148, at *9 (S.D.N.Y. Sept. 16, 2013) ("A conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession.") (citations omitted); *Colavito v. N.Y. Organ Donor Network, Inc.,* 860 N.E.2d 713, 717 (N.Y. 2006) (citations omitted). Notably, even "[w]here possession of property is initially lawful, conversion occurs when there is a refusal to return the property upon demand." *Okyere*, 2013 WL 5085148, at *9 (*quoting Salatino v. Salatino,* 881 N.Y.S.2d 721, 723 (App. Div. 2009)); *see Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc.*, 87 F.3d 44, 49 (2d Cir. 1996) (holding that for a claim of conversion "a demand is necessary only where the property is held lawfully by the defendant") (citing *White v. City of Mount Vernon,* 633 N.Y.S.2d 369, 370 (App. Div. 1995) ("If possession of the property is originally lawful, a conversion occurs when the defendant refuses to return the property after a demand or sooner disposes of the property….")).

as a result of the improper reporting and calculations of PCS and AIR, respectively. *Id.* ¶¶ 6-7. Despite Mariah's requests for the return of these monies, American Family has continued to retain the funds without the authority to do so. *Id*. ¶¶ 7, 112, 122-27.

Again, American Family attempts to mischaracterize Mariah's allegations to bolster its motion, and again, its motion must be denied. For instance, American Family contends that Mariah's claim of conversion must be dismissed because the claim falls within the subject matter of the Reinsurance Agreement. Am. Family Mem. at 19-20. However, as noted above, American Family cannot have it both ways — either a contract governs the issue, and Mariah has pled a breach of it, or no contract covers this dispute, and the conversion claim is proper.

American Family further contends that Mariah's claim of conversion should be dismissed because Mariah did not have ownership of the funds at issue. Am. Family Mem. at 20. However, to successfully maintain a claim of conversion under New York law, plaintiff must establish only that "its right to possession of the property was superior to the defendant's." *U.S. v. Paladin,* 539 F. Supp. 100, 103 (W.D.N.Y. 1982). In fact, where, as here, plaintiff has "an immediate superior right of possession to the property," ownership of the property at issue is irrelevant. *Guiffrida v. Storico Dev., LLC,* 876 N.Y.S.2d 793, 795 (App. Div. 2009) (citation omitted). Thus, whether Mariah had ownership of the funds at issue at the time of their conversion is irrelevant. What is relevant, and dispositive at this stage, is that Mariah had a superior right to possession of the funds at issue because American Family's possession of the funds was a direct result of PCS and AIR's misconduct. Am. Compl. ¶¶ 111-12.

Moreover, as noted above, even where initial receipt of property is proper, a claim for conversion may lie where a demand for the return of property is denied. *See Okyere*, 2013 WL 5085148, at *9; *see supra* II.B. Therefore, even assuming that American Family properly

received $100 million in reinsurance from Mariah, which it did not, Mariah properly pleads conversion against American Family because American Family denied Mariah's request that the funds in question be returned.  Am. Compl. ¶ 125.

### C.  MARIAH HAS STATED A CLAIM FOR TORTIOUS INTERFERENCE

In order to maintain a claim for tortious interference under New York law, plaintiff must plead that: (1) a valid contract existed; (2) defendant had knowledge of that contract; (3) defendant intentionally and improperly procured the actual breach of that contract without justification; and (4) plaintiff sustained damages.  *See Int'l Minerals & Res., S.A. v. Pappas*, 96 F.3d 586, 595 (2d Cir. 1996).

In support of its claim for tortious interference with contract, Mariah adequately alleges that there existed a valid contract between DB Americas and Mariah (the Indenture), that American Family knew of the Indenture, and that American Family intentionally and unjustifiably interfered with the Indenture by sending a withdrawal notice inducing DB Americas to transfer funds to its possession.  Am. Compl. ¶¶ 17, 109-12, 128-32.  American Family's arguments seeking dismissal of Mariah's tortious interference claim — namely that there was no breach of the Indenture and that it did not act to intentionally and unjustifiably procure any such breach — are unavailing.

First, American Family's contention that it did not intentionally harm Mariah fails.  The Amended Complaint alleges that, by January 2012, American Family was on notice of the wrongdoing described above.  Am. Compl. ¶ 109; *see* J. Cogan Decl. ¶ 12, Ex. K, Jan. 3 Letter at 1-2.  Still, on January 3, 2012, American Family sent a letter together with a withdrawal notice to DB Americas demanding payment of $100 million from Mariah, with the intention of wiping Mariah out.  *See* Am. Compl. ¶¶ 6, 109-12; J. Cogan Decl. ¶ 12, Ex. K, Jan. 3 Letter.

