**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARIAH RE LTD. (in liquidation), acting by and through Geoffrey Varga and Jess Shakespeare, in their capacities as liquidators thereof,<br><br>                    *Plaintiff*,<br><br>          v.<br><br>AMERICAN FAMILY MUTUAL INSURANCE CO., ISO SERVICES, INC. and AIR WORLDWIDE CORP.,<br><br>                    *Defendants*. | 13 Civ. 4657<br><br>ECF Case<br><br>Electronically Filed |

## REPLY IN SUPPORT OF ISO SERVICES, INC. AND AIR WORLDWIDE CORP.'S JOINT MOTION TO DISMISS

DAVIS POLK & WARDWELL LLP
Joel M. Cohen
Matthew B. Rowland
Richard R. Barker

450 Lexington Avenue
New York, New York 10017
(212) 450-4000

*Attorneys for Defendants ISO Services, Inc. and AIR Worldwide Corp.*

# TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ................................................................................................ 1
ARGUMENT ............................................................................................................................... 2
    I.    Mariah Cannot State a Breach of Contract Claim Against PCS ..................................2
          a.    Mariah Has No Claim Under Section 6(b) ........................................................2
          b.    Mariah Has No Claim Under Section 6(g) ........................................................3
          c.    Mariah Has No Claim Under Section 1(e) ........................................................4
          d.    PCS Had Discretion to Amend the Original Bulletin Under Section 6(c) .........5
    II.    Mariah Cannot State a Breach of Contract Claim Against AIR ...................................6
    III.    There Was No Breach of the Implied Covenant of Good Faith and Fair Dealing .........9
    IV.    Mariah Provides No Basis for Declaratory Relief ...........................................................9
    V.    Specific Performance Is Not Available ........................................................................10
CONCLUSION .......................................................................................................................... 10

# TABLE OF AUTHORITIES

PAGE

CASES

Caleb & Co. v. E.I. DuPont de Nemours & Co.,
   599 F. Supp. 1468 (S.D.N.Y. 1984)...................................................................................5

Christ Gatzonis Elec. Contractor, Inc. v. N.Y. City Sch. Constr. Auth.,
   23 F.3d 636 (2d Cir. 1994)...................................................................................................6

Crane Co. v. Coltec Indus., Inc.,
   171 F.3d 733 (2d Cir. 1999)..................................................................................................3

Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.,
   375 F.3d 168 (2d Cir. 2004)..................................................................................................4

Harris v. Provident Life & Accident Ins. Co.,
   310 F.3d 73 (2d Cir. 2002)....................................................................................................9

Int'l Klafter Co. v. Cont'l Cas. Co.,
   869 F.2d 96 (2d Cir. 1989)....................................................................................................8

LeBlanc v. Nortel Networks Corp.,
   No. Civ. A. 3:03-CV-65, 2006 WL 839180 (M.D. Ga. Mar. 30, 2006) .................................5

LJL 33rd St. Assocs. v. Pitcairn Props. Inc.,
   725 F.3d 184 (2d Cir. 2013)..................................................................................................9

Pronti v. Barnhart,
   441 F. Supp. 2d 466 (W.D.N.Y. 2006) ...............................................................................10

St. Clair Shores Gen. Emps. Ret. Sys. v. Eibeler,
   745 F. Supp. 2d 303 (S.D.N.Y. 2010)................................................................................ 10

Defendants ISO Services, Inc. ("PCS") and AIR Worldwide Corp. ("AIR") respectfully submit this Reply Memorandum in further support of their joint Motion to Dismiss.

## PRELIMINARY STATEMENT

Mariah provides no basis for holding PCS and AIR liable for issuing accurate reports. In the end, Mariah cannot escape the fact that it was the weather, not PCS or AIR, that caused its "loss." In sum:

1. Mariah does not dispute that the PCS and AIR reports accurately described the April Storm. Mariah's invented notion that PCS was prohibited from supplementing its Catastrophe Bulletin with additional information—to reflect events in the "real world"[1]—cannot be squared with the language of the PCS License Agreement and cannot save Mariah's claims from dismissal.

