# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

_____

No. 13-cv-4657 (RJS)

_____

MARIAH RE LTD.,

Plaintiff,

VERSUS

AMERICAN FAMILY MUTUAL INSURANCE CO., *et al.*,

Defendants.

_____

OPINION AND ORDER
September 30, 2014

_____

RICHARD J. SULLIVAN, District Judge:

Plaintiff Mariah Re Ltd. ("Mariah") – a special purpose entity designed to provide reinsurance for severe weather events – brings this action against Defendants American Family Mutual Insurance Co. ("American Family"), ISO Services, Inc. (doing business as Property Claim Service, hereafter referred to as "PCS"), and AIR Worldwide Corporation ("AIR") for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, conversion, tortious interference with contract, and declaratory judgment, in connection with losses sustained as a result of a storm that took place in the Midwest in April 2011. Now before the Court are Defendants' motions to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure. For the reasons set forth below, the Court grants Defendants' motions in their entirety.

## I. BACKGROUND

### A. Facts

American Family is a mutual insurance company that, among other things, offers insurance coverage for its policyholders who "suffer losses resulting from severe weather events." (AC ¶¶ 1, 12.)[1] Mariah, a so-

---

[1] The facts are drawn from the Amended Complaint (Doc. No. 22 ("AC")), and are assumed to be true for the purposes of these motions. In deciding the instant motions, the Court has also considered memoranda of law submitted by American Family (Doc. No. 24

called "special purpose vehicle," was "established for the particular purpose of providing reinsurance (*i.e.*, insurance on insurance) to American Family for certain losses . . . [suffered] as a result of severe weather events." (*Id.* ¶ 2.) In general terms, a special purpose vehicle (here, Mariah):

> underwrites reinsurance upon payment of a premium by a ceding company [here, American Family]. Investors, in turn, pay funds into the [special purpose vehicle] . . . and the funds are then deposited into a trust. . . . These funds will be maintained by the trust for purposes of investment over the designated risk period. This principal is connected to a trigger event, the occurrence of which leads to indemnification from the trust and [special purpose vehicle] structure. Simply, an investor's return on investment depends on the occurrence or non-occurrence of the event specified within the risk period covered by the catastrophe bond. In the event a catastrophe does not occur, then the bondholder receives his principal and interest earned over the course of the risk period. Likewise, should a catastrophe occur within the risk period, the bondholders will indemnify the insurance company from the principal deposited to cover the loss insured against.

Todd V. McMillan, *Securitization and the Catastrophe Bond: A Transactional Integration of Industries Through a*

*Capacity-Enhancing Product of Risk Management*, 8 Conn. Ins. L.J. 131, 140–41 (2001/2002).

In order to collateralize and fund its reinsurance obligations to American Family, Mariah offered notes to investors and raised a total of $100 million for its principal. (*See* AC ¶¶ 5, 15, 88, 109; *see also* Declaration of Jonathan D. Cogan, dated December 27, 2013, Doc. No. 33 ("Cogan Decl.") Ex. A ("Offering Circular").)[2] Because Mariah's reinsurance obligations were tied to weather-related losses, the profitability of Mariah's investment depended on the occurrence or non-occurrence of certain severe weather events, and the way those events were reported. (*See* AC ¶¶ 15–17.) Mariah's own prospectus readily acknowledged that "[i]nvesting in [these] notes is speculative and involves a high degree of risk," and further warned potential investors that "[t]he notes are . . . without recourse to [American Family] or any of its affiliates." (Offering Circular at 1.)

### 1. The Reinsurance Scheme

Mariah separately contracted with American Family, PCS, AIR, Deutsche Bank Trust Company Americas ("DB Americas"), and Deutsche Bank AG ("DB AG," and together with DB Americas, the "Banks"), with each playing a different role in the reinsurance scheme (the "Reinsurance Scheme"). (AC ¶ 17.) The Reinsurance

---

("AF Mem.") and PCS and AIR (Doc. No. 27 ("PCS-AIR Mem.")), Plaintiff's joint opposition (Doc. No. 32 ("Opp.")), the replies by American Family (Doc. No. 34) and PCS and AIR (Doc. No. 35), and the declarations and documents submitted in support thereof (Doc. Nos. 25, 33).

[2] The Offering Circular is referenced in the Amended Complaint (*see, e.g.*, AC ¶¶ 15, 25, 28), and a copy of this document was submitted with Mariah's opposition to the instant motions. On a motion to dismiss, a court may consider, in addition to the complaint itself, "any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint." *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (citations and quotation marks omitted).

Scheme is set forth in five documents, all dated November 15, 2010:   (1) the Catastrophe Excess of Loss Reinsurance Agreement (the "Reinsurance Agreement"), (2) the PCS License Agreement (the "PCS Agreement"), (3) the Calculation Agent Agreement (the "AIR Agreement"), (4) the Reinsurance Trust Agreement, and (5) the Indenture.[3]   Because this dispute largely concerns the contracts that established the Reinsurance Scheme, the Court briefly provides an overview of the relevant agreements and their terminology before turning to the facts that give rise to the instant case.

Pursuant to the Reinsurance Agreement between Mariah and American Family, Mariah agreed to make reinsurance payments of up to $100 million to American Family in the event that severe weather events caused a contractually-prescribed amount of loss as computed by a particular set of formulas. (*Id.* ¶¶ 15, 17.) Crucial to this dispute, Mariah's reinsurance obligations could increase – though never exceeding $100 million – if weather damage occurred in metropolitan areas, as opposed to more rural ones. (*See id.* ¶¶ 28–31.) This distinction is "presumably to account for the higher level of damage and loss that would be sustained if storms impacted more heavily-developed and populated areas." (*Id.* ¶ 30.)

Pursuant to the PCS Agreement, Mariah contracted with PCS – a reporting agency that "performs a variety of services of interest to the property/casualty industry, principally relating to catastrophes affecting the industry" (PCS Agreement at C-1) – to obtain a license to gain access to PCS's proprietary data.  PCS was responsible for issuing Catastrophe Bulletins, which are reports that provide basic information about weather events and estimate corresponding weather-related losses on a state-by-state basis. (*See* AC ¶¶ 18–20.)

As set forth in the AIR Agreement, Mariah retained AIR to calculate the amount that Mariah owed to American Family in reinsurance proceeds. (*See* AC ¶¶ 26–34.) As part of the calculation process, AIR agreed to review the data provided by PCS and determine, on a state-by-state basis, whether any weather-related damage occurred in a "metro area." (*Id.*) If so, the estimated loss for that state would be multiplied by a contractually-specified payout factor, known as the metro payout factor. (*Id.*) Conversely, if AIR determined that weather-related damage in a certain state did not impact a metro area, the estimated loss for that state would be multiplied by a lower payout factor, known as the non-metro payout factor. (*Id.*) Simply put, Mariah's liability would increase if the estimated loss in a given state was multiplied by the higher metro payout factor, as opposed to the lower non-metro payout factor. (*See id.*) AIR agreed to set out its conclusion, including the metro versus non-metro designation, in a document referred to as an Event Report. (*See* AIR Agreement at 3–4.)