American Family argues alternatively that even if its conduct was intentional, its interests were purely economic. Am. Family Mem. at 21. As a threshold matter, whether American Family's interests were purely economic (and therefore a defense to its tortious interference with the Indenture) is irrelevant at the motion to dismiss stage. Mariah has alleged facts sufficient to plead that American Family tortiously interfered with the Indenture, and Mariah "is not required to plead lack of justification as an element of its tortious interference claim" under New York law. *TechnoMarine SA v. Jacob Time, Inc.*, 905 F. Supp. 2d 482, 494 (S.D.N.Y. 2012) (finding that "[p]laintiff has plausibly alleged facts to satisfy all four of the elements of a tortious interference claim under New York law" and that "[j]ustification is a defense to tortious interference and not an element to be plead"); *see also Vinas v. Chubb Corp.*, 499 F. Supp. 2d 427, 433-34 (S.D.N.Y. 2007) (denying motion to dismiss claim of tortious interference with contract where "[t]he development of facts through discovery may serve to illuminate…aspects" of the parties' relationship as relevant to defendant's economic interest defense).[21]

Second, American Family contends that there was no actual breach of the Indenture by DB Americas. In its motion, American Family states that Mariah improperly alleges that the January 3, 2012 letter did not constitute an "Event Notice," as defined in the Reinsurance Agreement, and that in any case, it is an Event Report, not an Event Notice, that triggers

---

[21] However, even if economic justification were relevant to American Family's motion to dismiss, it is inapplicable because American Family has no "legal or financial stake" in DB Americas or DB AG's business. *See Vinas*, 499 F. Supp. 2d at 431-32 (citing *White Plains Coat & Apron Co., Inc. v. Cintas Corp.*, 867 N.E.2d 381, 383-84 (N.Y. 2007) (noting that the economic interest defense — asserted by a defendant to state "that it acted to protect its own legal or financial stake in the breaching party's business" — "has been applied, for example, where defendants were significant stockholders in the breaching party's business; where defendant and the breaching party had a parent-subsidiary relationship; where defendant was the breaching party's creditor; and where the defendant had a managerial contract with the breaching party at the time defendant induced the breach of contract with plaintiff").

payment to American Family.  Am. Family Mem. at 22-23.  American Family misunderstands both Section 9.5 of the Indenture and Mariah's allegations.

By way of background, the process for payment to American Family under the Indenture is as follows:  funds are first transferred from the "Collateral Account" to the "Reinsurance Trust Account," and then from the "Reinsurance Trust Account" to American Family.  Am. Compl. Ex. 3 §§ 10.4-10.5; J. Cogan Decl. ¶ 3, Ex. B, Indenture § 9.5.  The process triggering transfers of the funds under Section 9.5 of the Indenture is as follows:  after the issuance of a Catastrophe Bulletin by PCS identifying a relevant Covered Event, American Family is required to issue an Event Notice to Mariah "setting forth the calculations supporting a transfer of funds from DB Americas to American Family."  Am. Compl. ¶ 110; *see* Am. Compl. Ex. 3 § 16.2.  Thereafter, *"in the event that* [the Loss Payment Amount] set forth in an Event Report…exceeds the [Loss Payment Amount] set forth in [the Event Notice]" "[t]ransfers to a Reinsurance Trust Account" shall be made "in connection with an Event Report."  J. Cogan Decl. ¶ 3, Ex. B, Indenture § 9.5(b) (emphasis added).  In other words, only where the Event Notice underestimates losses is the Event Report taken into account in calculating the amount owed by Mariah to American Family.  *Id*.  Then, once funds are transferred to the Reinsurance Trust Account, American Family has the discretion to withdraw the funds "to pay or reimburse [itself] for the amounts [allegedly] payable by [Mariah]".  Am. Compl. Ex. 3 § 10.5(a).

American Family misunderstands the allegations made in the Amended Complaint related to DB Americas' breach of the Indenture.  Mariah properly alleges that American Family failed to provide an Event Notice to Mariah setting forth the calculations upon which transfers to the Reinsurance Trust Account would be based.  Am. Compl. ¶ 110.  Notably, American Family does not argue that it did issue an Event Notice as required under Section 9.5 of the Indenture.