2. The License Agreement gave PCS sole discretion to report the geographic impact of the April Storm as it deemed appropriate in the particular circumstances. The Agreement did not impose a time limit on when or how geographic information could be included in or added to a PCS Bulletin. It did not prohibit PCS from providing more detailed information as to one State (here, Kansas, which suffered by far the most damage from the April Storm) than as to others. Mariah's second-guessing of PCS's judgments regarding the geographic information contained in its Catastrophe Bulletins—which were provided not only to Mariah, but to PCS's many other subscribers as well—is precisely what is prohibited by the plain language of the License Agreement.

3. The process chosen by PCS to supplement its Catastrophe Bulletins was within PCS's discretion and did not breach the License Agreement. Mariah's focus on PCS's record-

---

[1] Memorandum of Law in Opposition to Defendants' Motion to Dismiss (Doc. No. 32) ("Opp'n") at 2–3.

keeping and notification processes—which fully complied with the Agreement—cannot obscure the fact that PCS accurately reported the scope and magnitude of the April Storm. The "loss" about which Mariah complains was a function of the reinsurance arrangement operating according to its terms.

4. Finally, AIR properly relied on the latest available information in preparing its report. Under the Calculation Agent Agreement, it could not do otherwise. Mariah's arguments with respect to the definitions of "Catastrophe Bulletin" and "Final Development Date" conflict with the plain language of the agreements.

## ARGUMENT

**I. Mariah Cannot State a Breach of Contract Claim Against PCS**

a. <u>Mariah Has No Claim Under Section 6(b)</u>

Mariah's principal claim is that PCS did not follow its current business practices in reporting geographic information with respect to the April Storm. What Mariah fails to confront is that the contractual definition of that term—"current business practices as described in the then-current version of Exhibit C"—incorporates substantial flexibility, and in particular invests PCS with sole discretion to include geographic information in its Catastrophe Bulletins "as it deems appropriate." (License Agreement (Am. Compl. Ex. 2) § 6(b), Ex. C; <u>see also</u> Memorandum of Law in Support of ISO Services, Inc. and AIR Worldwide Corp.'s Joint Motion to Dismiss (Doc. No. 27) ("Opening Br.") at 11–13.)

Mariah's argument boils down to the following: PCS had not previously added geographic information to a Catastrophe Bulletin after publishing a "Final Estimate," and PCS had not previously issued a revised Catastrophe Bulletin with the same name and date as the Original Bulletin. Those allegations (taken as true) do not state a claim for breach of the License Agreement. Mariah asserts generally that such procedures were "highly unusual" and a

"departure" from an undefined "program," but cites nothing in the contract binding PCS to follow a rigid procedure in communicating geographic information that it had sole discretion to provide as it deemed appropriate.

Moreover, Mariah misconstrues the meaning and purpose of the final estimate. As Exhibit C describes in detail, PCS undertakes to estimate the insured losses arising from a catastrophic weather event. That process "typically" includes generating a preliminary estimate within two weeks of the event, after which PCS may, in its discretion, perform additional surveys "until it believes that the industry insured loss has been reasonably estimated." (License Agreement (Am. Compl. Ex. 2) Ex. C, at 3–4.) PCS "[g]enerally" releases a "final Resurvey Estimate" within six months of the weather event, though it may take longer in some cases (as it did here). (Id. at 4.) The resurvey process thus relates solely to the evolving estimate of insured losses, and the "final" estimate simply indicates that PCS has concluded that additional surveys as to those losses are not necessary. There is not a single reference in Exhibit C or elsewhere in the License Agreement to suggest that the completion of the estimating process precluded PCS from supplementing its Catastrophe Bulletins with additional information regarding the storm. Nor could such a rigid requirement reasonably be inferred, given the explicit discretion enjoyed by PCS to provide geographic information and to otherwise amend its Catastrophe Bulletins, in each case without any contractual limitation as to timing. (See id. § 6(c), Ex. C, at 2.)

b. Mariah Has No Claim Under Section 6(g)

As explained in the Opening Brief, the requirements of Section 6(g) are straightforward. This provision required PCS to "keep a record of each Designation, Preliminary Estimate, and Resurvey Estimate." (Opening Br. at 15.) Although Mariah contends that this provision required PCS to "keep a record posted 'through ISOnet'" (Opp'n at 14), the provision's plain language required no such thing. See Crane Co. v. Coltec Indus., Inc., 171 F.3d 733, 737 (2d

3

Cir. 1999) (affirming dismissal because the "plain meaning of the language employed" in the parties' contracts indicated there had been no breach).