---

[3] Copies of the Reinsurance Agreement, the PCS Agreement, and the AIR Agreement are attached as exhibits to the Amended Complaint.  Copies of the Reinsurance Trust Agreement and the Indenture are attached as exhibits to the Declaration of Robert A. Kole (*see* Declaration of Robert A. Kole, dated November 20, 2013, Doc. No. 25 ("Kole Decl.") Exs. B ("Trust"), C ("Indenture")), and are deemed integral to the Amended Complaint for the purposes of this motion. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir. 1991) ("[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint, the defendant may produce the [document] when attacking the complaint for its failure to state a claim, because plaintiff should not so easily be allowed to escape the consequences of its own failure.").

Mariah entered into a Reinsurance Trust Agreement with American Family and DB Americas, and an Indenture with the Banks. (AC ¶ 17; Kole Decl. Ex. B.) Mariah established a Collateral Account for the deposit of the noteholders' principal and maintained a separate Reinsurance Trust Account from which payments would be made in the event that storm losses triggered liability under the Reinsurance Scheme. (*See* Reinsurance Agreement at 24–25.) Along with the Reinsurance Agreement, the Reinsurance Trust Agreement and the Indenture govern funding of the Reinsurance Trust Account from the Collateral Account. (*See id.*)

2.  Catastrophe 42

Mariah alleges that from April 3 to 5, 2011, a storm hit the United States, striking a number of states including Kansas, a state covered by the Reinsurance Agreement. (*See* AC ¶¶ 35–36.) On April 5, 2011, PCS posted a Catastrophe Bulletin (the "Original Bulletin") on its limited-access website, ISOnet PCS. (*See id.* ¶¶ 25, 37–38.) The three-page Original Bulletin designated the storm as Catastrophe Serial No. 42 ("Catastrophe 42") and listed Kansas as one of the states impacted. (*See id.* ¶ 37–38; *id.* Ex. 1.) Although the Original Bulletin did not provide specific geographic details about the storm's impact in Kansas, such as the cities or counties affected, the Original Bulletin did note that Catastrophe 42 "travers[ed] the Plains [and] sparked thunderstorms that pounded a swath from Kansas to Wisconsin . . . with howling winds and hail as large as baseballs." (*Id.* Ex. 1) The Original Bulletin further indicated that "[t]his severe weather outbreak ranks as one of the top outbreaks of all-time in terms of the shear [*sic*] number of severe weather reports." (*Id.*)

Thereafter, in connection with Catastrophe 42, PCS successively published three loss estimates before issuing, on November 2, 2011, the "Final Estimate of Insured Property Damage" report (the "Final Estimate"). (*Id.* ¶¶ 39–42.) In the Final Estimate, PCS estimated that Kansans suffered $710 million in Catastrophe 42-related damage, and stated that "[t]his estimate is . . . fully developed [and n]o further surveys will be conducted." (*Id.* ¶ 43.)

On the very next day, November 3, 2011, PCS provided additional "detailed information regarding the purported impact of [Catastrophe 42] within Kansas." (*Id.* ¶¶ 54–55.) PCS posted this information on ISOnet in what amounted to a two-page insertion to the three-page Original Bulletin. (*See id*; *id.* Ex. 5.) This insertion consisted of a three paragraph summary of Catastrophe 42 in Kansas (*e.g.*, "Severe storms brought hail up to hen egg size and 70 mph winds to parts of East-Central Kansas."), and a table listing cities and towns in Kansas (*e.g.*, Delia, Leavenworth, and Overland Park), their respective populations, the type of weather event that impacted that location (*e.g.*, hail or wind), and the severity of the weather event (*e.g.*, diameter of hailstones and speed of wind gusts). (*Id.* Ex. 5.) Thus, the combination of the Original Bulletin's content plus the information in the Kansas-specific insertion was the equivalent of a five-page document when printed in hard copy (the "Revised Original Bulletin"). (*See id.*) The content of the Original Bulletin was otherwise unchanged. (*Id.*) According to Mariah, unlike the practice with prior Catastrophe Bulletins, PCS did not notify its ISOnet subscribers via email about the issuance of the Revised Original Bulletin. (*See id.* ¶¶ 60, 62–63.)

4

On November 23, 2011, AIR issued an Event Report (the "November 23, 2011 Event Repot") using the data contained in the Revised Original Bulletin. (*Id*. ¶ 75.) Because some of the locations listed in the Revised Original Bulletin were in metro areas in Kansas, AIR classified Kansas's $710 million in losses as metro losses and made its calculations using the higher metro payout factor. (*Id*. ¶¶ 81–85.) According to the Amended Complaint, if PCS had not issued the Revised Original Bulletin, AIR would have classified these same Kansas losses as non-metro losses, and applied the lower non-metro payout factor in its calculations. (*See id*.) Ultimately, AIR considered the Kansas losses and the losses in other states and determined that Mariah was responsible for the maximum $100 million in reinsurance funds, which resulted in a 100% loss of Mariah's principal, effectively wiping out the vehicle. (*See id*. ¶¶ 75–88; *see also id*. Ex. 5.)

On January 3, 2012, American Family sent a letter to DB Americas, requesting that DB Americas "wire transfer [$100 million in reinsurance funds] from the Reinsurance Trust Account to American Family's account . . . ." (*Id*. ¶ 109.) In the letter, American Family noted that Mariah's investors objected to AIR's $100 million calculation and its use of the Revised Original Bulletin. (*See* Cogan Decl. Ex. K at 1–2.) Nonetheless, the letter further stated that there was "no basis for withholding, delaying or otherwise impeding the release of [$100 million] from the Reinsurance Trust Account to American Family." (*Id*. at 1; *see also* AC ¶ 109.) After DB Americas transferred the funds, American Family terminated the Reinsurance Agreement with Mariah. (*See* Cogan Decl. Ex. L.) American Family has rejected Mariah's request to return the funds. (*See* AC ¶¶ 7, 112, 125.)

## B. Procedural History

Mariah is in voluntary liquidation. Accordingly, Mariah brings this case by and through Geoffrey Varga and Jess Shakespeare, who were appointed as the Liquidators of Mariah on May 1, 2013. (*See* AC ¶ 11.) Mariah commenced this action on July 3, 2013 by filing a complaint. (Doc. No. 1.) Thereafter, on October 18, 2013, Mariah filed the Amended Complaint asserting breach of the PCS and AIR Agreements, breach of the implied covenant of good faith and fair dealing in the PCS, AIR, and Reinsurance Agreements, unjust enrichment, conversion, tortious interference with the Indenture, and declaratory judgment. Mariah seeks the withdrawal of the Revised Original Bulletin, the issuance of an Event Report that does not consider the Revised Original Bulletin, the return of the amount of principal deposited in Mariah's name under the Reinsurance Trust Agreement, monetary damages, and attorneys' fees. On November 20, 2013, Defendants filed motions to dismiss on the grounds that Mariah had failed to state claims on its various causes of action. (Doc. Nos. 23, 26.) The motions were fully briefed on January 14, 2014.

## II. LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must "provide the grounds upon which [the] claim rests." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ."). Plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns*, 493 F.3d at 98. However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. Thus, a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. If the plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Id.*, 550 U.S. at 570.

## III. DISCUSSION

The parties appear to agree that New York law should apply. The applicable contracts contain choice-of-law clauses that designate New York law (*see* AF Mem. at 9 n.5; PCS-AIR Mem. at 11 n.5), and the parties rely solely on New York law in their papers as to all causes of action. *See Network Enters., Inc. v. Reality Racing, Inc.*, No. 09-cv-4664 (RJS), 2010 WL 3529237, at *4 n.6 (S.D.N.Y. Aug. 24, 2010) ("Where the parties' briefs assume that New York law controls, such implied consent is sufficient to establish choice of law.") Accordingly, the Court will apply New York law with respect to all of Mariah's claims.