Instead, American Family attempts to divert attention away from its failure to issue an Event Notice by saying that the January 3, 2012 letter to DB Americas demanding payment was not an Event Notice, and that in any case, Event Notices do not trigger payment to American Family. Am. Family Mem. at 22-23.

Mariah never alleges that the January 3, 2012 letter is an Event Notice, nor does it allege that Event Notices alone trigger payment to American Family. Mariah alleges that American Family never issued an Event Notice, yet sent a letter to DB Americas on January 3, 2012 attaching a Withdrawal Notice demanding payment from the Reinsurance Trust Account for $100 million. Am. Compl. ¶¶ 109-10; *see* J. Cogan Decl. ¶ 12, Ex. K, Jan. 3 Letter at 1 ("This letter is being submitted to you simultaneously with American Family's Withdrawal Notice, which directs Deutsche Bank Trust Company Americas, in its role as Trustee under the Reinsurance Trust Agreement, to wire transfer $100 million from the Reinsurance Trust Account to American Family's account at US Bank."). Thus, by demanding payment from DB Americas without issuing an Event Notice, American Family induced DB Americas to breach the Indenture.

Even assuming *arguendo* that there was no actual breach of the Indenture by DB Americas, Mariah's claim of tortious interference with contract is still viable. Courts have upheld claims of tortious interference where there was no actual breach alleged, but a party's enjoyment of the contract's benefits was nevertheless diminished by defendant's actions. *Int'l Minerals & Res.,* 96 F.3d at 595; *Jews for Jesus, Inc. v. Jewish Cmty. Relations Council of N.Y., Inc.,* 968 F.2d 286, 292-93 (2d Cir. 1992). At a minimum, American Family's demand for payment from DB Americas not only diminished, but effectively terminated, Mariah's

enjoyment of the Indenture's benefits, *i.e.* its reinsurance investment. *Int'l Minerals & Res.,* 96 F.3d at 595; *Jews for Jesus, Inc.,* 968 F.2d at 292-93.

As American Family's improper demand for payment induced DB to breach its Indenture with Mariah, American Family's motion to dismiss Mariah's tortious interference with contract claim must be denied.

## III.    DECLARATORY RELIEF IS APPROPRIATE

Declaratory judgment is ripe where "the judgment will serve a useful purpose in clarifying or settling the legal issues involved" and "finalize the controversy and offer relief from uncertainty." *Duane Reade Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 389 (2d Cir. 2005). Mariah's claim for declaratory relief is not derivative or duplicative of its breach of contract claims because (i) declaratory relief is necessary to settle the rights and liabilities of the parties under the relevant contracts and (ii) there is a continuing and prospective harm that exists as American Family continues to retain funds properly due to Mariah.[22] The Falsified Inception Bulletin and Improper Event Report must be deemed invalid to not only clarify that the pay out of all of Mariah's funds to American Family was improper and should be reversed, but also to ensure that Mariah is relieved from the uncertainty regarding its liability for the miscalculated Loss Payment Amount. Thus, the requested declaratory relief is necessary to ensure that Mariah is not held responsible now, or at any time in the future, for the miscalculated Loss Payment Amount contained in the Improper Event Report. Neither the breach of contract claim, nor any other claim in this action, would independently adjudicate these issues and therefore the requested declaratory relief is appropriate and warranted. Am. Compl. ¶¶ 133-35.

---

[22] The existence of a breach of contract claim does not preclude declaratory judgment. *Quanta Specialty Lines Ins. Co. v. Investors Capital Corp.*, No. 06 CIV 4624 (PKL), 2008 WL 1910503, at *6 n.7 (S.D.N.Y. Apr. 30, 2008).

**<u>CONCLUSION</u>**

For the foregoing reasons, the Court should deny Defendants' motions to dismiss.[23]

Dated: December 27, 2013
       New York, New York

                                        Respectfully Submitted,

                                        KOBRE & KIM LLP

                                        By: /s/ Jonathan D. Cogan
                                        Michael S. Kim
                                        Jonathan D. Cogan
                                        Megha J. Charalambides
                                        800 Third Avenue
                                        New York, New York 10022
                                        Tel: +1 212 488 1200

                                        *Attorneys for Mariah Re Ltd. (In
                                        Liquidation)*

---

[23] To the extent Defendants' motions to dismiss are granted, Mariah respectfully seeks leave to amend the Amended Complaint. *See Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 101 (2d Cir. 2002) ("Leave to amend should be freely granted…").