Mariah's contention that "record-keeping" through ISOnet is "critical" to Mariah's investors is both speculative and irrelevant. (See Opp'n at 14.) The License Agreement does not "confer any rights or remedies upon . . . any holder or purchaser" of Mariah's notes. (License Agreement (Am. Compl. Ex. 2) § 16(a).) Moreover, the method by which PCS maintained the Original Bulletin had no impact on the information that AIR was required to consider in preparing the Event Report, which is the source of Mariah's alleged harm. (Opening Br. at 15.)

### c. Mariah Has No Claim Under Section 1(e)

Mariah also cannot establish a breach of Section 1(e), which required PCS to notify Mariah of certain changes in its "general methodology for estimating insured property losses." (Opening Br. at 14.) There is no allegation that PCS made any changes in its methodology for estimating losses. Mariah's assertion that Section 1(e) extends to some broader "general methodology" beyond "loss estimation methodology" cannot be squared with the plain language of this provision, which provides:

> [PCS] reserves the right, in its sole discretion, (x) to alter, amend, or change in any way its general methodology for estimating insured property losses attributable to Catastrophes, including preparing estimates and (y) to vary from such methodology in preparing estimates for individual Catastrophes, as it deems appropriate. [PCS] agrees to notify Licensee in writing, as soon as reasonably practicable prior to implementing such change, of any alteration, amendment or change in general methodology which [PCS] in its sole discretion deems material.

(License Agreement (Am. Compl. Ex. 2) § 1(e) (emphases added).) The plain language of Section 1(e)—including the modifier "such"—forecloses Mariah's argument.[2]

---

[2] Mariah's claim under Section 1(e) also fails for a lack of cognizable damages. See Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 177 (2d Cir. 2004). Whether PCS provided notice to Mariah of an alleged change in its methodology for
(….continued)

4

      d.   <u>PCS Had Discretion to Amend the Original Bulletin Under Section 6(c)</u>

Mariah spends a substantial portion of its Opposition contesting the applicability of Section 6(c) of the License Agreement, which permits PCS to amend a Catastrophe Bulletin "if, as and when [it] discovers or is informed of any matter that it deems in its discretion to constitute an error, omission or mistake." (License Agreement (Am. Compl. Ex. 2) § 6(c).) For the reasons described above, PCS's unquestioned discretion to provide geographic information in its Catastrophe Bulletins more than suffices to defeat Mariah's claims without regard to the application of Section 6(c).

Nevertheless, Section 6(c) provides an independent basis for dismissing Mariah's claims, and Mariah's various attempts to minimize the scope of Section 6(c) (Opp'n at 15–19) are unavailing:

<u>First</u>, whether the absence of detailed geographic information in a Catastrophe Bulletin was an "omission" was a matter expressly within PCS's discretion. (License Agreement (Am. Compl. Ex. 2) § 6(c).)[3]

<u>Second</u>, Section 6(c) does not impose a time limit on PCS's discretion to amend or supplement its Catastrophe Bulletins, and thus the cases Mariah cites are inapposite. <u>See</u> <u>Caleb & Co. v. E.I. DuPont de Nemours & Co.</u>, 599 F. Supp. 1468, 1474 (S.D.N.Y. 1984) (specifying "prompt" performance); <u>LeBlanc v. Nortel Networks Corp.</u>, No. Civ. A. 3:03-CV-65, 2006 WL 839180, at *4 (M.D. Ga. Mar. 30, 2006) (requiring performance "as soon as practicable" or "as

---

(continued….)
estimating insurance losses had no bearing on whether PCS properly issued the Amended Bulletin or whether AIR properly relied on that Bulletin.

[3] <u>See also</u> Am. Compl. ¶ 72 (stating that PCS "omitted" county-specific information for CATs 43 and 47); Opp'n at 19 (arguing that PCS's Bulletins for the April Storm "omitted information on a number of other states").)

promptly as practicable"). The cases do not support Mariah's attempt to graft a time limitation on PCS's discretion to amend its Bulletins "if, as and when" it discovered or was informed of an omission. See Christ Gatzonis Elec. Contractor, Inc. v. N.Y. City Sch. Constr. Auth., 23 F.3d 636, 640 (2d Cir. 1994) (refusing to impose "time constraints" that were not required by the plain language of the contract). Where the parties sought to impose specific temporal restrictions, they did so through clear contract language. (See, e.g., License Agreement (Am. Compl. Ex. 2) § 1(e) (requiring PCS to provide notification of changes in its methodology for estimating insured property losses "as soon as reasonably practicable").)