### A. Contract-Based Claims

Mariah asserts a variety of theories in support of its claims for breach of contract and breach of the implied covenant of good faith and fair dealing. Specifically, Mariah alleges that (1) PCS breached three different provisions of the PCS Agreement and the implied covenant of good faith and fair dealing incorporated therein (*see* AC ¶¶ 89–98); (2) AIR breached section 3(a)(i) of the AIR Agreement and the implied covenant of good faith and fair dealing incorporated therein (*see id.* ¶¶ 100–04); and (3) American Family breached the implied covenant of good faith and fair dealing contained within the Reinsurance Agreement (*see id.* ¶¶ 114, 116). Reduced to their essence, all of Mariah's contract claims turn on whether it was improper for PCS to insert – and for AIR and American Family to rely on – the two-pages of information added to the Original Bulletin. Notwithstanding Mariah's attempt to characterize the insertion as somehow nefarious (the pleadings refer to the document as the "Falsified Inception Bulletin" and repeatedly make conclusory assertions as to Defendants' fraudulent intent), it bears repeating that the Revised Original Bulletin is nothing more than the Original Bulletin plus a two-page insertion describing the storm's geographic impact in Kansas.

To state a claim for breach of contract under New York law, "a plaintiff must plead and prove: (1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach." *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004). An "essential requirement" to stating the claim is alleging a "specific provision" that was breached. *Orange Cnty. Choppers, Inc. v. Olaes Enters., Inc.*, 497 F. Supp. 2d 541, 554 (S.D.N.Y. 2007). Additionally, factual allegations showing damages are essential: "In the absence of any allegations of fact showing damage, mere allegations of breach of contract are not sufficient to sustain a complaint." *Lexington 360 Assocs. v. First Union Nat'l Bank of N.C.*, 651 N.Y.S.2d

490, 492 (App. Div. 1996) (citations and internal quotation marks omitted).

The implied covenant of good faith and fair dealing is incorporated into every contract. *See Oscar de la Renta, Ltd. v. Mulberry Thai Silks, Inc.*, No. 08-cv-4341 (RJS), 2009 WL 1054830, at *5 (S.D.N.Y. Apr. 17, 2009). The covenant "precludes each party from engaging in conduct that will deprive the other party of the benefits of their agreement." *Leberman v. John Blair & Co.*, 880 F.2d 1555, 1560 (2d Cir. 1989) (citation and internal quotation marks omitted). However, New York law is clear that the covenant "does not create obligations that go beyond those intended and stated in the language of the contract." *Wolff v. Rare Medium, Inc.*, 210 F. Supp. 2d 490, 497 (S.D.N.Y. 2002). In other words, "the implied covenant of good faith cannot create duties that negate explicit rights under a contract." *LJL 33d St. Assocs. v. Pitcairn Props. Inc.*, 725 F.3d 184, 195 (2d Cir. 2013); *see also Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 304 (1983).

## 1. PCS

Mariah alleges that PCS breached three provisions of the PCS Agreement – sections 6(b), 6(g), 1(e) – as well as the implied covenant of good faith and fair dealing. (*See* AC ¶¶ 89–98.) The Court will address each in turn.

### a. Section 6(b)

Section 6(b) of the PCS Agreement provides that PCS will:

> use reasonable commercial efforts [1] to obtain information for use in preparation of the PCS Designations and Estimates [*i.e.*, Catastrophe Bulletins] from its traditional insurance company sources, [2] to continue to prepare the Designations and Estimates, [3] to disseminate such Designations and Estimates and the Compilations through ISOnet PCS and/or the PCS Catastrophe History Database in accordance with its current business practices, as described in the then-current version of <u>Exhibit C</u> hereto, and [4] to provide such Designations, Estimates, and Compilations to Licensee through its subscription to ISOnet PCS.

(PCS Agreement at 8 (emphasis in original).) As the language of section 6(b)[3] makes clear, PCS was obliged to *disseminate* PCS "Designations and Estimates and the Compilations" in accordance with PCS's "current business practices," as set forth in the operative version of Exhibit C. Exhibit C provides an overview of PCS's services. (PCS Agreement at C-1.) Relevant here, Exhibit C includes a section entitled "Loss Estimate Reporting," which states in part that "Preliminary Estimates and Resurvey Estimates are officially disseminated by PCS to PCS subscribers via ISOnet PCS, an Internet service, *with limited distribution via electronic mail*." (*Id.* at C-4 (emphasis added).)

According to Mariah, ISOnet PCS subscribers could, "for a substantial fee," "sign up to receive email notifications when new catastrophe bulletins [were] issued by PCS . . . ." (AC ¶ 94.) Mariah alleges that PCS breached section 6(b)[3] because "ISOnet subscribers who elected to receive such email notifications . . . did not receive notice . . . when PCS issued the [Revised Original Bulletin, a] . . . deviat[ion] from its standard practice of providing such automatic e-mail notification . . . ." (*Id.*

(emphasis removed).)   However, this assertion fails to state a breach of section 6(b)[3] for the simple reason that the Revised Original Bulletin is not a "Preliminary Estimate[]" or a "Resurvey Estimate[]," and pursuant to PCS's "current business practices" set forth in Exhibit C, the email notification service is only required for such estimates.   Accordingly, the fact that PCS did not send an email notification of the Revised Original Bulletin is clearly not inconsistent with PCS's current business practices.   Indeed, the very next sentence in the Loss Estimate Reporting section of Exhibit C provides that "[i]n addition to publishing Preliminary Estimates and Resurvey Estimates, PCS also releases to subscribers *via ISOnet PCS* a variety of textual reports, bulletins and updates regarding [weather events]." (*Id.* at C-4 (emphasis added).)   Significantly, for this latter category of documents, there is no requirement of "a limited distribution via electronic mail."   Instead, the mere posting of the documents on ISOnet PCS is sufficient.   Thus, because the Revised Original Bulletin falls into this latter category of documents ("textual reports, bulletins and updates"), PCS was only required to release it to subscribers via ISOnet PCS, which it did.

Other provisions in Exhibit C likewise demonstrate that there is no bar to the issuance of a Revised Original Bulletin of the sort in question here.   Put simply, Exhibit C makes clear that PCS's "current business practices," as contemplated in section 6(b)[3], are designed to give PCS broad discretion and substantial flexibility. For example, Exhibit C provides that "Catastrophe Identification" is a matter left to PCS "in its sole judgment," and that the "designation of a geographic area or territories affected by a PCS Identified Catastrophe" is likewise "a matter within

PCS's judgment and sole discretion." (PCS Agreement at C-1–C-2.)   Exhibit C further provides that "[i]n order to preserve its flexibility to adjust to external circumstances and enhance the quality of its estimates, PCS may, in its sole discretion, change its general loss estimation methodology at any time and modify application of its methodology in connection with any particular catastrophe." (*Id.* at C-5–C-6.)