Third, Mariah offers only a vague explanation for its assertion that PCS failed to use "reasonable commercial efforts" to include geographic information in its Catastrophe Bulletins. As described above, the License Agreement does not set forth rigid procedures for providing supplemental information. The fact that PCS chose to provide more detailed geographic information regarding Kansas (the State most affected by the April Storm) than it did as to other States is hardly unreasonable, and comes within PCS's "sole discretion" over the "designation of a geographic area or territories affected by a PCS Identified Catastrophe." (License Agreement (Am. Compl. Ex. 2) Ex. C, at 2.)

## II. Mariah Cannot State a Breach of Contract Claim Against AIR

Mariah does not dispute that AIR was required to consider information contained in the "latest Catastrophe Bulletins available as of five (5) Business Days prior to the Event Reporting Date," or that the Amended Bulletin was available to AIR within that time frame. (Calculation Agent Agreement (Am. Compl. Ex. 4) § 3(a)(i)(A).) Instead, Mariah contends that the Amended Bulletin was not a "true Catastrophe Bulletin" (Opp'n at 20–22), and that, even if it was, AIR was not permitted to consider the Amended Bulletin because it was issued after the Final

6

Development Date (id. at 22–25). Both arguments fail under the plain language of the Agreement.

First, the Amended Bulletin is plainly a Catastrophe Bulletin. It was "originated and disseminated by [PCS]" and on its face it "identifies and assigns a catastrophe number to a Peril." (Reinsurance Agreement (Am. Compl. Ex. 3) at 2.) Mariah's suggestion that there can be only one "birth certificate" Bulletin for a storm (Opp'n at 21) is a concept made up out of whole cloth. If accepted, such an argument would mean that there could *never* be an effective amendment to an Original Bulletin, whether the amendment took place the next day or months later. Yet the License Agreement clearly provides for amendment of Catastrophe Bulletins at PCS's discretion. See supra Argument § I. Mariah's crabbed reading of the definition of Catastrophe Bulletins is meritless.[4]

Second, according to Mariah, the Final Development Date precluded AIR from "tak[ing] into account any change in the Insured Industry Loss Amount that took place after November 2, 2011." (Opp'n at 23.) Mariah's claims against AIR fail because there was no change in the Insured Industry Loss Amount. As explained in the Opening Brief, the Insured Industry Loss Amount with respect to the April Storm was $1,355,000,000 both before and after the Amended Bulletin. (Opening Br. at 18–19.) That fact guts Mariah's claim against AIR based on the Final Development Date.

---

[4] Mariah also argues that AIR could not consider the Amended Bulletin because it was not "dated" as "the 'most recent' bulletin." (Opp'n at 21–22.) This argument misstates the relevant provision of the Calculation Agent Agreement, which requires that AIR rely on the latest "Catastrophe Bulletins" (plural), not the single bulletin "dated" as "most recent." (See Calculation Agent Agreement (Am. Compl. Ex. 4) § 3(a)(1).) Mariah's argument would impose a rigid and nonsensical restriction on AIR's ability to consider all relevant information available as of the date of its report.

7

Faced with that reality, Mariah simply rewrites the contract to suggest that the <u>division</u> between Metro and non-Metro amounts is (or may be) relevant to calculating the Insured Industry Loss Amount. The contractual definition of that term, however, is clear: "the <u>sum</u> of the Metro Insured Industry Loss Amount <u>together</u> with the Non-Metro Insured Industry Loss Amount." (Reinsurance Agreement (Am. Compl. Ex. 3) at 8 (emphases added)). Plainly, the definition provides that the Insured Industry Loss Amount is the <u>total</u> of the two component pieces (Metro and Non-Metro) and therefore does not depend on how the number is divided between the two categories.