Notwithstanding the substantial discretion afforded to PCS by Exhibit C, not to mention the fact that the "current business practices" limitation is only applicable to dissemination under section 6(b)[3], Mariah takes issue with the Revised Original Bulletin because it was issued after PCS had already issued its final estimate, which Mariah characterizes as "highly unusual." (Opp. at 11.)   Mariah also contends that "[t]he sudden and deliberate inclusion of county-specific geographic information in the [Revised Original Bulletin] constitutes a stark deviation from PCS's 'current business practices' . . . ." (AC ¶ 92.)   In addition, Mariah asserts that PCS failed to comport with PCS's "current business practices" because PCS "backdated" the Revised Original Bulletin to the same date (April 5, 2011) as the Original Bulletin, contrary to its usual practice of "dating and posting bulletins in sequential order according to the date they actually were created." (Opp. at 11; *see also* AC ¶ 60 (alleging that this was done "in order to make it appear to onlookers that the [Revised Original Bulletin] had existed all along").)

Having carefully reviewed the PCS agreement, the Court finds that Mariah has failed to allege a breach of section 6(b)[3]. While it is clear that PCS was obligated to comply with its "current business practices" as set forth in Exhibit C, the simple fact

remains that Exhibit C contains no restriction on PCS's duties and rights concerning revisions to an already published report. (*See* PCS Agreement at C–1–C–6). Given the broad discretion afforded to PCS to "preserve its flexibility to adjust to external circumstances and enhance the quality of its estimates" (*id*. at C–5–C–6), section 6(b) cannot reasonably be construed to prohibit PCS's discretion to create the Revised Original Bulletin – which again consisted of the identical Original Bulletin with the insertion of two pages of information about the storm's impact on various Kansas locations.

Moreover, as described by Exhibit C, PCS's current business practices extend to "[t]he design of a geographic area or territories affected by a PCS Identified Catastrophe" – a matter once again "within PCS's judgment and sole discretion." (*Id*. at C–2.) Although this section of Exhibit C does not explicitly direct PCS to detail county-specific geographic information through a revision to a Catastrophe Bulletin, it certainly does not prohibit it. Likewise, the fact that section 6(b) does not directly address the so-called "backdating" of the Revised Original Bulletin cannot be interpreted as a prohibition in that regard.[4] Again, section 6(b) gives PCS broad discretion "to obtain information for use in the preparation" of Catastrophe Bulletins

and specifically directs PCS "to continue to prepare" such Bulletins. (*Id*. at 8.) Thus, Mariah's assertion that PCS was obliged to pursue a "pencils down" approach following dissemination of the Original Bulletin is belied by the PCS Agreement itself. In short, section 6(b) simply does not address whether or how PCS may create and disseminate a document akin to the Revised Original Bulletin.

More broadly, Mariah asserts that the lack of prior precedent for a revision to a Catastrophe Bulletin constitutes proof that Defendant's actions were not in accordance with PCS's "current business practices." Once again, this argument is at odds with the broad language of the agreement, and while Mariah is correct that Exhibit C "does not give PCS carte blanche to do whatever it wants" (Opp. at 13), the plain language of section 6(b) makes clear that Exhibit C, not PCS's past practices, is the source of PCS's "current business practices" for purposes of construing the contract.

Finally, section 6(c) provides that "[i]f, as and when [PCS] discovers or is informed of any matter that it deems in its discretion to constitute an error, omission or mistake, it will use reasonable commercial efforts to correct or cause to be corrected any such error, omission or mistake." (PCS Agreement at 9.) Considered in tandem with the broad language of section 6(b) and Exhibit C, this language simply cannot be squared with Mariah's cribbed reading of the PCS Agreement.

Accordingly, because PCS's alleged conduct comports with the language of section 6(b)[3] and Exhibit C, the Court finds that Mariah has failed to allege a breach of that section.

---

[4] With respect to Mariah's charge of "backdating," it again bears noting that the information contained in the Original Bulletin, which comprised three of the five pages of the document that the Court refers to as the "Revised Original Bulletin," remained unchanged. The insertion itself was not dated. In colloquial terms, the insertion was "pasted" within the Original Bulletin and did not change the date previously listed on the Original Bulletin, April 5, 2011. Thus, the term "backdating" used in the Complaint is largely conclusory and pejorative, and entitled to no weight. Nevertheless, the Amended Complaint does allege that the insertion first appeared on ISOnet PCS on November 3, 2011.

### b.  Section 6(g)

Section 6(g), a record-keeping provision, states that:

> While the [notes issued by Mariah] are outstanding and for three (3) years thereafter, [PCS] agrees to keep a record of each Designation, Preliminary Estimate and Resurvey Estimate disseminated through ISOnet PCS while such [notes] were outstanding and the initial date of dissemination of each such Preliminary Estimate or Resurvey Estimate.

(*Id.* at 10.)  Mariah contends that PCS violated section 6(g) by removing the Original Bulletin from ISOnet and replacing it with the Revised Original Bulletin.  (*See* AC ¶¶ 60, 95–96.)

Mariah argues that section 6(g) requires PCS to keep a copy of each Catastrophe Bulletin on ISOnet itself.  (*See* opp. at 13–14.)  Mariah's interpretation strains the plain meaning of the text.  Reasonably read, the phrase "disseminated through ISOnet" simply clarifies which documents PCS must keep a record of.  Thus, section 6(g) does not require a particular method of record-keeping, much less dictate keeping records, including the Original Bulletin, on ISOnet itself.

However, even assuming Mariah alleged a breach of section 6(g), dismissal would nevertheless be appropriate for failure to adequately plead damages.  Mariah does not allege facts to show that the record-keeping error resulted in damages.  As discussed below, AIR had a contractual duty to create its Event Report using the latest Catastrophe Bulletins, which in this case, includes the Revised Original Bulletin.  The presence or absence of the Original Bulletin on ISOnet is simply irrelevant to AIR's ultimate damage calculations.  Even if the Original Bulletin had been available on ISOnet, AIR's November 23, 2011 Event Report would have been identical because AIR still would have been contractually obligated to consider the Revised Original Bulletin as the latest Catastrophe Bulletin available.  Accordingly, because Mariah "has failed to come forward with evidence sufficient to demonstrate damages flowing from the breach alleged," Mariah's claim cannot survive.  *Lexington 360*, 651 N.Y.S.2d at 492.

### c.  Section 1(e)

Section 1(e) provides:

> [PCS] reserves the right, in its sole discretion, (x) to alter, amend or change in any way its general methodology for estimating insured property losses attributable to Catastrophes, including preparing Estimates and (y) to vary from such methodology in preparing Estimates for individual Catastrophes, as it deems appropriate.  [PCS] agrees to notify [Mariah] in writing, as soon as reasonably practicable prior to implementing such change, of any alteration, amendment or change in general methodology which [PCS] in its sole discretion deems material.

(PCS Agreement at 3.)  According to Mariah, PCS violated section 1(e) by its "issuance of the [Revised Original Bulletin] after the Final Estimate" because the Revised Original Bulletin constituted an "alteration in [PCS's] general methodology without notice to [Mariah] . . . ."  (Opp. at 14.)  The Court disagrees.  Mariah has alleged no facts to suggest that PCS's

issuance of the Revised Original Bulletin, even with its inclusion of geographic impact data, somehow altered, amended or changed PCS's "general methodology for estimating insured property losses attributable to [Catastrophe 42] . . . ."

Moreover, it bears noting that the Revised Original Bulletin did not actually change the estimate of the insured property losses. Before PCS issued the Revised Original Bulletin on November 3, 2011, PCS issued its Final Estimate, which estimated that Kansas suffered $710 million in applicable losses. (*See* AC Ex. 5.) The issuance of the Revised Original Bulletin the next day did not alter that $710 million estimate. To be sure, the Revised Original Bulletin impacted whether AIR would consider the $710 million to be a metro loss or a non-metro loss. However, this fact is irrelevant to whether PCS "alter[ed], amend[ed,] or change[d] in any way its general methodology for estimating insured property losses" contemplated by section 1(e).