Despite the simplicity of the language, Mariah suggests there is an ambiguity because the definition of Insured Industry Loss Amount uses the words "sum" and "together." (Opp'n at 23–25.) Without any rational explanation, Mariah argues that "the sum of [Amount A] together with [Amount B]" can be read to mean something other than "the sum of Amount A plus Amount B." That contention makes no sense, linguistically or mathematically. By its terms, the Final Development Date simply refers to the date after which PCS—consistent with its current business practices, <u>see</u> <u>supra</u> Argument § I(a)—reported that no further surveys of <u>losses</u> would be conducted. It has nothing to do with geographic designations.[5] If Mariah had wanted to provide for a Final Development Date after which there could be no changes to the <u>Metro</u>

---

[5] Mariah's other arguments are similarly meritless. The fact that the definition of Final Development Date includes a reference to calculating the "Event Index Value" is irrelevant. That value is impacted by changes in the <u>total</u> loss amount (i.e., the "sum" of Metro and Non-Metro), not just by changes in the component parts. In addition, the fact that the Offering Circular may use slightly different language to describe the Insured Industry Loss Amount—though still clearly stating that it is the total of Metro and Non-Metro—is irrelevant. Mariah has brought suit under its contract with AIR, not under the Offering Circular. "It is a fundamental principle of contract interpretation that, in the absence of ambiguity, the intent of the parties must be determined from their final writing"—i.e., the contract itself. <u>Int'l Klafter Co. v. Cont'l Cas. Co.</u>, 869 F.2d 96, 100 (2d Cir. 1989).

Insured Industry Loss Amount, it easily could have done so. It did not, and AIR was bound to follow the contract as written.

### III. There Was No Breach of the Implied Covenant of Good Faith and Fair Dealing

As explained in the Opening Brief, Mariah's claim for a breach of the implied covenant of good faith and fair dealing cannot survive because it rests on the "same facts" as the alleged breach of contract. Harris v. Provident Life & Accident Ins. Co., 310 F.3d 73, 81 (2d Cir. 2002). This claim lacks merit because it attempts to negate PCS's "express rights" under the License Agreement—to include geographic information in its sole discretion and to amend or revise its Catastrophe Bulletins—as well as AIR's explicit obligation to use the latest information available to prepare an accurate Event Report. See LJL 33rd St. Assocs. v. Pitcairn Props. Inc., 725 F.3d 184, 195–96 (2d Cir. 2013).

Rather than address these binding authorities, Mariah attempts to support its claim by arguing that PCS "exercised [its] discretion in an arbitrary and irrational manner" when it issued the Amended Bulletin, and that AIR improperly relied on that Bulletin. (Opp'n at 26.) As explained above, Mariah has not alleged sufficient facts to suggest that PCS and AIR did anything other than perform under their contracts. Accordingly, this claim must be dismissed.

### IV. Mariah Provides No Basis for Declaratory Relief

As explained in the Opening Brief, Mariah's claim for declaratory relief is derivative and duplicative of its claim for breach of contract, and fails for the same reasons. (Opening Br. at 21.) In its Opposition, Mariah contends that declaratory relief is "necessary to ensure that Mariah is not held responsible now, or at any time in the future, for the miscalculated Loss Payment Amount contained in the [November 23, 2011] Event Report." (Opp'n at 40.) Mariah apparently believes declaratory relief is appropriate to resolve hypothetical claims against Mariah by its investors, who are not parties to the instant case. (See id.)

This is not a sufficient basis for preserving Mariah's declaratory judgment claim. As a general matter, federal courts cannot "make a declaration as to the rights of other claimants not parties to the[] case[]." Pronti v. Barnhart, 441 F. Supp. 2d 466, 477 (W.D.N.Y. 2006).

## V. Specific Performance Is Not Available

The Opposition does not challenge PCS and AIR's arguments that the Amended Complaint fails to allege an adequate basis for specific performance. (Opening Br. at 22.) Mariah's claim should therefore be dismissed for the reasons stated in the Opening Brief.

## CONCLUSION

For the reasons stated above and in the Opening Brief, Mariah cannot state a claim upon which relief may be granted. The Amended Complaint should be dismissed with prejudice.[6]

Dated: New York, New York
January 14, 2014

By: /s/ Matthew B. Rowland

Joel M. Cohen
Matthew B. Rowland
Richard R. Barker

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800

*Attorneys for Defendants ISO Services, Inc. and AIR Worldwide Corp.*

---

[6] Mariah should not be given leave to amend. (Opp'n at 41 n.23.) Mariah "has already amended its complaint in this matter and has provided the Court with no inkling of what its amendment might look like or what additional facts may entitle it to relief." See St. Clair Shores Gen. Emps. Ret. Sys. v. Eibeler, 745 F. Supp. 2d 303, 316 (S.D.N.Y. 2010) (denying request to amend).

10