At bottom, Mariah's pleadings are devoid of allegations concerning changes to PCS's "methodology for estimating insured property losses," which is the purview of section 1(e). Instead, Mariah transparently seeks to expand the scope of the provision to include an amorphous general methodology that is not tied to loss estimation. Indeed, Mariah attempts to fault PCS for "focus[ing]" its motion on "general *loss estimation* methodology" instead of "general methodology" (*see* Opp. at 14–15 (emphasis in original)), even though the provision explicitly governs PCS's "general methodology *for estimating insured property losses*" (PCS Agreement at 3 (emphasis added)). Mariah's reading strains the plain meaning of section 1(e), and its claim cannot survive PCS's motion. *See*

*Wastemasters, Inc. v. Diversified Investors Servs. of N. Am., Inc.*, 159 F.3d 76, 79 (2d Cir. 1998) ("[C]ourts should not rewrite the contracts before them . . . .").

#### d.  Implied Covenant of Good Faith and Fair Dealing

Mariah's final contract-based claim – that PCS breached the implied covenant of good faith and fair dealing – rests on the same facts that drive its breach of contract claim. (*See* AC ¶ 116 ("Defendants . . . have breached their contractual agreements, including the implied covenant of good faith and fair dealing, with Mariah . . . as detailed in paragraphs 1 through 112.").) Likewise, the relief that Mariah seeks on the implied covenant claim is identical to the relief it seeks on the breach of contract claim. (*See id.* ¶ 117.) In an attempt to avoid dismissal, Mariah asserts that its implied covenant claim is an alternative pleading. (*See* Opp. at 25 ("In the alternative to the above described breaches of the [PCS Agreement] and the [AIR Agreement], Mariah also adequately alleges that PCS and AIR respectively breached the covenant of good faith and fair dealing.").)

However, this argument is unavailing because the Second Circuit has explicitly noted that "when a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013); *see also Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 ("New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled."); *Gray v. Toyota Motor Sales, U.S.A., Inc.*, 806 F. Supp. 2d 619, 624 (E.D.N.Y.

2011) ("Plaintiffs' claims [for breach of contract and breach of the implied covenant] are redundant and the implied covenant claim must fail.  This is true even though the Court has already dismissed the breach of contract claim." (citations omitted)).

In sum, Mariah's implied covenant of good faith and fair dealing claim against PCS is duplicative of its breach of contract claim and must be dismissed.

*     *     *

For the reasons explained above, Mariah's contract-based claims, *i.e.*, the claims for breach of contract and breach of the implied covenant of good faith and fair dealing, against PCS are dismissed.

### 2.  AIR

According to Mariah, AIR breached section 3(a)(i) of the AIR Agreement, as well as the implied covenant of good faith and fair dealing incorporated therein, by relying on the Revised Original Bulletin to issue the November 23, 2011 Event Report (*See* AC ¶¶ 99–108, 114–17.)  Again, the Court disagrees.

### a.  Breach of Contract

Section 3(a)(i) of the AIR Agreement, entitled "Services Relating to Event Reports," requires AIR to use "the latest Catastrophe Bulletins available as of five (5) Business days prior to the Event Reporting Date," which in this case was November 23, 2011. [5]  (AIR Agreement at 3.)  Mariah

---

[5] Section 3(a)(i)(A) provides, in part, that:

[AIR] shall (1) use commercially reasonable efforts to determine, based on information readily and publicly available online from government entities or agencies, whether

acknowledges that the Revised Original Bulletin, which was posted on November 3, 2011, was available to AIR within the timeframe contemplated by section 3(a)(i).  Nevertheless, Mariah argues that AIR's consideration of the Revised Original Bulletin was improper because it was not a "true" Catastrophe Bulletin, and because it was issued after the Final Development Date.  (*See* AC ¶¶ 101–08.)  The Court will address each of these arguments.

### i.  "True" Catastrophe Bulletin

Mariah alleges that relying on the Revised Original Bulletin was improper because it was not a true Catastrophe Bulletin.  The term "Catastrophe Bulletin," as defined in the Reinsurance Agreement, means "any catastrophe bulletin originated and disseminated by [PCS] (including through ISOnet PCS) that identifies and assigns a catastrophe number to a [weather event] and/or gives preliminary, or subsequently, resurvey estimates of insured property losses arising from a [weather event]."  (Reinsurance Agreement at 2.)

any part of a location identified in a Catastrophe Bulletin belongs to a Metro County, thereby resulting in a Metro Occurrence; *provided*, that should no Metro County or location within any Metro County be identified in any Catastrophe Bulletin relating to a Covered Event in a state, the Non-Metro Payout Factor will be used for such Covered Event in such state, and (2) obtain the Metro Insured Industry Loss Amounts or Non-Metro Insured Industry Loss Amounts, as applicable, with respect to the Severe Thunderstorms to which such Event Report Request relates . . . .  [AIR] shall not undertake any independent assessment of the accuracy of such Metro Insured Industry Loss Amounts or Non-Metro Insured Industry Loss Amounts, as applicable, so reported and is not liable for any inaccuracies or gaps in such estimates.

(AIR Agreement at 3–4.)

The Revised Original Bulletin meets this definition, as it is *identical* to the Original Bulletin but for the insertion about Kansas locations affected by the storm.

Faced with this reality, Mariah analogizes the Original Bulletin to a birth certificate to buttress its assertion that there can only be one, static Original Bulletin. (*See* AC ¶ 19; Opp. at 5, 21.) As the Court already concluded, nothing in the PCS Agreement imposes such a limitation. If Mariah sought such a limitation, it certainly could have negotiated for it. But it did not. Moreover, Mariah's own pleadings appear to contemplate revisions to Catastrophe Bulletins. (*See* AC ¶ 21 ("Following the initial Catastrophe Bulletin, PCS could issue 'Extension' Bulletins to extend the duration of the storm and the affected geographic area – *e.g.*, one additional day, three additional states, etc.").)

In short, if the Original Bulletin meets the definition of "Catastrophe Bulletin," then the Revised Original Bulletin must also meet the definition. To conclude otherwise would mean PCS would *never* be able to revise or amend a Catastrophe Bulletin, whether it be hours or months after its dissemination. Plainly, the definition and the relevant agreements do not contemplate the limitation urged by Mariah.

### ii. Final Development Date

Mariah next argues that AIR was not permitted to consider the Revised Original Bulletin because it was issued after November 2, 2011, the so-called Final Development Date in this case. (*See id.* ¶¶ 105–08; Opp. at 22–23.) The Final Development Date imposes a restriction on AIR, such that after November 2, 2011, AIR was not permitted to "take[] into account" "any change in the Insured Industry Loss

Amount . . . for purposes of calculating the Event Index Value . . . ." (Reinsurance Agreement at 6.)

Although difficult to parse without a scorecard of definitions from the various agreements, Mariah's argument is ultimately unavailing because the Revised Original Bulletin did not change the Insured Industry Loss Amount for Catastrophe 42. Indeed, the Insured Industry Loss Amount for all of the states affected by Catastrophe 42, as reflected in *both* the November 2, 2011 Final Estimate and the November 23, 2011 Event Report, totaled over $1.3 billion, of which $710 million was attributed to losses in Kansas. (*See* PCS-AIR Mem. at 18–19; AC Ex. 5.) Put differently, the Insured Industry Loss Amount was $1,355,000,000 before and after the issuance of the Revised Original Bulletin.

To be sure, the Revised Original Bulletin affected AIR's *apportionment* of the Insured Industry Loss Amount between its two component parts, the metro loss and non-metro loss amounts. Thus, the Revised Original Bulletin necessarily impacted the Event Index Value, which distinguishes between metro and non-metro loss amounts.[6] However, the restriction imposed by the Final Development Date does not even *reference*, much less extend to, the metro and non-metro loss amounts. Instead, "Final Development Date" is defined in

---

[6] The "Event Index Value" is determined by the following formula: $\sum_S (M_S * I^M_S + N_S * I^N_S)$. (Reinsurance Agreement at 4.) The components of the formula are defined as follows: (1) $M_S$ is the Metro Payout Factor for each state (S) with a Metro Occurrence in the Covered Area; (2) $I^M_S$ is the Metro Insured Industry Loss Amount for each state (S) with a Metro Occurrence in the Covered Area; (3) $N_S$ is the Non-Metro Payout Factor for each state (S) without a Metro Occurrence in the Covered Area; and (4) $I^N_S$ is the Non-Metro Insured Industry Loss Amount for each state without a Metro Occurrence in the Covered Area.

terms of the "Insured Industry Loss Amount" – a number that was wholly unaffected by the Revised Original Bulletin.

Ultimately, Mariah cannot escape the fact that the information contained in the Revised Original Bulletin did not change the Insured Industry Loss Amount, even though it shifted the distribution of the Insured Industry Loss Amount between metro and non-metro losses. The restriction set forth by the Final Development Date definition does not preclude such shifts, and the Court will not permit Mariah to rewrite the contract to impose additional restrictions.

Faced with this plain language of the contract, Mariah argues, in the alternative, that "there is ambiguity in the definition of Insured Industry Loss Amount that cannot be resolved . . . on a Motion to Dismiss." (Opp. at 24.) As alluded to earlier, the definition of Insured Industry Loss Amount is "the sum of the Metro Insured Industry Loss Amount together with the Non-Metro Insured Industry Loss Amount." (Reinsurance Agreement at 8.) Mariah asserts that this definition "uses the terms 'sum' and 'together,' and it is not clear from the face of the definition exactly what these terms, taken together, were intended to mean." (Opp. at 24–25.)

In fact, the definition of Insured Industry Loss Amount is every bit as simple and straightforward as it appears. The plain meaning of "sum" is "the aggregate of two or more numbers" or "the result of performing an addition," as in "the [sum] of 5 and 7 is 12." Webster's Third New International Dictionary 2289 (2002). Thus, the Insured Industry Loss Amount is simply the amount obtained from adding the Metro Insured Industry Loss Amount and the Non-Metro Insured Industry Loss Amount. No more, no less. In essence, Mariah attempts

to argue that a component part's change in value is necessarily a change to the whole, even if the value of the whole remains constant. Effectively, Mariah contends that 7 is "different" depending on whether it is realized through the equation 4+3 or 3+4 or 7+0 or 0+7. This conclusion amounts to bad math and bad logic. A change in the Metro Insured Industry Loss Amount that is offset by a corresponding change to the Non-Metro Insured Industry Loss Amount does not result in a change to the sum of the two amounts, which is, by definition, the Insured Industry Loss Amount. Notwithstanding Mariah's urging to the contrary, the language is not ambiguous.

Accordingly, the Court can discern nothing in the AIR Agreement that prevented AIR from properly considering the Revised Original Bulletin, even though it was issued a day after the Final Development Date.

### b.  Good Faith and Fair Dealing

Mariah also alleges that AIR breached the AIR Agreement's implied covenant of good faith and fair dealing. (*See* AC ¶ 116.) However, like Mariah's claim against PCS, the alleged breach of the implied covenant here is based on the same facts as the contract breach described above; therefore, the Court dismisses the claim. *See Harris*, 310 F.3d at 81.

### 3.  American Family

Mariah next alleges that American Family breached the implied covenant of good faith and fair dealing with respect to the Reinsurance Agreement. The thrust of Mariah's argument is that American Family, despite being on notice of the alleged misconduct by PCS and AIR, nevertheless

sought payment from the Reinsurance Trust Account.  (*See* AC ¶ 109; Opp. at 27.)

Mariah correctly cites case law for the proposition that "the [implied] covenant is breached when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other of the right to receive the benefits under the agreement." (Opp. at 28 (quoting *Orange Cnty. Choppers, Inc.*, 497 F. Supp. 2d at 560).) However, as noted above, the implied covenant does not exist where it would conflict with express contractual terms.  *See LJL*, 725 F.3d at 195.

According to the Reinsurance Agreement, Mariah had a contractual duty to pay the reinsurance proceeds owed to American Family when Mariah received AIR's Event Report.  (*See* Reinsurance Agreement at 21.)  The Reinsurance Agreement further provides that American Family "may withdraw [reinsurance proceeds] from the Reinsurance Trust Account, at any time, . . . to pay or reimburse [American Family] for the amounts payable by [Mariah] to [American Family] under this Reinsurance Agreement . . . ."  (*Id*. at 27.)  In other words, once Mariah owed American Family money, the contract explicitly permitted American Family to withdraw the money from the Reinsurance Trust Account "at any time." (*Id*.)  The language is unqualified.  The inclusion of "at any time" makes clear that the parties did not contemplate an exception for allegations of misconduct or challenges to the Event Report.  In any event, the Court has already determined that Mariah has not sufficiently alleged that AIR or PCS breached their respective agreements in determining the amount owed to American Family.  Accordingly, the Court dismisses

Mariah's contract-based claim against American Family.

## B.  Remaining Claims

Mariah asserts three additional claims for unjust enrichment, conversion, and tortious interference with contract against American Family, and a fourth claim seeking declaratory judgment against all Defendants.  (*See* AC ¶¶ 118–35.)  The Court addresses each claim in turn.[7]

### 1.  Unjust Enrichment

To state a claim for unjust enrichment, Mariah must show that (1) "[American Family] was enriched at [Mariah's] expense," and (2) "equity and good conscience require" recovery.  *Giordano v. Thomson*, 564 F.3d 163, 170 (2d Cir. 2009). Nonetheless, an unjust enrichment claim cannot stand where a "valid and enforceable" agreement "governed the particular subject matter" of the claim.  *See Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586–87 (2d Cir. 2006); *see also Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388 (1987) ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract [including claims such as unjust

---

[7] Mariah's pleadings also seek specific performance.  (*See* AC ¶¶ 136–41.)  Mariah failed to address this argument in its opposition papers.  (*See generally* Opp.)  In any event, dismissal is appropriate because "specific performance is an equitable remedy for a breach of contract, rather than a separate cause of action."  *Cho v. 401–403 57th St. Realty Corp.*, 752 N.Y.S.2d 55, 57 (App. Div. 2002).  As set forth above, Mariah has failed to state a claim for breach of contract or breach of the implied covenant of good faith and fair dealing.  Accordingly, there is no basis for a contractual remedy.

enrichment,] for events arising out of the same subject matter.").

Here, because the Reinsurance Agreement governs whether and under what circumstances American Family is entitled to payment, it appears rather obvious that the Reinsurance Agreement governs the subject matter of this unjust enrichment claim. *See Beth Isr.*, 448 F.3d at 586–87. Nevertheless, Mariah argues that its unjust enrichment claim arises from American Family's *retention* of the reinsurance proceeds, not the receipt of those funds pursuant to the Reinsurance Agreement. (*See* Opp. at 32–33.) This is mere wordplay, and the Court is aware of no case in which the simple act of retaining funds – properly received pursuant to a contract – has been deemed sufficient to take a claim outside the scope of that contract. *See Bates Adver. USA, Inc. v. McGregor*, 282 F. Supp. 2d. 209, 217 (S.D.N.Y. 2003) (the "Agreement specifically addresses the amount to be paid [to the defendant] – *the true subject of the dispute here, even if it is framed as repayment* to [plaintiff] – which precludes a claim for unjust enrichment." (emphasis added)). Mariah's distinction between receipt and retention would swallow the rule that precludes recovery for unjust enrichment on a claim covered by a valid contract.

In any event, Mariah readily concedes that, "[o]bviously, if PCS and AIR ultimately are found not to have committed the breaches alleged, then equity and good conscience presumably would not require American Family to return the money to Mariah." (Opp. at 30.) With this concession, Mariah acknowledges that its unjust enrichment claim is just a rehash of its breach of contract claims, which the Court has already rejected. Consequently,

Mariah's unjust enrichment claim is easily dismissed.

### 2. Conversion

Mariah next alleges that American Family is liable for conversion because American Family did not return, upon Mariah's request, the funds received pursuant to the Reinsurance Scheme. (*See* AC ¶¶ 122–27.)

To state a claim for conversion, Mariah must show that (1) it has "legal ownership or an immediate superior right of possession to a specific identifiable thing," and (2) American Family "exercised an unauthorized dominion over the thing in question to the exclusion of [Mariah's] rights." *Martinez v. Capitol One, N.A.*, 863 F. Supp. 2d 256, 266 (S.D.N.Y. 2012); *see also Nat'l Ctr. For Crisis Mgmt., Inc. v. Lerner*, 938 N.Y.S.2d 138, 138–39 (App. Div. 2012). Just like Mariah's unjust enrichment claim, a claim for conversion is prohibited where the subject matter of the claim is covered by a valid and binding contract. *See Poplar Lane Farm LLC v. Fathers of Our Lady of Mercy*, 449 F. App'x 57, 59 (2d Cir. 2011) (summary order) ("[W]hen a valid agreement governs the subject matter of a dispute . . . , claims arising from that dispute are contractual; attempts to repackage them as sounding in . . . conversion, . . . unjust enrichment, implied and quasi contract . . . are generally precluded, unless based on a duty independent of the contract."). Thus, like Mariah's unjust enrichment claim, Mariah's conversion claim fails because the Reinsurance Agreement governs the subject matter of this dispute. In its opposition, Mariah argues that "American Family cannot have it both ways – either a contract governs the issue, and Mariah has pled a breach of it, or no contract covers this

16

dispute, and the conversion claim is proper." (Opp. at 35.)  Mariah ignores an obvious third option:  Mariah failed to allege a breach of a valid contract, and this contract forecloses Mariah's conversion claim.

### 3.  Tortious Interference with Contract

Mariah also alleges that American Family tortiously interfered with the Indenture, a contract between Mariah and the Banks.  (*See* AC ¶¶ 128–32.) Specifically, Mariah asserts that American Family "intentionally and unjustifiably induced the Banks to breach the [Indenture] by transferring funds to American Family in violation of Article IX, Section 9.5."  (*Id*. ¶ 130.)

To state a claim of tortious interference with the Indenture, Mariah must allege "(1) the existence of a valid contract between [Mariah] and a third party; (2) [American Family's] knowledge of the contract; (3) [American Family's] intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom."  *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401–02 (2d Cir. 2006) (citation and internal quotation marks omitted).  This claim fails for two independent reasons.  First, Mariah has not sufficiently alleged an actual breach of the Indenture by the Banks.  Second, Mariah has failed to sufficiently allege that American Family acted with the requisite intent to procure the breach

According to Mariah, DB Americas breached Section 9.5 of the Indenture by transferring funds from the Reinsurance Trust Account to American Family without first receiving "written notice from American Family setting forth the calculations supporting a transfer of funds

from DB Americas to American Family." (*See* AC ¶¶ 110−111.)  Section 9.5, entitled "Transfer to and from the Collateral Accounts and Reinsurance Trust Accounts," describes such transfers in connection with a document referred to as an Event Notice.  Pursuant to the Reinsurance Agreement, when American Family believed that a weather event caused a particular threshold level of loss, American Family was obliged to submit an Event Notice to Mariah and the Banks.  (*See* Reinsurance Agreement at 32.) The language of the Indenture indicates that, upon receipt of the Event Notice, Mariah was supposed to send AIR a so-called Event Report Request and the Banks were supposed to transfer money from the Collateral Account to the Reinsurance Trust Account.  According to Mariah, DB Americas breached the Indenture because it transferred funds from the Collateral Account to the Reinsurance Trust Account (and eventually to American Family) even though American Family never submitted an Event Notice.  (Opp. at 38–39.)[8]

On closer inspection, the facts alleged in the Amended Complaint and the attachments actually support an inference that American Family *did* submit an Event Notice.  Although the Event Notice triggers the transfer of funds from the Collateral Account to the Reinsurance Trust Account,

---

[8] The Amended Complaint neither quotes from nor attaches the Indenture.  (*See* AC ¶¶ 109–112.)  As a result, the pleadings are vague with respect to how American Family's alleged conduct induced a breach of the Indenture.  To make up for this deficiency, Mariah has attempted to expand and specify its pleadings in its opposition brief.  (*See* Opp. at 36–40.)   Although   obviously   improper   and impermissible, *see Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (reiterating that "a party is not entitled to amend its complaint through statements made in motion papers" nor "amend pleading through statements in briefs" (citations omitted)), the Court is still able to dismiss this claim on the merits.

it is the Event Report that ultimately determines the amount to be paid to American Family because "[n]o claims shall be made upon [Mariah] . . . and [Mariah] has no liability for any losses hereunder, unless and until [Mariah] has received an Event Report . . . ." (Reinsurance Agreement at 21.) It is evident on the face of the pleadings that the November 23, 2011 Event Report was ultimately issued at the behest of Mariah, as this document – which is addressed to Mariah, American Family, and DB Americas – states "we [AIR] hereby advise you [Mariah] that we have performed the procedures required to be performed by us . . . *as requested by the Event Report Request* . . . ." (AC Ex. 5.) To cut to the chase, either American Family sent an Event Notice, which both prompted the transfer of funds from the Collateral Account to the Reinsurance Trust Account and triggered Mariah's Event Report Request, in which case there was no breach by the Banks, or Mariah itself breached the Reinsurance Agreement and procured the DB Americas's breach of the Indenture by issuing an Event Report Request without first receiving an Event Notice.

In any event, even assuming the truth of Mariah's allegation (in its opposition brief) that American Family did not file an Event Notice, Mariah has not alleged any facts to suggest that American Family was somehow responsible for procuring the transfer of funds from the Collateral Account to the Reinsurance Trust Account. How the funds flowed from the Collateral Account to the Reinsurance Trust Account (before being transferred to American Family) is a mystery left unanswered by the Amended Complaint, and Mariah may not simply assume American Family's role in its pleadings.

Finally, Mariah has failed to plead any facts to suggest that American Family acted with the requisite intent for a tortious interference claim. "The New York Court of Appeals has described the 'intention' required by the third prong as 'an intention to harm plaintiff without economic or other lawful excuse or justification.'" *Indep. Asset Mgmt. LLC v. Zanger*, 538 F. Supp. 2d 704, 711 (S.D.N.Y. 2008) (quoting *Alvord & Swift v. Stewart M. Muller Constr. Co.*, 46 N.Y.2d 276 (1978)). Mariah's allegations to this effect are purely conclusory, merely reiterating that American Family "intentionally and unjustifiably" induced a breach. (*See* AC ¶ 130.) Mariah offers no facts to suggest American Family intended to harm Mariah without justification. In light of the Court's finding that Mariah has failed to sufficiently allege any "wrongdoing" by PCS and AIR with respect to the operative contracts, Mariah's assertion that American Family was on notice of such "wrongdoing," and thus, intentionally procured a breach of the Indenture, is premised on an assumption that the Court has already rejected.

For all of these reasons, the Court has little difficulty dismissing Mariah's tortious interference claim.

### 4. Declaratory Judgment

Finally, Mariah seeks a declaratory judgment announcing that:

(a) the [Revised Original Bulletin] was improperly issued in violation of the [relevant contracts], (b) the [November 23, 2011] Event Report containing the corrupt calculation based on the [Revised Original Bulletin] is invalid, null and void, and (c) the payout of all of Mariah's funds, which was based on the

improper [Revised Original Bulletin] and corrupt calculation in the [November 23, 2011] Event Report, was in violation of the [relevant contracts].

(AC ¶ 135.)   For the reasons discussed above, the Court has already determined that the Revised Original Bulletin was *not* improperly issued. Consequently, the chain reaction that followed and resulted in the payout of Mariah's funds was *not* "in violation" of the relevant contracts. Accordingly, Mariah's declaratory judgment claim must meet the same fate as its contract claims.

Nevertheless, even if Mariah were to somehow prevail on some or all of its claims, declaratory judgment would still be inappropriate.   The Declaratory Judgment Act provides, in relevant part:

In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a); *see also* Fed. R. Civ. P. 57.   The Court retains "unique and substantial discretion in deciding whether to" issue declaratory relief. *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995).   In deciding "whether to entertain an action for declaratory judgment, [the Second Circuit has] instructed district courts to ask: (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d

384, 389 (2d Cir. 2005).   However, "[t]here is no basis for declaratory relief where only past acts are involved."   *See Lojan v. Crumbsie*, No. 12-cv-0320 (LAP), 2013 WL 411356, at *5 (S.D.N.Y. Feb. 1, 2013). Moreover, "[t]he fact that a lawsuit has been filed that will necessarily settle the issues for which declaratory judgment is sought suggests that the declaratory judgment will serve no useful purpose."   *Fleisher v. Phoenix Life Ins. Co.*, 858 F. Supp. 2d 290, 302 (S.D.N.Y. 2012) (citation and internal quotation marks omitted); *see also Dolphin Direct Equity Partners, LP v. Interactive Motorsports & Entm't Corp.*, No. 08-cv-1558 (RMB), 2009 WL 577916, at *11 (S.D.N.Y. Mar. 2, 2009) ("Because this Court has already analyzed the parties' rights and obligations under the [contracts] in connection with Plaintiffs' breach of contract claims, a declaratory judgment on the same issues would be superfluous." (citation and internal quotation marks omitted)).

In this case, the declaratory judgment that Mariah seeks is based entirely on Defendants' past acts, and Mariah fails to articulate the need for prospective relief. Indeed, declaratory relief in this case would be wholly superfluous, as the resolution of Mariah's other claims would "settle the issues for which declaratory judgment is sought."   *See Fleisher*, 858 F. Supp 2d at 302.

Accordingly, the Court dismisses Mariah's declaratory judgment claim against American Family, PCS, and AIR.

## IV.   DISMISSAL WITH PREJUDICE

Tucked in a footnote on the very last page of its opposition brief, Mariah requests leave to amend the Amended Complaint should the Court dismiss its claims.   (*See*

19

Opp. at 41 n.23.) Mariah invokes the well-established proposition that "leave to amend should be freely granted," but otherwise fails to provide any reason, much less a good one, justifying its request.

To be sure, Rule 15 of the Federal Rules of Civil Procedure provides that courts should "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). Nonetheless, "it is within the sound discretion of the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). Thus, "[l]eave to amend, though liberally granted, may properly be denied for: undue delay, bad faith [or] dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of amendment." *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (citation and internal quotation marks omitted). The futility of an amendment is assessed under the standard for a Rule 12(b)(6) motion to dismiss. *See Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002) ("An amendment to a pleading will be futile if a proposed claim could not withstand a motion to dismiss pursuant to Rule 12(b)(6)."). A plaintiff must therefore provide some indication of the substance of the contemplated amendment before a court could entertain the request. *See In re World Com, Inc. Sec. Litig.*, 303 F. Supp. 2d 385, 391 (S.D.N.Y. 2004) ("In the absence of any identification of how a further amendment would improve upon the [c]omplaint, leave to amend must be denied as futile.").

Here, Mariah does not explain what its desired amendment to the already Amended Complaint would say or how the change would overcome a subsequent motion to dismiss. (*See* Opp. at 41 n.23.) And given the nature of this action and the language of the contracts at issue, it is difficult to fathom how any amendment could be fashioned to salvage a cause of action for Mariah. Accordingly, Mariah's request to amend the Amended Complaint is denied, and Mariah's claims are dismissed with prejudice.

## V. CONCLUSION

At bottom, the Reinsurance Scheme formulated by the parties was a highly sophisticated and integrated set of agreements whereby investors and insurers gambled on the likelihood and severity of catastrophic weather events. If storms were infrequent and mild, investors in Mariah stood to realize significant earnings on their investment at the expense of the ceding insurer, American Family. If, on the other hand, the weather turned fierce, as was the case with Catastrophe 42, American Family gained a hedge on its policyholders' claims by accessing the funds in the special purpose vehicle, Mariah. PCS, AIR, and the Banks were engaged solely to facilitate the arrangements between the risk-taking parties and had no skin in the game. Having gambled and lost on the weather – and there appears to be no dispute that Catastrophe 42 was a "severe" weather event that "ranks as one of the top [weather] outbreaks of all-time" (AC Ex. 1) – Mariah now attempts to convert its unsuccessful risk venture into a game of "gotcha" on the contracts. Unfortunately for Mariah, the documents themselves are unambiguous and provide no basis for the relief sought in the Amended Complaint. Accordingly, for the reasons set forth above, IT IS HEREBY ORDERED THAT Defendants' motions to dismiss are GRANTED with prejudice.

The Clerk of the Court is respectfully directed to terminate the motions pending at docket entries 23 and 26, and to close this case.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: September 30, 2014
       New York, New York

               *      *      *

Plaintiff Mariah is represented by Jonathan D. Cogan and Megha J. Charalambides, Kobre & Kim LLP, 800 Third Avenue, 6th Floor, New York, NY, 10022.

Defendant American Family is represented by Robert A. Kole, David S. Douglas, Jean-Paul Jaillet, and Jessica F. Pizzutelli, Choate Hall & Stewart LLP, Two International Place, Boston, MA 02110.

Defendants AIR and PCS are represented by Joel M. Cohen and Matthew B. Rowland, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, NY 10017.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 09-30-14

21